Page 1

 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
 2                   GALVESTON DIVISION


 3


 4   Immobiliaria JRB, S.A.    )
     De D.V.                   )
 5                             )   Case No. 3:17-CV-194
                               )   Admiralty 9(H)
 6   VS.                       )
                               )
 7   M/V Caballo Maya, Et      )
     at.                       )
 8


 9


10


11   ********************************************************

12                    ORAL DEPOSITION OF

13                       DAVID LOPEZ

14                      APRIL 9, 2018

15   ********************************************************

16


17


         ORAL DEPOSITION of DAVID LOPEZ, produced as a
18   witness at the instance of the Defendant, and duly
     sworn, was taken in the above-styled and numbered
19   cause on April 9, 2018, from 10:26 a.m. to 1:43 p.m.,
     before Denyce M. Sanders, RDR, CRR, TCRR, CCR (LA), in
20   and for the State of Texas, recorded by machine
     shorthand, at the offices of, ROYSTON, RAYZOR, VICKERY
21   & WILLIAMS, L.L.P.,1600 Louisiana Street, Suite 5000,
     Houston, Texas, pursuant to the Federal Rules of Civil
22   Procedure and the provisions stated on the record or
     attached hereto; that the deposition shall be read and
23   signed before any notary public.

24


25

David Lopez
April 09, 2018                                                    2 to 5

Page 2

```
 1            A P P E A R A N C E S
 2
    FOR THE PLAINTIFF:
 3
       HARRIS & RUFTY, L.L.C.
 4     650 Poydras Street, Suite 2710
       New Orleans, Louisiana  70130
 5     Mr. Alfred J. Rufty III
       504.525.7500
 6     ajr@harrisrufty.com
 7
    FOR THE DEFENDANT:
 8
       MILLS SHIRLEY L.L.P.
 9     2228 Mechanic Street, Suite 400
       Galveston, Texas  77550
10     Mr. Andres "Andy" Soto
       409.761.4228
11     asoto@millsshirley.com
12
13
    ALSO PRESENT:
14
       Mr. Aaron Omar Olvera Monroy
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                      INDEX
 2              ORAL DEPOSITION OF
 3           DAVID LOPEZ, APRIL 9, 2018
 4                                          Page
 5   APPEARANCES.............................    2
 6   BY MR. SOTO.............................    5
 7   BY MR. RUFTY............................  125
 8   BY MR. SOTO.............................  129
 9   BY MR. RUFTY............................  134
10   BY MR. SOTO.............................  135
11
12
13
14
15   WITNESS CORRECTIONS AND SIGNATURE........  138
16   REPORTER CERTIFICATION...................  140
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              EXHIBIT INDEX
 2            ORAL DEPOSITION OF
 3         DAVID LOPEZ, APRIL 9, 2018
 4              Description              Page
 5
    Exhibit 1      CV............................  6
 6
    Exhibit 2      Declaration of David Lopez....  12
 7
    Exhibit 3      7-3-15 letter from PGR to ....  42
 8              Oscar Israel Garcia Cordova,
                Esquire
 9
    Exhibit 4      5-12-16 letter from Gabriel ..  53
10              Cruz Cruz, Esquire, to
                Attorney General's Office
11
    Exhibit 5      Certificate of Delivery as ...  71
12              Depository of the Caballo
                Maya
13
    Exhibit 6      Petition to Lift .............  92
14              Precautionary Seizure
15
16          •_____•
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                   DAVID LOPEZ,
 2   having been first duly sworn, testified as follows:
 3            E X A M I N A T I O N
 4   BY MR. SOTO:
 5       Q.  Mr. Lopez, good morning.  You and I just met.
 6   You know my name is Andy Soto.  I represent the
 7   Defendant in this case, the Caballo Maya, who is
 8   being -- the owner, Marfield, has made a restricted
 9   appearance to defend the vessel.
10          You've done plenty of depositions, and so I
11   think we can skip all the preliminary rules about
12   talking over each other.  I think we're going to be
13   just fine.  We can jump right into it.
14          One of the things that I think I do want to
15   do, though, is, let's just get an agreement as to the
16   names, because we have some very long names, and I
17   think we all tend to abbreviate them.  I just want to
18   make sure that for the purposes of the record, it's
19   very clear who we are talking about when we use these
20   abbreviations.
21          And so the Plaintiff in this case is
22   Inmobiliaria JRB, S.A. de C.V.  I sometimes call them
23   JRB or Inmobiliaria.  Is that understood?
24       A.  Yes.  And thank you for doing that, I do the
25   same.
```

David Lopez
April 09, 2018                                                    6 to 9

Page 6

1    Q.    And then we have another company, which is
2    GGM Shipping, S.A. de C.V., which subsequently changed
3    its name to Shipping Group Mexico SGM, S.A. de C.V.
4          Can we have an agreement that we will just
5    refer to that company as SGM?
6    A.    Yes.
7    Q.    Does that work for you?
8    A.    Yes.
9    Q.    Okay.  And the last, we have Oceanografía,
10   S.A. de C.V.  I sometimes just call them Oceanografía.
11   I know Counsel has referred to them as OSA.  Either
12   one is fine with me.
13         Is that okay?
14   A.    I'll understand both of those terms to apply
15   to Oceanografía, S.A. de C.V.
16   Q.    Right.
17         Okay.  Let's talk about your curriculum vitae
18   that you have produced in this case, along with
19   your -- curriculum vitae that you have produced in
20   this case.  I've already premarked it as Exhibit 1.
21   I'm going to hand you a copy right there.
22              (Exhibit 1 marked/introduced.)
23   A.    Thank you.
24   Q.    (BY MR. SOTO)  Is this curriculum vitae
25   up-to-date?

Page 7

1    A.    To the best of my knowledge, yes.
2    Q.    Is there any education, special training,
3    license or certification relevant to this lawsuit that
4    is not included in this curriculum vitae?
5    A.    No.
6    Q.    I do not see that you have a college degree
7    in Mexico; is that correct?
8    A.    I am -- do not have a college degree in
9    Mexico.
10   Q.    Okay.  I don't see that you attended law
11   school in Mexico; is that correct?
12   A.    I taught in law school in Mexico, but I did
13   not attend law school in Mexico.
14   Q.    What law school classes did you teach?
15   A.    I taught at the Autonomous University of
16   Guadalajara in an international program sponsored by
17   Baylor Law School dealing with the North American Free
18   Trade Agreement, Mexican law, U.S. law and Canadian
19   law.
20         I taught at Panamericana University in Mexico
21   City years ago.  I don't remember the subject matter
22   of the course.  It may have been some sort of
23   comparative law course back when I was a law
24   professor.
25         I taught at the University of Monterrey,

Page 8

1    again, of course, a number of years ago, dealing with
2    Mexican law, U.S. law, Canadian law in a comparative
3    sense.  It may have been only U.S. and Mexican law.
4    It's been a number of years.  I don't remember.
5          There may have been other times that I taught
6    or presented at law schools in Mexico.
7          For example, I might have done a presentation
8    at what's called ITAM, I-T-A-M, which is the
9    Technological -- Autonomous Technological Institute of
10   Mexico, which is in Mexico City.
11   Q.    Are you an attorney licensed to practice in
12   Texas?
13   A.    Yes.
14   Q.    Have you been certified in any areas of law
15   by the Texas Board of Legal Specialization?
16   A.    No, sir.
17   Q.    Have you been engaged as a lawyer to
18   represent a client in a maritime lien case in Texas?
19   A.    No.
20   Q.    And you are not an attorney licensed to
21   practice in Mexico; is that correct?
22   A.    I'm not licensed to practice in Mexico.
23   Q.    Have you ever been retained to represent a
24   client in a maritime lien case in Mexico?
25   A.    Not as counsel of record.  One of the things

Page 9

1    that I've done for many years now is serve as
2    litigation counsel on cross-border disputes.  And to
3    the extent any of those cases may have involved
4    maritime issues, I would have been an attorney
5    involved in the proceeding, but not counsel of record
6    in Mexico.
7          In addition, I've done multiple maritime law
8    cases as an expert witness over the years.  But,
9    again, I'm not counsel in those cases.
10   Q.    Well, let's break that down.
11   A.    Sure.
12   Q.    Have you ever arrested a vessel in Mexico?
13   A.    No.  Or anywhere.
14   Q.    Have you ever defended a vessel or a vessel
15   owner than that has been arrested in Mexico?
16   A.    No.
17   Q.    You said that you have been an expert in
18   maritime cases?
19   A.    Yes.
20   Q.    Okay.  Are those Jones Act cases, or are they
21   personal injury cases?  Are they lien cases?
22   A.    I can't answer your question, because you're
23   referring to U.S. law as the basis for the case.
24   Q.    Fair enough.
25   A.    Yeah.

David Lopez
April 09, 2018                    10 to 13

Page 10

1    Q.   Let me rephrase that.
2    A.   Sure.
3    Q.   How about this:  What types of maritime cases
4  have you been an expert -- testifying expert in?
5    A.   Sure.
6    Q.   And when you answer your question, can you
7  give me the dates and the case name so I can go ahead
8  and find it?
9    A.   I can't give you dates.  I just can't.
10 Because it's been over a period of years --
11   Q.   Sure.
12   A.   -- and I would only be guessing.
13        Now, I can try to find the dates after the
14 deposition and provide that information to you.
15   Q.   Fair enough.
16   A.   I know that I have dealt on at least one
17 occasion, and maybe two, with other cases involving
18 Oceanografía, or OSA, with regard to maritime matters.
19 I could try to identify that case or those cases for
20 you and let you know more thoroughly what the issues
21 were that were involved and when my involvement
22 occurred.
23        In addition, I was an expert witness for
24 the -- for one of the defendants in the BP oil spill
25 case in lawsuits brought my Mexican states against

Page 11

1  British Petroleum and others.  And that case involved
2  pretty extensive analysis of Mexican maritime law,
3  both at a constitutional level, case-law level with
4  regard to the law of maritime commerce and navigation
5  and regulations.
6        That's what comes to mind as I sit here
7  today.
8    Q.   What about specifically maritime lien cases?
9    A.   Again, when I refer to the OSA work or
10 matters that I have been involved within the past,
11 those may have been maritime lien cases, I just can't
12 tell you offhand right now.
13   Q.   So they may have, you're not sure?
14   A.   I honestly don't remember the substance of
15 the cases.  It's been quite a bit of time, and I've
16 done quite a bit of work in Mexican law over the
17 years.
18   Q.   Do you remember, were those cases that were
19 docketed in the U.S., or were they Mexican cases?
20   A.   They probably were U.S. cases -- well, the BP
21 case in particular, and so my guess would be that
22 these were U.S. lawsuits in which I was involved as an
23 expert on matters of Mexican maritime law.  And they
24 may have involved some proceedings in Mexico, but I
25 would not have been directly involved in those,

Page 12

1  although I may have reviewed the pleadings, and the
2  analysis of those proceedings may have been part of my
3  work.
4    Q.   Okay.  Is it fair to say that you don't have
5  any experience in arresting vessels or defending
6  against arresting vessels?
7    A.   I'm not a maritime lawyer, so that would be
8  fair to say.
9    Q.   Let's talk about your testifying experience.
10        Exhibit 1 is just your CV?
11   A.   Yes.
12   Q.   So -- we can mark your affidavit.
13        (Exhibit 2 marked/introduced.)
14   Q.   (BY MR. SOTO)  I'm going to mark your
15 affidavit, or the declaration of David Lopez, as
16 Exhibit 2.
17   A.   Thank you.
18   Q.   You're welcome.
19        And I will tell you, I have -- I've gone
20 through some of the cases in your report, but
21 certainly not all of them.  But I'd like to -- I'd
22 like to sort of just discuss broadly the different
23 areas in which you've appeared as an expert in Mexican
24 law, because they're pretty wide-ranging.
25        Have you testified as an expert in custody

Page 13

1  cases?
2    A.   Yes.
3    Q.   And I'm talking specifically about Mexican
4  law here in this line of questions.
5    A.   Yes, as well as in international child
6  abduction cases that -- which, in fact, turn on issues
7  of custody at the time the child was removed.
8    Q.   Do you consider yourself an expert in
9  custody -- Mexican custody law?
10   A.   Yes.
11   Q.   Okay.  Have you testified as an expert in
12 Mexican divorce cases?
13   A.   Yes.  Frequently.
14   Q.   And do you consider yourself an expert in
15 Mexican divorce cases?
16   A.   Yes, but let me make a clarification to you.
17 Where I've testified is in U.S. divorce cases
18 involving issues of Mexican marital law.
19   Q.   Okay.
20   A.   Whether it's marital property law or
21 formation of the marriage, as well as with regard to
22 Mexican divorces as well.
23   Q.   Do you consider yourself an expert on Mexican
24 divorce law?
25   A.   Yes.

David Lopez
April 09, 2018                                              14 to 17

Page 14

1    Q.   Because I assume what you're talking about is
2    comparative analysis of Mexican divorce law and U.S.
3    divorce law, which would require an expertise in both?
4    A.   No.
5    Q.   Okay.
6    A.   I don't testify about U.S. law.
7         Now, when I was a very young lawyer, I did do
8    family practice and was a divorce lawyer for a couple
9    years, but I don't think of myself as an expert in
10   Mexican family law, for example.
11        But Mexican divorce law or marriage law or
12   marital property regime law is relevant in Texas cases
13   where the parties got married in Mexico, then they
14   moved to the United States; and after some time here,
15   they get divorced.  And sometimes there are questions
16   that come up in those cases about whether the election
17   in Mexico of a separate property regime for the couple
18   or a community property regime is enforceable in
19   Texas.
20   Q.   Have you testified as an expert in personal
21   injury cases?
22   A.   Many times.
23   Q.   Do you consider yourself an expert in
24   personal injury law?
25   A.   Yes.  Mexican personal injury law.

Page 15

1    Q.   Fair enough.
2         Have you testified as an expert in
3    international trade law?
4    A.   Yes, I believe so.  There have been some
5    cases where I've talked about customs law and
6    importation and exportation law for Mexico.
7    Q.   Okay.  Do you consider yourself an expert in
8    that field?
9    A.   Yes.
10   Q.   Have you testified as an expert in Mexican
11   criminal law?
12   A.   Yes.
13   Q.   Do you consider yourself to be an expert in
14   Mexican criminal law?
15   A.   I consider myself to be qualified as an
16   expert to help U.S. courts understand Mexican criminal
17   law, yes.
18   Q.   Have you testified as an expert in Mexican
19   real estate law?
20   A.   To the extent your question asks about
21   recording of interest, trusts, which is an important
22   way of owning property -- real property in Mexico,
23   especially for foreigners, and things of that nature,
24   then, yes, I have testified on those issues as an
25   expert before.

Page 16

1    Q.   Okay.  Do you consider yourself an expert in
2    Mexican real estate law?
3    A.   To the extent it involves the issues that I
4    just mentioned, yes.
5    Q.   Okay.  What about bankruptcy cases, have you
6    testified as an expert in Mexican bankruptcy law?
7    A.   I've testified as -- I've testified on
8    bankruptcy issues under Mexican law in U.S. cases at
9    least once, perhaps twice.
10   Q.   Is that an area you feel that you are an
11   expert in?
12   A.   Yes.
13   Q.   Have you testified as an expert in cases
14   involving Mexican tax law?
15   A.   No.
16   Q.   Do you consider yourself an expert in Mexican
17   tax law?
18   A.   Not at all.  That's an area that I avoid.
19   Q.   Do you consider yourself an expert in Mexican
20   maritime liens?
21   A.   I consider myself -- yes, I consider myself
22   qualified to help the court understand what law
23   applies to a Mexican maritime lien situation, what the
24   law provides, and the implications of the application
25   of that law to a set of facts.

Page 17

1    Q.   There's a little distinction there, though,
2    between --
3    A.   Okay.
4    Q.   -- being qualified to explain to the court
5    what law applies in a given situation and being an
6    expert in a particular area.
7         So my question to you is:  Do you consider
8    yourself to be an expert in the area of Mexican
9    maritime liens?
10   A.   Tell me what you mean by the distinction.  If
11   you'll clarify the question, maybe I can answer it.
12   Q.   Sure.
13        There's -- there is a difference between
14   telling the court that this is the law they need to
15   look at, as opposed to being an expert in that area of
16   law by virtue of training or education or experience.
17        And so, again, my question is:  Do you
18   consider yourself an expert in the area of Mexican
19   maritime lien law?
20   A.   I don't see the distinction you're making, so
21   I guess I would say yes.
22   Q.   Yes, you do?
23   A.   I do.
24   Q.   And what is the basis of that expertise?
25   A.   Well, beginning in 1994, I began studying,

David Lopez
April 09, 2018                                    18 to 21

Page 18

1  investigating, understanding Mexican law, all aspects
2  of it, from the Constitution down to various inferior
3  or lower-level sources of law.  And so I clearly have
4  an understanding of the structure and operation of the
5  Mexican legal system, of the Mexican judicial system.
6  And within that, I'm an expert at identifying what law
7  may apply to a given factual issue or circumstance
8  that you have, identifying a law, assessing which law
9  is accurate for a particular situation, and helping
10 the U.S. court understand what that law means in the
11 context of the situation.
12      Q.   What special education have you received with
13 respect to Mexican maritime lien law?
14      A.   I've never taken a Mexican maritime lien
15 course or lien class in a Mexican law school.  But,
16 again, I guess we're sort of talking about two
17 different things.
18           To understand Mexican law, you don't have to
19 take a class in maritime law.  You have to understand
20 how the Mexican legal system is structured, you have
21 to understand where to find the appropriate law, you
22 have to understand how Mexicans interpret different
23 legal provisions.  And then it's really
24 straightforward.
25           See, the civil law system, as compared to the

Page 19

1  common law system, is intended to be more objective,
2  more simplified, more organized and structured.  And
3  so with that understanding, it's not rocket science to
4  determine what the applicable law here is.
5           Moreover, if you look at Mr. -- is it
6  Mr. Garza, is he your expert?  Is that right?
7      Q.   He is.
8      A.   He and I really disagree about very few
9  things.  We agree about the relevant law applicable in
10 this situation.  We agree about the fact that a
11 maritime lien situation is a two-step process, you
12 have to be a creditor in your own right in order to
13 take advantage of the maritime privilege.
14           And so, if anything, I think that confirms my
15 point that the background you need to do the
16 assessment in this case to help the judge understand
17 the relevant law doesn't require any special training
18 beyond the training that I have as a Mexican law
19 expert over more than 20 years, as well as a teacher
20 and author on Mexican law.
21      Q.   I do think we're talking past each other.
22      A.   Okay.
23      Q.   And so I want to get back -- focused here.
24      A.   Sure.
25      Q.   My question is not whether or not you have an

Page 20

1  understanding of Mexican law, whether you are a
2  student of Mexican law generally, whether or not you
3  can identify law that should be applied in any given
4  situation.
5           My question is, with respect to your
6  background, again, your training, your education and
7  your experience, and specifically focusing on the area
8  of Mexican maritime law, whether there is anything
9  specific to that area of law that you have studied,
10 received training, received some kind of
11 certification, a specialization, something along those
12 lines is specific what I'm asking about right now.
13      A.   Okay.  Well, maybe those are your questions,
14 then.
15           Have I received a certificate in Mexican
16 maritime law, no.
17           Have I attended a Mexican class in a law
18 school on maritime law, no.
19      Q.   Have you attended any class anywhere on
20 maritime law?
21      A.   No.
22      Q.   Has your testimony, your expert testimony,
23 ever been struck by a court?
24      A.   I've never -- as far as I know, in the more
25 than 135 cases in which I've testified either live or

Page 21

1  by affidavit, I've never been unqualified on Mexican
2  law, not even from the earliest cases.
3      Q.   Again, it's a little different.
4           I'm not asking whether or not you've been
5  qualified or unqualified --
6      A.   Sure.
7      Q.   -- I'm asking specifically, has a court ever
8  struck your testimony?
9      A.   Not that I'm aware of.
10     Q.   Okay.  Let's look at your report, which is
11 Exhibit 2.
12     A.   Okay.
13     Q.   Is this a complete report that you have
14 authored in this case?
15     A.   As of January 17, 2018, it is, yes.
16     Q.   Okay.  As we sit here today, is there -- have
17 you added or supplemented this report?
18     A.   Well, if you notice, in paragraph 1.6 on
19 page 3, I list the different case materials that I've
20 reviewed.  Things like the complaint and different
21 declarations of the parties, as well as underlying
22 evidence.
23           But I -- very importantly, at the end of that
24 section, I say: "I reserve the right to expand or
25 modify my opinions in this matter based on additional

Page 22

1  case materials presented to me in the future."
2      Since the time of this affidavit, I've
3  received a couple of additional items: one is the
4  expert report of Mr. Garza, which I received
5  yesterday.
6      Q.  And I don't want to cut you off, but we'll
7  get to the additions, and I'm going to give you a
8  chance to talk about that.
9      A.  Okay.
10     Q.  But let's just go back to my original
11 question.
12     Have you prepared any additional amendments
13 or supplements?
14         MR. RUFTY:  Please let him finish his
15 answer.  I think he was in the process of answering
16 your question.
17     A.  Let me answer your question directly, and
18 then I'll fill in the rest.
19     I don't have a supplemental affidavit to give
20 you today.
21     Q.  (BY MR. SOTO)  Okay.
22     A.  So I have not written anything in addition
23 beyond what's Exhibit No. 2.
24     But that being said, I have been presented
25 with some new case materials that probably will lead

Page 23

1  me to produce a supplemental report.
2      Q.  Okay.  When were you provided with these new
3  materials?
4      A.  Yesterday.
5      Q.  And when do you intend to provide your
6  supplemental report?
7      A.  I don't have in mind any deadline.  I
8  understand, from the discussion before the deposition,
9  that you guys have a July trial setting, and that will
10 factor into it, but I haven't had a discussion with
11 Mr. Rufty or anybody else about a deadline for my new
12 work.
13     Q.  Do you still stand by the opinions and
14 conclusions in this report, or do you intend to change
15 those in your supplemental report?
16     A.  I don't know yet.  I have to look at the new
17 materials to determine whether or not they affect your
18 opinions.  If they don't affect my opinions, then I'm
19 not going to change them.  If they're consistent or
20 support my opinions, I won't change them.  If they
21 cause me to think differently, then, of course, I'm
22 going to change my opinions to the extent that the new
23 materials make it necessary to do so.
24     Q.  So as we sit here today, you cannot tell me
25 whether or not your opinions and conclusions are going

Page 24

1  to change based on the materials that have been
2  provided to you yesterday?
3      A.  Correct.  I can't.
4      Q.  As we sit here today, are you aware of any
5  corrections or alterations that need to be made to
6  this report?
7      A.  No.  The opinions that I express in my
8  affidavit of January 2018 are correct based on the
9  information that's reflected in the affidavit itself.
10     Q.  Well, let's talk about -- as I said, I was
11 going to give you an opportunity to speak about the
12 documents you reviewed.  Let's talk about those.
13 Those are in Section 1.6.
14     A.  Yes, sir.
15     Q.  And you were telling me today that this is
16 not a complete list of the documents that you've
17 reviewed; correct?
18     A.  The documents listed in 1.6 were complete as
19 of January 2018 when I issued my declaration.  But
20 since then, I've been given a couple of additional
21 documents.
22     Q.  When you say "a couple," how many?
23     A.  Two.
24     Q.  What are the documents you've been provided?
25     A.  The affidavit of Mr. Garza, which I received

Page 25

1  yesterday; and then there is a document that I think
2  he refers to as delivery certificate, or certificate
3  of delivery, which is the English translation.  And I
4  received that document this morning.
5      Q.  When you received the -- the report of
6  Mr. Garza, did you receive the appendixes as well?
7      A.  Yes.  I include those as one document.
8      Q.  Did you receive Caballo Maya's production in
9  this case?
10     A.  I'm sorry?
11     Q.  Did you receive the Defendant, Caballo
12 Maya's, production?
13     A.  To the extent items listed in 1.6 are within
14 that production, then I have those documents, but I
15 don't recall receiving a set of materials called
16 "production by Caballo Maya."
17         MR. RUFTY:  Are you referring to the
18 discovery responses of this past week?
19         MR. SOTO:  I'm referring to documents
20 Bates-stamped Caballo Maya 1 through 477.
21     A.  I don't remember seeing those Bates numbers
22 on anything that I reviewed.  That doesn't mean that
23 that's not correct.  It's been a while since I've
24 looked at the underlying documents.  But Bates
25 numbering stands out in my mind as a litigator, and I

David Lopez
April 09, 2018                                    26 to 29

Page 26

1   don't remember Bates numbering on my records in this
2   case.
3        Q.   (BY MR. SOTO)   So looking at the listed
4   materials that are set forth in 1.6 of your report, do
5   you believe this list to represent all the documents
6   that are relevant in this case?
7        A.   I can't answer your question yes or no.   I
8   requested all documents relevant to the preparation of
9   my analysis and my opinions, and I believe I received
10  what was relevant.
11       I really have not had time to digest
12  Mr. Garza's declaration and the materials attached to
13  it, much less the certificate of delivery that I
14  received this morning.
15       Q.   Have you reviewed the Plaintiff's responses
16  to written discovery in this case?
17       A.   I did receive, yesterday, a third -- a second
18  document yesterday -- thank you for reminding me --
19  that I believe were some discovery responses by your
20  clients.
21       Q.   And that's -- it's good for us to get that.
22       So you reviewed yesterday or received
23  yesterday -- I don't know if you had a chance to
24  review them yet, but you received yesterday the
25  Defendant's discovery responses; correct?

Page 27

1        A.   If you -- during a break, I can get the
2   particular document and let you know for sure what the
3   title is.
4        As I recall it, Mr. Soto, it's responses by
5   your client to discovery from JRB.   And for the most
6   part, my reaction was that they were just not really
7   relevant to my work, for the most part.   Maybe one or
8   two were.
9        Q.   Have you reviewed the Plaintiff's discovery
10  responses, the Plaintiff's answers to interrogatories
11  and request for productions that were issued by the
12  Defendant?
13       A.   I would answer no, because they don't appear
14  to be listed in 1.6.   And I tried to be comprehensive
15  in my listing 1.6.
16       Q.   Well, and that's a good way to maybe shortcut
17  this and save some time.
18       A.   Sure.
19       Q.   Other than the documents listed in 1.6, and
20  other than Mr. Garza's report, the certificate of
21  discovery that's referenced in the report and the
22  Defendant's discovery responses, have you received and
23  reviewed any of the documents that are not identified
24  in 1.6?
25       A.   The documents you listed are the universe of

Page 28

1   what I call case materials that I've reviewed.   Of
2   course, I've reviewed secondary authority, I've
3   reviewed Mexican law.   But putting aside everything
4   that's not immediately generated in this case,
5   your -- the way you described it is accurate.
6        Q.   Okay.   Let's move to Section 1.7, which talks
7   about assumptions of facts that you have made in
8   reaching your opinions and conclusions.
9        Do you know whether or not any of these
10  assumptions need to be changed or are no longer
11  accurate, based on any of the three documents that you
12  received and reviewed within the last few days?
13       A.   Okay.   Again, I've had a very limited ability
14  to review those three documents, but let me go point
15  by point.
16       In terms of Subsection (a), I believe that
17  remains correct.
18       Subsection (b) is correct.
19       Subsection (c) is correct.
20       Subsection (d) continues to be correct, based
21  on information that I've received.
22       Subsection (e) I understand to still be
23  correct.
24       Subsection (f) I understand to be correct.
25       And then Subsection (g) I understand to be

Page 29

1   correct.
2        So it appears that, based on what I've seen
3   in the new documents that I was given yesterday, even
4   including them, the facts recited in 1.7 remain
5   accurate, to the best of my information.   And again,
6   I'm not a fact witness, just an expert witness.
7        Q.   And to be fair, though, you said you've not
8   had a chance to really review or digest those
9   materials; is that correct?
10       A.   That's right.
11       Q.   And if these assumptions turned out to
12  be -- if any of these assumptions turned out to be
13  false or incomplete, would that change your opinions
14  and conclusions?
15       A.   It would depend on the extent to which
16  they're -- they turn out to be incorrect or
17  incomplete.   It's hard to say just as a general
18  matter.
19       Q.   And you say that these assumptions come from
20  "...case materials and information provided to me by
21  counsel..."
22       A.   Yes.
23       Q.   I want to break that down.
24       A.   Okay.
25       Q.   What assumptions come from information

David Lopez
April 09, 2018                                      30 to 33

Page 30

1    provided to you by counsel?
2        A.   In 1.7(d), I was informed by counsel that in
3    July 2015, SGM engaged JRB to contract and arrange for
4    the provision of services and supplies to maintain the
5    vessel on SGM's behalf.
6        Q.   So (d) is an assumption that you were asked
7    to be -- to make by counsel?
8        A.   Yes.
9        Q.   Okay.  Any other information that was
10   provided to you by counsel?
11       A.   With regard to 1.7(e), I did look at the
12   invoices underlying those amounts.  I did see that
13   they included the supplies and services delineated in
14   1.7(e).  I believe I did my own calculation of the
15   pesos for crew salaries and the pesos for pilotage and
16   other port services, but it may be that I relied on
17   Mr. Rufty to make sure that the numbers were accurate
18   and assume that, after he told me they were, that they
19   were accurate.
20       Q.   Well, if you performed that calculation,
21   did -- where is it?  Do you have it?
22       A.   It might just have been on a piece of scratch
23   paper where I just added the numbers, or I may have
24   just used a calculator with the invoices to one side
25   and, you know, added the numbers at the time.

Page 31

1        Q.   Is that calculation set forth in a document
2    that we can attach to your report?
3        A.   No.  Not that I have.
4        Q.   It's no longer in your possession?
5             MR. RUFTY:  Object to form.
6        A.   Well, there may not have been a document, as
7    I'm telling you.  I may have just had the invoices
8    with my calculator calculating.  And then it might
9    have been that I came to a number and said,
10   "Mr. Rufty, can you please confirm that these are more
11   or less accurate?"
12            And so I can tell you today that I don't have
13   a document.  Whether one existed, I don't know.
14       Q.   (BY MR. SOTO)  Okay.  Is there any other
15   information that was provided to you by counsel that
16   you relied upon?
17       A.   No.  I believe I derived all of the other
18   information in 1.7 from documents that I reviewed in
19   the case.
20       Q.   Okay.  Well, let's go through some of these.
21   Let's go through (a).
22       A.   Yes, sir.
23       Q.   Do you know how Oceanografía came to be in
24   possession of the Caballo Maya when it was arrested?
25       A.   No.

Page 32

1        Q.   You do not?
2        A.   No.
3        Q.   Were you aware of the arbitration --
4        A.   Let me ask you this -- I'm sorry.
5             Are you asking me, am I, as a fact witness
6    with firsthand knowledge, aware of how it came to be
7    in the possession of OSA, or are you asking me am I
8    aware as somebody who's read documents of what
9    happened?
10       Q.   My understanding, as we sit here today, is
11   that you are not a fact witness.
12            Are you a fact witness with any firsthand
13   knowledge of any of the information in this case?
14       A.   I am not.
15       Q.   So all of my questions are going to be not as
16   a fact witness but an expert witness.  But I'm glad
17   you made that distinction, but did I not -- I was not
18   aware of any facts that you would have obtained
19   firsthand.
20            And so my understanding is, you are purely an
21   expert witness; is that accurate?
22       A.   You're exactly right.
23       Q.   Okay.
24       A.   And the reason why I -- why I asked for the
25   clarification in the question is that I believe, when

Page 33

1    I read Mr. Garza's declaration, in the limited time
2    that I had to do it between yesterday and today, he
3    had a number of facts about that process.  And so
4    that's kind of educated me somewhat about how we get
5    to 1.7(a).
6        Q.   Okay.  Were you aware or are you aware of the
7    London arbitration where there was a dispute as to the
8    ownership of the Caballo Maya by Oceanografía and SGM
9    as buyers on one hand and Marfield on the other hand?
10       A.   I'm aware that an arbitration existed, and it
11   may still be going on, but I don't know the details of
12   the arbitration.
13       Q.   Were you aware of that when you wrote your
14   report?
15       A.   Yes.
16       Q.   Okay.  And have you reviewed the final -- the
17   partial final award in that arbitration proceeding?
18       A.   I have not.  If it's not listed in 1.6 or the
19   documents that we've talked about this morning, then I
20   haven't seen it.
21       Q.   Okay.  Were you aware that Marfield was
22   determined to be the owner of the Caballo Maya?
23       A.   No.  I have seen information that the
24   arbitrators ruled that to be the case, so I'm aware to
25   that extent.

David Lopez
April 09, 2018                                    34 to 37

Page 34

1   Q.   Moving on to (b).
2   A.   Yes, sir.
3   Q.   In making the assumption in (b), were you
4   aware that SGM voluntarily applied to be the
5   depository?
6   A.   I believe I did see a document where it
7   requested to be the bailee.  When you say "deposit,"
8   "depositorio," D-E-P-O-S-I-T-O-R-I-O, or "deposito" in
9   Spanish, I believe the correct legal translation is
10  "bailment" and "bailee."
11  Q.   Okay.  I'm not saying that I disagree with
12  you, because certainly I'm not an expert in
13  translation --
14  A.   Sure.
15  Q.   -- but maybe -- and maybe that's a question I
16  should ask you.
17       Do you have any particular training or
18  expertise in translating Spanish to English?
19  A.   Yes.  I've been doing it for 21 years.  I've
20  been reading, translating lengthy, complex Mexican
21  legal documents for all that time.
22  Q.   Are you a certified translator?
23  A.   I'm not certified as a translator.
24  Q.   In this case, in Plaintiff's petition, in all
25  the documents, I think we've been referring to SGM as

Page 35

1   a depository situation.
2   A.   Okay.
3   Q.   So that's how I'm going to proceed.
4   A.   Sure.
5   Q.   If you believe the correct term would be
6   bailee, understood.  And I'm not trying to twist your
7   words --
8   A.   Okay.
9   Q.   -- in any way.
10  A.   That's very fair.  Thank you for letting me
11  know.
12  Q.   Who normally acts as a depository in
13  situations where an asset is arrested in Mexico?
14  A.   In Mexico, there's an agency -- its acronym
15  is the SAE -- and in situations where, under Mexican
16  criminal law, the government confiscates assets
17  because they believe them to have been involved in a
18  criminal matter or in a crime, the government will
19  attach the property and then deposit it, to use that
20  term, with this agency that is in charge, as a general
21  rule, for possessing, maintaining and then delivering,
22  at the end, the property as determined by a court or
23  by the Mexican government.
24  Q.   Okay.  At the time that SGM was requesting to
25  be made the depository, were you aware that it was

Page 36

1   claiming to own the Caballo Maya?
2   A.   Yes.
3   Q.   And did you know that at that time, JRB was
4   claiming to be the charter by virtue of a bareboat
5   charter with SGM?
6   A.   I don't recall reading that, so I guess, as I
7   sit here today, I was not aware of that particular
8   fact.
9   Q.   Would that change your analysis in any way?
10  A.   No.
11  Q.   Okay.  One of the assumptions that you make
12  throughout the report is that JRB, at all times, was
13  acting as SGM's agent; is that correct?
14  A.   I do see JRB acting as an agent.  And based
15  on the information that you see in 1.7(d), to me, that
16  is in the nature of an agency relationship under
17  Mexican law.
18  Q.   So I just want to make -- because that's --
19  it's not in the list of assumptions here, but I
20  believe it's in Section 4.3 where you discuss your
21  opinion that JRB is or was acting as SGM's agent, so I
22  want to make sure that we include that as an
23  assumption you are making in this report; is that
24  fair?
25  A.   I don't know if it's an assumption as much as

Page 37

1   a legal conclusion.
2   Q.   Okay.  It's a fact that is -- it is a fact
3   contained within your report that you believe SGM --
4   sorry.  Strike that.  Strike that whole thing.
5   A.   Okay.
6   Q.   Very poorly done.
7   A.   No problem.  It's Monday morning.
8   Q.   I think that we are -- I think that we are
9   agreed and we understand each other that in your
10  report, your report contains the conclusion -- your
11  conclusion that at all relevant times, JRB was acting
12  as SGM's agent; correct?
13  A.   Correct.
14  Q.   And I believe what you say specifically in
15  4.3 is that SGM designated JRB to perform the actions
16  set forth in the order designating SGM as a
17  depository; correct?
18  A.   Correct.
19  Q.   And so if SGM is delegating the authority
20  conveyed by that order, the order designating SGM as
21  the depository, and JRB is carrying out those actions
22  as its agent, JRB's rights, obligations, authorization
23  in performing those actions are subject to that same
24  order; correct?
25  A.   I think the way I view it, Mr. Soto, is that

David Lopez
April 09, 2018                                    38 to 41

Page 38

1  the order creates the initial relationship between SGM
2  and the vessel, which is a bailment relationship, and
3  the order also creates the obligation to maintain the
4  vessel in good condition.
5          The step after that, then, is, I believe, an
6  agency relationship between SGM and JRB, but I don't
7  necessarily think that that agency relationship is
8  premised on the order.  It's affected by the order.
9      Q.  And I am not -- I am not asking you whether
10 or not the order created the agency relationship.
11     A.  Okay.
12     Q.  It's more along the lines of I want to find
13 out your opinions, conclusions with respect to how the
14 order affects that agency relationship, and
15 specifically the rights, obligations and limitations
16 that are going to be imposed on JRB by virtue of that
17 order.  Okay?
18     A.  Thank you.
19     Q.  And so, for instance, if the order prohibits
20 SGM from taking the Caballo Maya out of national
21 waters, would JRB, acting as its agent, be delegated
22 the obligations from SGM, would it also be limited by
23 the order stating not to take the Caballo Maya out of
24 national waters?
25     A.  It's a good question.  I think it's a little

Page 39

1  complicated under Mexican law for this reason:
2  Mexican law contemplates that an agent is only going
3  to be able to do as much as its principal can do, as a
4  general matter.  But Mexican law also contemplates
5  that sometimes agents do things beyond the scope of
6  the agency or beyond the limitations that the
7  principal has, but that those actions by the agent,
8  let's say, that initially are beyond the agency are
9  subject to ratification by the principal, and so we
10 would look to the order and its limitations imposed on
11 the principal, clearly.
12         Your question to me is whether they
13 necessarily control the agent, and I would say, in the
14 first instance, yes.  But not necessarily in all
15 regards.
16     Q.  Well, let me -- let's try to unpack that,
17 then.
18     A.  Sure.
19     Q.  We are agreed that the only authority to act
20 that SGM has with respect to its position as a
21 depository derives from the order appointing it as a
22 depository?
23     A.  I agree with that.
24     Q.  And we agree that there are -- if there are
25 limitations in that order designating it as a

Page 40

1  depository, then SGM is limited by those -- by that
2  order, by those limitations in that order?
3      A.  I agree with that.
4      Q.  Okay.  And what you're telling me in your
5  report is that SGM then took its obligations under
6  that order and delegated those obligations to JRB;
7  correct?
8      A.  I don't want to use the word "delegate."
9  That may have particular implications.  But based on
10 what we see in 1.7(d) where I'm told to assume that
11 SGM engaged JRB to contract and arrange for the
12 provision of services and supplies to maintain the
13 vessel on SGM's behalf, I view that as creating an
14 agency relationship -- here's what's not happening.
15 And maybe this is why I'm having trouble with the word
16 "delegate" in your question.
17         A bailee like SGM, under Mexican law, has to
18 remain the bailee.  It has to remain primarily
19 responsible for the preservation and protection of the
20 property that is in bailment.  And technically, a
21 bailee can never really designate its obligations
22 without the permission of the bailor.  However, a
23 bailee can have third parties do certain tasks in
24 fulfillment of the bailment.
25         And so that's the only wrinkle that I'm

Page 41

1  adding to your question.
2      Q.  Okay.  Let me see if I can redo this, then.
3          We were agreed that SGM's authority derived
4  from the order appointing it as a depository; correct?
5      A.  Yes.
6      Q.  In engaging JRB to act as its agent with
7  respect to performing those functions in that order,
8  it could only authorize JRB to the extent that SGM is
9  authorized in that order; is that correct?
10         MR. RUFTY:  Object to form.
11     A.  I agree with that.
12     Q.  (BY MR. SOTO)  Now, you state in your report
13 there is no written agency agreement, correct, between
14 JRB and SGM?
15     A.  I do state that, and I -- as far as I know,
16 that's correct.
17     Q.  Okay.  But in your opinion, that does not
18 prevent the creation of an agency relationship in
19 Mexico?
20     A.  As a matter of Mexican law, it does not.
21     Q.  Looking at 1.6(c) [sic], can you tell me what
22 is the basis for that assumption?
23     A.  1.7(c) is based on a document dated July 3,
24 2015, issued by the PGR in Mexico, which I translate
25 as the attorney general of Mexico, that office.  And

Page 42

1  that document, I believe, has on it Executive Order
2  A/011/00.  And I believe it's a two-page document, as
3  I recall.
4       Q.  Is this the document?
5       A.  You have handed me a two-page document
6  Bates-numbered Lopez_0430, 0431, and that is the
7  document that I'm referring to as my -- the basis for
8  the facts I recite in 1.7(c).
9       Q.  Okay.  If you hand that back to me, I'll mark
10 it as an exhibit.
11           (Exhibit 3 marked/introduced.)
12           MR. SOTO:  And for the record, Alfred,
13 what I want to do is -- some of these documents, where
14 I have the Spanish version and the English version,
15 I'm going to put the English version on top and the
16 exhibit sticker on the English version; but they are
17 both in Exhibit 3.  The first two pages are the
18 English translation, and then the Spanish translation
19 is underneath that.
20      Q.  (BY MR. SOTO)  And I want to talk about
21 assumption (e) again very quickly.
22      A.  Yes, sir.
23      Q.  Now, did you state that you did review the
24 invoices and prepared calculations totaling up to
25 those invoices?

Page 43

1       A.  I did receive invoices.  I believe I did my
2  own calculation of the amounts relating to crew
3  salaries and pilotage and other port services.  I
4  don't -- I'm not sure, as I sit here today, whether I
5  did the calculation of the 17 million pesos or the
6  exchange rate calculation to get to U.S. dollars that
7  are in 1.7(e).  Those numbers may have come from
8  counsel.
9       Q.  Okay.  There have been some documents that
10 appeared to be wire transfers in this case.
11          Have you done an analysis to compare the
12 invoiced amounts with the wire transfer documents?
13      A.  I have not done that analysis.  In connection
14 with that, I did request from counsel to see some
15 documentation that the amounts in the invoices were,
16 in fact, paid by JRB.  Because that's important to my
17 analysis.  I received some wire transfer
18 documentation, and I was told by counsel that those
19 wire transfers reflect payment of the invoices, and I
20 have left it at that.
21      Q.  And were you told that all of the invoices
22 had been paid by wire transfers?
23      A.  No.  I was told that -- I don't remember if I
24 was ever told that one way or the other.  The
25 impression I left with was that I wanted information

Page 44

1  to confirm that these invoices that are referred to in
2  1.7(e) had been paid by JRB.  And when I was given
3  wire transfer information and told that those wire
4  transfer documents or pages confirmed payment by JRB,
5  I left it at that.
6       Q.  So you have assumed that the invoices have
7  all been paid?
8       A.  Have all been paid by JRB.
9       Q.  Okay.  But you haven't done any independent
10 work to verify that assumption?
11      A.  I have not done any independent work to
12 verify the assumption.
13      Q.  And if that assumption turned out to be not
14 true, would that change your analysis?
15      A.  It could, because it is material to my
16 analysis that payment of those amounts was made, and
17 it also is material to my analysis that it was -- they
18 were made by JRB.
19      Q.  Okay.  Now, how did that change your analysis
20 if it turned out the invoices were not paid?
21          MR. RUFTY:  Object to form.
22      A.  Sure.  And if -- if I -- if I assume that
23 these invoices for the services and supplies to the
24 vessel were incurred but never paid, there is a part
25 of my affidavit where I talk about Mexican civil code

Page 45

1  provisions relating to payment.  Anybody with a legal
2  interest in a matter has a right to make a payment.
3  That does not require permission of the person who is
4  obligated to make those payments.  It does not require
5  notice to the person obligated to make payments, what
6  we would think of as a debtor.
7           And that's important to my analysis in order
8  to establish that JRB is a creditor.  And that's the
9  first step, in a maritime lien context, that you have
10 to reach.
11      Q.  (BY MR. SOTO)  If it turns out that JRB did
12 not pay a particular invoice, does JRB -- is it true,
13 then, that JRB would not have a maritime lien arising
14 from that invoice that it did not pay?
15      A.  Based on the information that I know now and
16 on the analysis that I've done so far, the answer to
17 your question is, yes, that matters.  In other words,
18 if JRB contracted for a service but is not out of
19 pocket the amount for that service, then JRB has not
20 reached the status of a creditor as to that particular
21 invoice or service.
22      Q.  Is the term "lien," as we are using the
23 term -- as -- do you understand what a maritime lien
24 is with respect to U.S. law?
25      A.  Not really.  I -- I have a sense that it's

David Lopez
April 09, 2018                                    46 to 49

Page 46

1  more than the maritime privilege under Mexican law.
2      Q.   And that's where I'm sort of getting at,
3  because we're -- we're going to dive into some of this
4  stuff, and there is a difference in language, and I
5  want to -- I want to ask you if -- if that difference
6  in language matters, if we're talking about the same
7  thing with respect to maritime privilege versus a
8  maritime lien?
9      A.   Sure.
10      Q.   So is there a difference between a maritime
11  lien, as that's understood in U.S. law, and the
12  maritime privilege, as that's understood in Mexican
13  law?
14      A.   Let me tell you what my very rudimentary
15  understanding is with regard to U.S. maritime liens.
16  I understand, as a general matter -- and
17  again, I'm not a U.S. maritime lawyer, I don't
18  practice in the field or work in it as you do,
19  Mr. Soto.  But my understanding is that U.S. law
20  both -- maritime law both creates the ability to
21  impose or apply or fix a lien, as well as the ability
22  to enforce that lien against a vessel.
23          That's my understanding.  I may be wrong
24  about it, but that's my impression, based on what I've
25  read.

Page 47

1          Mexican maritime law is different than that.
2  You don't find, in the law of navigation and maritime
3  commerce in Mexico, the creation or provision that
4  allows somebody to create a lien associated with the
5  vessel.  What you have is a privilege, which is an
6  additional way that a creditor can attempt to recover
7  a debt.
8      Q.   Is a -- is a -- is a privilege -- let me back
9  up.
10          At issue in this dispute, then, is whether or
11  not the Plaintiff has a privilege against the Caballo
12  Maya?  Is that how you would describe it?
13      A.   Well, based on the transcript of the October
14  hearing with the judge, the judge is interested in
15  knowing several things:  one of the things is whether,
16  under Mexican law, JRB had a maritime right.  Let me
17  just say that generally.  Whether it was entitled to
18  any special treatment under maritime law with regard
19  to the vessel itself.  And so as I view it -- maybe
20  I'm getting away from your question.  You might have
21  to ask it again.  I'm sorry.
22          Well, why don't you ask your question again.
23  I'm sorry.
24      Q.   Sure.  Sure.
25          I just want to make sure, again, that we're

Page 48

1  speaking in the certain terms, of the same term --
2      A.   Okay.
3      Q.   -- because we have been in this lawsuit,
4  Plaintiff's complaint, discussing whether or not
5  Plaintiff has a valid lien -- maritime lien in Mexican
6  law, and so I want to be fair to you, and I want to
7  make --
8      A.   Sure.
9      Q.   -- sure I'm not putting words in your mouth
10  if you don't believe that "lien" is the correct term,
11  or do you think that we are all speaking about the
12  same -- the same issue here, whether or not we're
13  talking about the lien, as has been talked about in
14  this suit, or a privilege which is discussed in your
15  report, are we talking about the same thing?
16      A.   Here's my answer to you:  It is very
17  important to my work, as a Mexican law expert, to help
18  the court understand Mexican law and how it applies in
19  a particular context.  In order to do my job
20  faithfully, I try to stick to the Mexican law as
21  closely as possible.  I don't inject interpretation, I
22  don't interject liberal translation, because I don't
23  think that's appropriate.
24          The Mexican provision that is at the heart of
25  this case, which is Article 91 of the maritime

Page 49

1  commerce law, uses the word "privilege."
2          And I was looking at Exhibit 2 in my
3  affidavit -- you don't have the exhibits attached, but
4  one of the exhibits is the Mexican law, and I wanted
5  to refer you to Article 91 in particular.  I want to
6  maintain -- I want to be loyal to what the Mexican
7  Congress adopted.  They call it maritime privilege.
8      Q.   Is the maritime privilege an encumbrance on
9  the vessel?
10      A.   In my view, no.  That alone is not an
11  encumbrance like a lien, as I would think of in the
12  United States.
13      Q.   So the privilege is not --
14      A.   The privilege is a priority of payment.
15      Q.   Okay.
16      A.   And the ability to go after the vessel for
17  that --
18      Q.   Okay.  So --
19      A.   -- recovery.
20      Q.   -- the vessel is liable for the debt?
21      A.   Let me look at Article 91 just to be sure.
22  Do you have -- can you give me a copy of that?  And if
23  not, I can get it.
24          Oh, you're right, maybe it's quoted in here.
25      Q.   It's in your report.  It's on page 7.

David Lopez
April 09, 2018                                    50 to 53

Page 50

1     A.   Okay.
2          MR. RUFTY:  Off the record, while he's
3     looking at that.
4     A.   Your question to me was whether Mexican law
5     creates a lien imposed on the vessel?
6     Q.   (BY MR. SOTO)  No.  I'm trying to understand
7     whether or not the incidence of a Mexico privilege --
8     I'm trying to understand the similarities between a
9     privilege and a lien so that I can be sure that we're
10    talking about the same thing --
11    A.   Uh-huh.
12    Q.   -- and not something that completely -- just
13    isn't apples to apples.
14    A.   Sure.
15    Q.   And so my question was:  Is a privilege,
16    which is created by a debt, I understand, and can be
17    enforced through an arrest process in Mexico, is that
18    an encumbrance that follows the vessel such that the
19    vessel is liable for that obligation?
20    A.   The answer to your question is -- the short
21    answer is yes, and here's why:  According to Article
22    91 of the maritime commerce law, we're dealing with
23    what are called maritime privileges, not maritime
24    liens.
25         A maritime privilege is a right to be

Page 51

1     preferred in payment ahead of other creditors.  So
2     there's a particular ordering in Article 91, depending
3     on the nature of the obligation that's paid, whether
4     it's crew salaries, portage fees, things like that.
5          And then Mexican law refers to the privilege
6     as applying to vessels.  And that's in Article 93.
7          So, yes, these portions of the maritime
8     commerce law don't necessarily create a lien that
9     encumbers the vessel, but they give a creditor, with
10    regard to supplies and services on the vessel, an
11    ability to recover its cost that does not exist for
12    creditors in other situations.
13    Q.   The liability of the debt isn't against the
14    owner; correct?  Or not solely against the owner;
15    correct?
16         Let me elaborate just enough so you can sort
17    of see where I'm going.
18         An incident of a lien is that the lien itself
19    is charged, it's an encumbrance on the vessel itself,
20    so it doesn't matter who owns it.  It doesn't matter
21    if the vessel changes hands.  The lien, the debt,
22    encumbers the vessel, attaches to the vessel such that
23    the holder of that lien can seek payment for that
24    debt?
25    A.   As against the vessel.

Page 52

1     Q.   As against the vessel.
2     A.   Correct.
3     Q.   So my question to you is, whether or not that
4     is similar in Mexican law, does the privilege follow
5     the vessel?  Does it encumber the vessel such that the
6     holder of that privilege can seek it against the
7     vessel, as opposed to just the owner so that it does
8     not matter who owns the vessel?
9     A.   Yes.
10    Q.   Is the answer to that yes?
11    A.   Yes.
12    Q.   So it is similar in the nature of a lien in
13    that it does encumber the vessel, and it follows the
14    vessel wherever it goes?
15    A.   I'm having trouble with the very first part
16    of your question, because we really haven't fleshed
17    out what it means to be a lien.
18         All I can tell you is this:  That if you are
19    a creditor with regard to a vessel, what Article 91
20    does is that with -- particular to certain types of
21    expenses that you have paid as the creditor, it gives
22    you the right to collect as to the vessel beyond just
23    the owner of the vessel.
24    Q.   Okay.  I'm not sure that answers my question.
25    A.   Okay.

Page 53

1          MR. SOTO:  But why don't we go ahead and
2     take a break.
3          (Break.)
4     Q.   (BY MR. SOTO)  Let's move on to Section 4.3 of
5     your report.
6     A.   Okay.
7     Q.   You state in Section 4.3 that the basis for
8     SGM's status as depository, as the bailee, is the
9     order from the Mexican attorney general's office;
10    correct?
11    A.   Yes.
12    Q.   And I think we've already talked about this,
13    but we would agree that the -- SGM's rights and
14    obligations, its authority with respect to acting as
15    the depository or bailee, is governed by or set forth
16    by the attorney general's orders?
17    A.   Are the attorney general's orders -- so by
18    that, do you mean Exhibit No. 3 as well as the
19    delivery certificate?
20    Q.   Well, let's go one by one, then.
21    A.   Okay.
22         (Exhibit 4 marked/introduced.)
23    Q.   (BY MR. SOTO)  In fact, I'm going to hand you
24    what I'll mark as Exhibit 4.  And again, just like
25    before, Exhibit 4 is going to have the English

David Lopez
April 09, 2018                                    54 to 57

Page 54

1  translation on top and then the original Spanish
2  version of the document behind it.
3       Now, this is not a document that you've
4  reviewed before, is it?
5       A.   That's correct.  I have not reviewed Exhibit
6  4 before today.
7       Q.   Well, I will represent to you that if you were
8  to compare the resolutions in Exhibit No. 3, which you
9  have reviewed, and you were to compare the resolutions
10  in this Exhibit No. 4, you will see that I believe
11  they are the same.  So my understanding is that this
12  is the sort of longer sort of complete version of that
13  order where it has recitations explaining sort of the
14  background of the case and then the resolutions behind
15  it.
16       A.   It might be, but it might not be.  And here's
17  the reason:  When you handed me Exhibit No. 4, the
18  first thing I see is that it relates to an Amparo
19  proceeding.  In Mexico, Amparo is a very unique
20  procedural device that they have in their federal
21  system that allows for parties or individuals to bring
22  constitutional challenges to acts of a government
23  agent, sometimes including courts.  And so this may be
24  the decision of or relate to an Amparo case.
25       And then I also notice that it's dated,

Page 55

1  according to the file stamp, May 12, 2016.  So maybe
2  that's just the date on which it was filed by the
3  attorney general's office in an Amparo case.  That's
4  somewhat confusing to me, so I'd want to know about
5  that.
6       It could be that you're correct that it
7  flushes out some of the obligations under the July 3,
8  2015, two-page official letter to Mr. Oscar Garcia.  I
9  just don't know.
10       Q.   Well, if we start on page Bates number
11  Caballo Maya 62 --
12       A.   Okay.
13       Q.   -- and then go through the end of the
14  document, which is Caballo Maya 75 --
15       A.   Okay.
16       Q.   -- it appears to me that there are -- it is a
17  document from the PGR, the Mexican Attorney General's
18  Office, with factual recitations about the dispute and
19  then resolutions related to the appointment of SGM as
20  a depository; agreed?
21       A.   It appears that page 1 is a cover page for
22  filing a document in an Amparo case.  And then what we
23  have beginning at the second page of the document,
24  which is Caballo Maya 62, continuing to Caballo Maya
25  75, appears to be an agreement that some parties

Page 56

1  signed and that relates to the same criminal
2  investigation, as we see in the July 3, 2015, letter.
3       Q.   Is this a document that was issued by the
4  Mexican Attorney General's Office?
5       A.   As a matter of fact, I'm not sure, but it
6  appears that this is an agreement printed on PGR
7  letterhead, PGR being the Mexican Attorney General's
8  Office.
9       Q.   And there are resolutions in here, in this
10  document.  It begins on page Caballo Maya 74 from the
11  Mexican Attorney General's Office related to SGM's
12  position as depository.
13       Do you see that?
14       MR. RUFTY:  Where are you, Counsel?
15       MR. SOTO:  It's on page Caballo Maya 74.
16       According to -- I'm looking at Caballo Maya
17  74, and this is a section that is basically a
18  conclusion section that identifies certain matters,
19  such as the designation of Mr. Garcia as the bailee of
20  Caballo Maya.
21       And so is that consistent with what you're
22  saying?  I think we're on the same page.
23       Q.   (BY MR. SOTO)  I don't know if we are or not,
24  truthfully, anymore.
25       A.   Go ahead.

Page 57

1       Q.   My question to you is whether or not this
2  document, beginning on page Caballo Maya 74, contains
3  resolutions from the Mexican Attorney General's Office
4  related to SGM's status of a depository of the Caballo
5  Maya?
6       MR. RUFTY:  Object to form.
7       A.   What I can say is that this document appears
8  to relate to the bailment of the Caballo Maya with
9  Mr. Garcia, and it may relate to the conditions under
10  which the bailment is to occur.
11       Q.   (BY MR. SOTO)  Does this document set forth
12  the conditions by which the bailment is to occur?
13       A.   I don't know.  I just got it.
14       Q.   Because you haven't reviewed it before?
15       A.   I have not seen Exhibit No. 3 [sic] before.
16       Q.   If it turns out --
17       A.   Exhibit No.  4, I'm sorry.
18       Q.   Sure.
19       If it turns out that Exhibit No. 4 -- which I
20  will tell you has been stipulated as to the
21  authenticity of the parties previously.
22       A.   Yes.
23       Q.   If it turns out that Exhibit No. 4 is a
24  document which is issued by the PGR, the Mexican
25  Attorney General's Office, concerning the Caballo

David Lopez
April 09, 2018                                    58 to 61

Page 58

1  Maya, would you agree that it sets forth the
2  conditions of the bailment or the depository?
3      A.   All I can tell you now is that it might.  I
4  haven't reviewed it, so I don't know if it does or
5  not.
6      Q.   Do you want to take a minute to review it?
7           MR. RUFTY:  Do you mean -- "sets forth
8  the conditions," do you mean copies, conditions from
9  the bailment agreement, or what do you mean by "sets
10 forth"?
11          MR. SOTO:  No.  What I'm trying to get,
12 Counsel, is this an agreement that this is the -- this
13 is the full order from the Mexican Attorney General's
14 Office -- it's the full order that was excerpted in
15 the document that was produced by Plaintiff that sets
16 forth the terms of the depository --
17     A.   Let me answer your question.
18          MR. SOTO:  -- designation?
19     A.   Let me answer --
20          MR. SOTO:  If we can't agree to that,
21 then that's fine, then we'll move on.  But I thought
22 that was a simple known fact.
23     A.   What the parties have agreed to is something
24 that I don't know about, number one.
25          Number two, when I testify under oath, I have

Page 59

1  to be very careful in what I tell you.  And so --
2      Q.   (BY MR. SOTO)  I understand all that.
3      A.   -- you're asking me whether a document that
4  you just handed to me is or is not something.  And
5  what I'm telling you very fairly, Mr. Soto, is, there
6  are indicia that what you're saying is correct, but
7  until I review the document and have time to review
8  it, I can't testify under oath that what you're saying
9  is correct.
10     Q.   So the reason you can't testify under oath
11 today is because you haven't had an opportunity to
12 review this document?
13     A.   Correct.
14     Q.   Because it was not provided to you?
15     A.   Not until today.
16     Q.   If you look at page Caballo Maya 74 under
17 resolution [sic].
18     A.   Okay.
19     Q.   I'm going to read that.  It says: "RESOLVED.
20 FIRST.  The depository of the CABALLO MAYA ship, with
21 the IMO 9453341, Ship's Regulatory Patent number
22 000081740, is the citizen Oscar Israel Garcia Cordova,
23 Legal Representative of 'Shipping Group Mexico Sgm
24 S.A. de C.V.', under the terms of Article 182-L, who
25 from this moment will be in this possession of the

Page 60

1  ship, provided that this doesn't affect the public
2  order, with the condition that he may not alienate or
3  encumber, and must maintain the aforementioned ship in
4  good conditions until the time in which the legal
5  destination of the seized asset is determined."
6           Isn't it true that as a condition of SGM
7  acting as the depository or the bailee of the Caballo
8  Maya, SGM was prohibited from alienating or
9  encumbering the vessel?
10     A.   Whether that's true or not is a fact, and I'm
11 not a fact witness.  I can tell you what the document
12 says, if that's your question.
13     Q.   Is that what the document says?
14     A.   What the document says is that Mr. Oscar
15 Garcia is designated as bailee of the vessel, the
16 Caballo Maya that's at issue here, and it says he
17 shall, from this moment, be in possession of the
18 vessel, as long as it does not affect the public
19 order, for it to remain in his possession with the
20 condition -- in my exhibit -- and I'm reading from the
21 Spanish.  I don't rely on other people's translations.
22          Can you tell me what this word is,
23 "condicionantes"?
24     Q.   Mr. Lopez, I cannot, and I'm going to ask you
25 to rely on the English version --

Page 61

1      A.   I won't.
2      Q.   -- because it's a certified translator.
3      A.   I won't.  It's already an erroneous
4  translation.  I can tell you that, just by looking at
5  the first line.
6      Q.   I will tell you that the same provision has
7  been translated through a certified translation by
8  Plaintiff's translator, and, in fact, we're using the
9  same translator --
10     A.   Okay.
11     Q.   -- and it's been translated the same way.
12     A.   Whether they're working for you or the
13 Plaintiff, it's still not right.
14     Q.   We're going to have to -- the Court can't
15 read Spanish, and with all -- I don't think we have
16 time here for you to translate the Spanish document
17 for us.
18          MR. RUFTY:  Well, I think we have time
19 to address what the witness regards as a proper
20 translation of the sentence or so that --
21     Q.   (BY MR. SOTO)  What's improper?
22     A.   Sure.  The translator, who may be a fine
23 translator, and certified, starts by saying:  "The
24 depository of the Caballo Maya ship...is the citizen
25 Oscar Israel Garcia Cordova..."

David Lopez
April 09, 2018                                    62 to 65

Page 62

1       What this says is that Oscar Cordova is
2  hereby designated or is designated as bailee of the
3  vessel.  So in those two sentences, it's not correct.
4       But in order to interpret correctly or
5  translate correctly the provision that you're
6  concerned about in your question, which relates to the
7  alienation or encumbering, it's -- it's difficult for
8  me to do that, because the words in the Spanish
9  version are obscured by a stamp.  And in Mexico, they
10 do this all the time in legal documents,
11 unfortunately.
12      But ask your question again, and then I'll
13 just assume what the word says.  I think it says
14 condicionante, C-O-N-D-I-C-O-I-N-A-N-T-E.
15      Q.  Have you seen this provision before, this
16 language?
17      A.  Not that I recall, no.
18      Q.  It's not in the order that's been marked as
19 Exhibit No. 3?
20      A.  It may be.
21      Q.  So can you tell me what that says?
22      A.  Sure.  Okay.  I believe it is.  You're
23 exactly right.  We can see it clearly in
24 Exhibit No. 3, even though it's obscured in Exhibit
25 No. 4.  And the phrase that relates to your question

Page 63

1  is, as translated by me, with the condition that he
2  cannot alienate or encumber and shall maintain the
3  vessel in good condition.
4       Q.  Okay.
5       A.  The indicated vessel.
6       Q.  So you have assumed that Exhibit No. 3, which
7  is a document you have previously reviewed --
8       A.  Uh-huh.
9       Q.  -- is accurate and that Exhibit No. 3 sets
10 forth the rights, obligations and the authority of SGM
11 as acting as a depository or bailee of the Caballo
12 Maja; correct?
13      A.  I received the document that's Exhibit No. 3,
14 and I used that document to inform me about what the
15 obligations of the bailee were with regard to the
16 bailment.
17      Q.  You will agree that Exhibit No. 3 sets forth
18 the conditions of that designation of depository/
19 bailee?
20      A.  I assume that it does that, yes.
21      Q.  And Exhibit No. 3, like Exhibit No. 4, states
22 that SGM cannot encumber the vessel; correct?
23      A.  It says that he may not encumber the vessel.
24      Q.  Okay.
25      A.  And technically, it says they cannot alienate

Page 64

1  or encumber.
2       Q.  Is "they" referring to SGM, since the section
3  is discussing Mr. Cordova as the representative of
4  SGM?
5       A.  It could be.  That would be my assumption,
6  that the reference is to him as the legal
7  representative of the company and the company.
8       Q.  So doesn't this -- doesn't Exhibit No. 3 and
9  Exhibit No. 4, which has the same language, prohibit
10 the creation of a lien or a privilege on the Caballo
11 Maya by SGM?
12      A.  I'm not sure about that.  That wasn't my read
13 of it.  Let's see.  And again, I'm going to refer to
14 the Spanish.
15      Okay.  Yeah, it clearly -- the way I read
16 that language, he cannot alienate the vessel, so when
17 he's acting as bailee, he can't alienate the vessel.
18 And in his capacity as bailee, Mr. Garza and SGM
19 cannot -- cannot encumber it.  That's what I read that
20 to say, Exhibit No. 3.  And the language is the same
21 in Exhibit No. 4.
22      Q.  So they cannot cause a lien or a privilege to
23 attach to the vessel if they cannot encumber it;
24 correct?
25      A.  Well, it says what it says, and I believe it

Page 65

1  says with the condition that they cannot alienate or
2  encumber the indicated vessel.  That's what it says.
3       Q.  And I don't want to be nitpicky --
4       A.  Sure.
5       Q.  -- but this is an issue of Mexican law in
6  translations here, and so I just want to make sure
7  that we are agreed to my understanding that the plain
8  reading of that language is that SGM and Mr. Cordova
9  cannot cause a maritime lien or a privilege to attach
10 to the Caballo Maya; is that correct?
11      A.  I'm just telling you what it says translated.
12 It says with -- that he becomes the bailee for the
13 Caballo Maya with the condition that they -- and I
14 believe your assumption is correct, that's both
15 Mr. Garcia and SGM -- cannot alienate or encumber the
16 indicated vessel.  That's what it says.
17      Q.  My question to you, Mr. Lopez --
18      A.  Yes.
19      Q.  -- is whether or not that means that SGM and
20 Cordova were prohibited from allowing or causing a
21 lien or privilege to encumber the Caballo Maya.
22      A.  I don't know is my answer to you today.
23      Q.  Okay.  And what if -- if the PGR had said
24 that the SGM and Cordova cannot encumber it and cannot
25 seek any reimbursement for expenses, would that then

David Lopez
April 09, 2018                                     66 to 69

Page 66

1  provide you with enough information to decide whether
2  or not they could or could not cause a maritime lien
3  or privilege to attach to the vessel?
4      A.   No.  And here's why.  The provision is
5  unclear in this sense:  It's appointing Mr. Garza, on
6  behalf of SGM, as the bailee.  Whether the provision
7  means that they cannot seek reimbursement from the
8  government of Mexico is one thing.  Whether it means
9  they cannot, under any circumstance, attach a lien to
10  it or a -- or encumber it, I can't tell from document.
11  That's my problem.
12      Q.   Well, all 3 or 4 says is that they can't
13  encumber the vessel; correct?
14      A.   That's what it literally says, on the
15  condition that they cannot alienate or encumber the
16  indicated vessels.
17      Q.   And as you sit here today, you cannot tell me
18  whether or not that means that SGM or Cordova was
19  prohibited from encumbering the Caballo Maya with a
20  maritime privilege or lien?
21          MR. RUFTY:  Object to form.
22      A.   There's two things that I can't tell you:  I
23  can't tell you whether that extends to cost incurred
24  by the bailee to maintain the vessel.  It could.  But
25  I can't tell you whether or not that provision

Page 67

1  continues to apply after the bailment ends.  And
2  that's the situation we're in now.
3          As I understand it, the bailment ended in
4  2017.  So it could be that this provision meant that
5  they could not alienate it or encumber it for the
6  duration of the bailment.
7          Let me give you an example.
8          I understand that at the same time Mr. Garza
9  and SGM received the bailment, they were also
10  attempting to obtain ownership of the vessel in the
11  Mexican courts; correct?
12      Q.   I don't know off the top of my head.
13      A.   Yeah.  In other words, in 2015, when this
14  order issues that's Exhibit No. 3, they were also
15  working through the Mexican courts to try to establish
16  procession and ownership of the vessel.  That's based
17  on what I think Mr. Garza says, as well as other
18  documents that I've seen.
19          Here's why that's important:  Even though
20  they're acting as bailee for the duration of this
21  order, which ends in February, it may be that if the
22  Mexican courts determined that they were the owner
23  of the vessel, well, they certainly could alienate it
24  after that determination and the conclusion of the
25  bailment, regardless of what's written in here.

Page 68

1  That's my point.
2      Q.   Sure.
3          There's no question that --
4      A.   Right.
5      Q.   -- if SGM has delivered the vessel, at that
6  point, the bailment, the depository's designation,
7  would terminate --
8      A.   That's right.
9      Q.   -- because they would be delivered the
10  vessel.
11      A.   That's my point.
12      Q.   Certainly.
13          The question is, while they are acting as the
14  bailment before this designation -- bailee, while
15  they're acting as a depository, they are told that
16  they cannot encumber the vessel; correct?
17      A.   Correct.
18      Q.   So expenses that are incurred during this
19  time period cannot give rise to the encumbrance on the
20  vessel, by order of the Mexican Attorney General's
21  Office; correct?
22          MR. RUFTY:  Object to form.
23      A.   With this -- I think you and I are not
24  disagreeing.
25          What I'm saying is that according to what I

Page 69

1  read in Exhibit 3 and 4, they accepted the bailment on
2  the condition that they would not alienate or encumber
3  the vessel while the bailment lasts.
4          This document doesn't tell us about their
5  ability to encumber or alienate it after the bailment
6  ends.  It doesn't talk to that.
7          But there's another important point.  Very
8  important.  You and I were having a discussion before
9  our little break about the difference between a
10  privilege and a lien under Mexican law.
11          What -- the point here is that, in Mexico,
12  when you see the word "grabar," G-R-A-B-A-R, which is
13  translated as "to encumber," that may be talking about
14  something completely different from Article 91 of the
15  maritime commerce law, which gives them the right to a
16  maritime privilege.
17          And as I've just explained to you, it is in
18  rem, and I guess that's similar to the U.S. maritime
19  lien approach, but it's a privilege.  The Mexicans
20  don't use the term "maritime lien."
21      Q.   (BY MR. SOTO)  On page 9 of your opinion --
22      A.   Sure.
23      Q.   It's about halfway down.
24      A.   Okay.
25      Q.   It's under the paragraph that starts:  "Under

David Lopez
April 09, 2018                                    70 to 73

Page 70

1   the Commercial Code..."
2           Do you see that?
3       A.  Correct.
4       Q.  The next sentence says: "Absent a contract,
5   compensation to the bailee shall be in accordance with
6   the custom and usage of the place where the bailment
7   is made."
8       A.  Right.
9       Q.  Do you see that?
10          And you go on to discuss, then, the custom
11  and usage of payment of the bailee.
12      A.  Uh-huh.
13      Q.  But I wanted to be clear that what you are
14  saying in this report is that the following subjects
15  apply absent a contract.
16          So if there is a contract between the bailee
17  that discusses the terms of that bailment, it is that
18  contract that will govern; correct?
19          MR. RUFTY:  Object to form.
20      A.  Yes, I agree with that statement.
21      Q.  (BY MR. SOTO)  Okay.  And I did not see any
22  contract related to the bailment in the list of the
23  materials that you reviewed, so I assume you were not
24  provided with one; correct?
25      A.  I was not provided with one.

Page 71

1       Q.  Okay.  But you were provided with I believe
2   you referred to it as a certificate of delivery.  I
3   have a copy of it with me.
4           MR. SOTO:  And again, for purposes of
5   the record, I'm going to put the English translation
6   on top and the Spanish right behind it.
7           THE WITNESS:  Sure.
8           (Exhibit 5 marked/introduced.)
9           MR. SOTO:  I'll go ahead and mark this
10  as Exhibit No. 5.
11      Q.  (BY MR. SOTO)  Is this a document that you
12  were provided -- I forget, yesterday or today?
13      A.  This morning.
14      Q.  This morning.  Yes.
15          Is this a document that you were provided
16  with this morning?
17      A.  The Spanish-language version of Exhibit No. 5
18  appears to be the document that I was provided this
19  morning that I have been referring to as a certificate
20  of deposit or a deposit certificate.
21      Q.  Okay.
22      A.  It could also be interpreted bailee, bailment
23  certificate.
24      Q.  Okay.  And were you provided with the
25  certified English translation as well?

Page 72

1       A.  No.
2       Q.  Do you want to take a moment to review it?
3       A.  The English?
4       Q.  Or the Spanish.  Or do you need a moment to
5   review it before we get into the line of questioning?
6       A.  To the extent -- I mean, I've reviewed the
7   Spanish.  I don't rely on the English translations.
8       Q.  Okay.
9       A.  And to the extent that I did review it, I'm
10  able to answer your questions now.
11      Q.  Okay.  This, what we're calling a certificate
12  of delivery, it appears to me that it is an agreement
13  by which -- well, it's an agreement that's signed by
14  Mr. Cordova as a representative of SGM, is it not?
15      A.  At Caballo Maya 80, I do see a signature line
16  for Mr. Garcia and a signature on that line, and I
17  assume it's his.
18      Q.  And it was also signed by an agent for the
19  PGR, correct, in the Mexican Attorney General's
20  Office?
21      A.  Correct.
22      Q.  So this appears to me to be an agreement by
23  which SGM is accepting the delivery of the Caballo
24  Maya to act as a depository, or the bailee, and the
25  conditions of that?

Page 73

1       A.  I think that's a fair characterization of
2   Exhibit No. 5.
3       Q.  And if we go to Caballo Maya page 77.
4       A.  Okay.
5       Q.  Page 77 contains some of the recitals in the
6   agreement.
7           If you go down to number 7.
8       A.  Yes.
9       Q.  And about two-thirds of the way down, it
10  says: "The ship will be in his possession from this
11  moment, provided that the possession doesn't affect
12  the public order or interest, with the condition that
13  he may not alienate or encumber it and must maintain
14  the aforementioned ship in good physical conditions,
15  until the legal destination of the seized asset is
16  decreed."
17          Do you see that?
18      A.  I do see that.
19      Q.  And I believe that's the same language that
20  we saw before.
21          Do you have any issues with the translation?
22      A.  It's slightly different.
23      Q.  Okay.  Do you have any problems with the
24  translation as I just read it?
25      A.  The translation is loosely correct but not

Page 74

1    technically correct.
2         Q.   Okay.  Is the translation where it speaks
3    about SGM not being prohibited from alienating or
4    encumbering the vessel; is that correct?
5         A.   No, that's the part that's somewhat off,
6    technically speaking.
7         Q.   Would you provide me what you believe is your
8    direct translation of that sentence?
9         A.   Sure.
10              Technically, it is not "with the condition
11   that," but it is technically correct to translate it
12   as "with the obligation that."
13        Q.   So it would read:  "...the obligation that
14   the possession doesn't affect the public order or
15   interest, with the" -- oh, I'm sorry.  I'm sorry.
16        A.   It comes a little further down.
17        Q.   So it is a sentence that you -- the
18   translation you are correcting, in your opinion, would
19   be:  "...with the obligation that he may not alienate
20   or encumber it and must maintain the aforementioned
21   ship in good physical conditions, until the legal
22   destination of the seized asset it's decreed"; is that
23   correct?
24        A.   That's correct.
25              And again, I'm not faulting the translator or

Page 75

1    quibbling with the translator.  "Condition" could be a
2    legitimate translation of the word "obligation," but
3    when I'm dealing with Mexican law in a U.S. court
4    under oath, I try to stay as faithful to the wording
5    of the Spanish as possible, within the context.
6         Q.   Turn over to page 79, Bates stamp Caballo
7    Maya 79, in the same exhibit.
8         A.   Okay.
9         Q.   This is a portion of the -- of the agreement
10   where we have some -- again, some more sort of -- a
11   list, first, second, third, of agreed conditions or
12   obligations.
13              And if we look at what is a portion under the
14   first such agreement on page 79, and it begins with --
15   the paragraph begins with:  "The citizen Oscar Israel
16   Garcia Cordova..."
17              Do you see that?
18        A.   Are you at the top of Caballo Maya 78?
19        Q.   I'm on 79, actually.
20        A.   On 79.  I'm so sorry.  Where on 79?
21        Q.   It's the paragraph that begins with:  "The
22   citizen..."
23        A.   Oh.  Yes, I'm with you.
24        Q.   Okay.  And if you read that -- that
25   paragraph.  It's a long way, the relevant part that I

Page 76

1    want to talk about --
2         A.   Sure.
3         Q.   -- is about a third of the way down.  After a
4    semicolon, it states:  "...he will be responsible for
5    any expenses produced, and will give it the best
6    maintenance possible, keeping it in good conditions,
7    without requesting any sort of reimbursements for the
8    deposit, he will be responsible for any damage or harm
9    suffered by the seized asset due to his malice or
10   negligence, and is required to provide a monthly
11   report of the state of the ship and how it has been
12   used."
13              Do you see that section?
14        A.   Yes, I do see the Spanish version of what
15   you're saying, and it's one, two, three, four, five,
16   six, seven lines down.
17        Q.   Do you have any issue with that translation
18   as I read it?
19        A.   Let me look at it.  Just a couple of issues
20   with the translation.
21              Starting in the Spanish -- or, starting in
22   the English, they have the sentence:  "He will be
23   responsible for any expenses produced..."
24              And the word "responsible" is not in there in
25   the Spanish.  In the Spanish, it says that "He will

Page 77

1    undertake the expenses," as I would relate it,
2    "generated by the bailment.  He will keep the
3    vessel -- he will maintain the vessel in the best
4    manner possible and preserve it or maintain it in good
5    condition."
6              And then the other place I quibble is with
7    the next few words.  The translator puts in English:
8    "...without requesting any sort of reimbursements for
9    the deposit..."
10             And the way I would translate the Spanish
11   phrase is, "...without requesting any refund for the
12   bailment."  "...without requesting any refund for the
13   bailment."
14        Q.   I understand the language there that you're
15   using is a little different than what the translator
16   is using, but --
17        A.   Okay.
18        Q.   -- doesn't the meaning of it essentially
19   amount to the same thing, that SGM is agreeing to be
20   responsible for the cost of the bailment without a
21   right to be reimbursed for those costs?
22        A.   No.  Again, the word "responsible" is not in
23   the Spanish.
24        Q.   SGM is agreeing to pay the cost of the
25   bailment without a right to be reimbursed or refunded

Page 78

1  for those costs?
2      A.  It just says that he will carry out the
3  expenses generated in connection with the bailment.
4  Carry out.  "Cargo," C-A-R-G-O, means to carry out.
5      Q.  What does the carry-out expenses mean?
6      A.  In other words, to perform, to make, to carry
7  out, to execute.
8      Q.  You don't execute expenses, you --
9      A.  That's why translation is an art, it's not a
10  science.  In other words, I'm telling you what the
11  Spanish version says literally.  And I have to do
12  that, because I want to remain careful with regard to
13  the Spanish.
14          The translator messed up, because what the
15  translator has done is basically suggest that there's
16  liability on the part of the person paying the
17  expenses for the expenses.  When you see the word
18  "responsible," that's what the translator is
19  translating.  But the word "responsibility" in Spanish
20  is more akin to liability, and that's not the word
21  that they use in the Spanish.
22          So responsibility for the expenses is not a
23  correct translation.
24      Q.  Well, and, Mr. Lopez, I'm not -- I don't want
25  to take your deposition as to --

Page 79

1      A.  Yeah.
2      Q.  -- a translator, that's not what you're here
3  for.
4      A.  Okay.
5      Q.  I want to get your expert opinion as to what
6  that means.  Because when we're getting into literal
7  translation of the document, "carrying out expenses"
8  doesn't make any sense to me.
9          So what I want to ask you, then, is, what is
10  your opinion as to what that sentence means?
11      A.  What I understand that sentence to say is
12  that the bailee -- in this case, SGM -- will carry out
13  the expenses.  And by that, I mean they will address
14  the expenses to maintain the ship in good order.
15  Which is a requirement of the bailment.
16      Q.  Does it address --
17          MR. RUFTY:  Let him finish, please.
18      A.  But that's different from what the translator
19  said, which is that they're responsible for those
20  expenses.  That's the distinction I make.
21      Q.  (BY MR. SOTO)  Forget what the translator
22  says.
23      A.  Okay.
24      Q.  I don't want to -- I don't want to -- I think
25  we're getting bogged down here comparing your

Page 80

1  interpretation to hers.
2      A.  Okay.
3      Q.  Again, my question to you is:  What does this
4  sentence mean?  Does this sentence mean that SGM will
5  pay the expenses of the bailment without a right to be
6  reimbursed or refunded?
7      A.  What this means is that the bailee will
8  undertake the expenses, meaning take care of the
9  expenses, in order to maintain the ship in good
10  condition without requesting refund -- any refund for
11  the bailment.  That's what it says.
12      Q.  What does that mean?
13      A.  I'm not sure what it means.
14      Q.  As you sit here today, you don't know how --
15  you do not have an opinion as to what that means?
16      A.  As I sit here today, I don't.  For two
17  reasons:  First of all, I've only seen the document
18  within the last couple hours, number one.
19          But, number two, I'm not sure whether that
20  provision means that the bailee is not going to seek a
21  refund from the Mexican government for the expenses of
22  the bailment, whether it means that the bailee will
23  not seek a fee for the bailment, or whether, as you're
24  suggesting, it means that they won't seek any refund
25  whatsoever, ever, for the bailment.  To me, that's

Page 81

1  kind of a fact question that the parties need to
2  testify about or provide evidence on and that the
3  court needs to decide.  To me, it's not clear from
4  this language.
5      Q.  As you sit here today, you do not have an
6  expert opinion as to what that sentence means?
7      A.  As to what the phrase "without requesting any
8  refund for the bailment," I don't have any opinion
9  today what that means.
10      Q.  Assume for me that JRB procured and/or paid
11  for the services at issue in this lawsuit with the
12  understanding that SGM would be the party reimbursing
13  it for those expenses.
14          Under that situation, would SGM be the
15  debtor?  The ultimate debtor, I think, is the phrase
16  you use in your report.
17      A.  No.  The debtor would be the vessel, or
18  Marfield.  The creditor -- it would be a creditor in
19  that situation.
20          Are you saying the debtor -- the debtor as
21  between SGM and JRB?
22      Q.  No.  No.
23      A.  I didn't think so.
24      Q.  I'm saying that if, when JRB procured the
25  services at issue in this lawsuit and then paid for

Page 82

1   the services in this lawsuit, it did so with the
2   understanding that SGM would be the party reimbursing
3   it for those services.
4        In that scenario, isn't SGM the debtor, the
5   party responsible for those costs, since JRB procured
6   them and paid for them with the understanding that it
7   would be reimbursed from it?
8        A.   Okay.  You're saying that the agreement in
9   July 2015 between SGM and JRB was not only that JRB
10  would act as its agent for SGM with regard to the
11  vessel, but that SGM would be the one to whom JRB
12  would look for reimbursement?
13       Q.   Correct.
14       A.   So you're asking me to assume that.
15       Q.   Yes.
16       A.   All right.
17       Q.   And in that situation, isn't SGM the debtor
18  responsible for the -- those payments, those costs,
19  those expenses?
20       A.   Yes, in the sense that a principal, under
21  Mexican law, has a duty to reimburse an agent for
22  appropriate expenses incurred by the agent in carrying
23  out the agency.
24       Q.   Maybe we're talking past each other, and I
25  want to --

Page 83

1        A.   Okay.
2        Q.   -- talk about an incident of maritime lien
3   from the U.S., granted.
4        A.   Okay.
5        Q.   Is that a maritime lien cannot be -- will not
6   arise against a vessel, it will not attach against a
7   vessel if the parties who are creating the debt
8   understand that the vessel is not going to be liable
9   for that?  So if you and I enter into an agreement
10  where you're going to provide services to me and I
11  tell you -- I may have a -- I may be chartering a
12  vessel, I may be the owner of the vessel, but I want
13  you to understand that I'm the -- this is me, it's
14  against me personally.
15       A.   Not the vessel.
16       Q.   Not the vessel.
17       A.   Okay.
18       Q.   And the vessel is not liable.  In the same
19  sense that if you were to engage into a contract to
20  provide services and you didn't know that the other
21  party owned a vessel, you didn't know where those
22  services were going, that debt wouldn't give rise to
23  maritime lien, because you -- there was an
24  understanding between the parties that the debt
25  belonged to the contracting parties.

Page 84

1        A.   Understood.
2        Q.   Okay.
3             MR. RUFTY:  Object to form.
4        Q.   (BY MR. SOTO)  So with that background --
5        A.   Okay.
6        Q.   -- I think, just to sort of clarify again, my
7   question to you is, if JRB, when providing services
8   and goods that are the subject of this lawsuit, if it
9   did so with the understanding that SGM was going to be
10  the party reimbursing it, is SGM then the party that
11  is the debtor, not the Caballo Maya?
12            MR. RUFTY:  Object to form.
13       A.   In my view, as a matter of Mexican law, the
14  answer to your question depends on whether that was
15  the agreement.  If you're telling me to assume that
16  the agreement in July 2015 was that JRB would act as
17  SGM's agent and the agreement further was that JRB was
18  to look only to SGM for reimbursement of amounts
19  incurred as the agent for SGM, if you're asking me to
20  assume that, I'm not sure -- I guess what you're
21  asking me to further tell you is what that means under
22  Mexican law.  Because I can't tell you what that means
23  under U.S. law, that's not --
24       Q.   (BY MR. SOTO)  I'm only asking you the
25  question as to Mexican law.

Page 85

1        A.   Okay.
2        Q.   And I'm not asking you to assume the -- an
3   agency relationship, because that's a conclusion
4   that's already in your report.  I don't know.
5        A.   Sure.
6        Q.   What I will ask you to assume is this, this
7   fact situation.
8        A.   Okay.
9        Q.   SGM is claiming to be the owner of this
10  vessel.  JRB is claiming to be a charterer of the
11  vessel.  SGM and JRB have an understanding that JRB is
12  going to look to SGM for reimbursements for expenses
13  paid.
14       A.   Okay.
15       Q.   In that situation, is the Caballo Maya liable
16  for those expenses, or is SGM the sole debtor?
17            MR. RUFTY:  Object to form.
18       A.   Under Mexican law, if JRB is, in its own
19  right, a creditor, it has the ability, under Article
20  91 of the maritime commerce law, to seek recovery
21  against the vessel in rem for expenses that are
22  granted preference under Article 91.  So that -- I
23  don't think that this arrangement that you're talking
24  about where there's an agreement that JRB would look
25  only to SGM affects JRB's rights under Article 91.  I

Page 86

1  don't know what it does with regard to U.S. law, but
2  under Mexican law, Article 91 doesn't make any
3  distinction in that situation.
4        Q.   (BY MR. SOTO)  Under Mexican law, can an owner
5  subrogate itself?  If an owner arranges for services
6  that it wants provided to his own vessel and then pays
7  for their -- those services that he ordered, can he
8  then claim a maritime lien against his own ship if
9  that ship is sold to another party?
10       A.   In your hypothetical, is the owner a creditor
11  with regard to the vessel?
12       Q.   That's my question to you, sir.
13            If an owner engages a vendor to provide
14  services that the owner is ordering for his own vessel
15  and he pays for those services, and if that vessel
16  later on changes ownership to now a new owner, can the
17  owner go and claim a lien against that vessel for
18  subrogation saying that, "I paid for the services"?
19       A.   Sure.
20       Q.   Is the answer yes?
21       A.   Here's the answer to your question:  If,
22  under Mexican law, that owner in that very curious
23  situation is, as a matter of substantive law, a
24  creditor, what Article 91 says is that a creditor
25  can't -- has a maritime privilege.  Assuming that

Page 87

1  they're a creditor with regard to certain types of
2  expenses.
3            And so the answer would be yes, but only if,
4  under Mexican law, they are, in fact, a creditor.
5       Q.   Well, how would they be a creditor under
6  Mexican --
7       A.   Well, that's what I'm telling you, if under
8  Mexican law.  I don't know the answer to the question,
9  because I haven't looked at it.  Your hypothetical is
10  not something that was presented to me before.  And so
11  I can tell you what the formula is, but I can't tell
12  you whether, in fact, it applies to your situation.
13       Q.   Well, what does it take to be a creditor
14  under Mexican law?
15       A.   You can have an express debtor/creditor
16  relationship.  You can have a situation where, by
17  virtue of operation of law, somebody becomes a
18  creditor, not an express contract.  For example, an
19  unjust enrichment situation.
20            Those are a couple of the contexts that I can
21  think of where somebody becomes a creditor, where it's
22  either expressed or imposed by law.
23            Now, whether your owner situation, as to its
24  own vessel, satisfies those conditions, I just don't
25  know.

Page 88

1       Q.   Can a charterer who orders services for the
2  vessel that its chartering pay those services and then
3  later on claim a lien against the vessel that it's
4  chartering?
5       A.   Is there any existing -- is there any express
6  agreement to the parties as to that?
7       Q.   There's a charter agreement.
8       A.   Okay.  And the charter agreement provides
9  that that's the case?
10       Q.   No.
11       A.   Well, that's what I'm asking you.
12       Q.   No, the charter is just -- the charter is --
13  a charterer orders services for the vessel its
14  chartering --
15       A.   Sure.
16       Q.   -- pays for the services and later on arrests
17  that vessel and claims, I paid for services for that
18  vessel, so I now have a maritime lien against that
19  vessel.
20       A.   Again, you need to distinguish two different
21  things.  Mexican maritime law, in the hypothetical
22  you're giving me, doesn't enter the picture until you
23  get to the second stage, the maritime privilege part.
24            What your question is focused on is in the
25  first stage, which is a general question of Mexican

Page 89

1  substantive law.  Whether, in the context, this
2  charterer who incurs expenses that benefit the vessel
3  is thereby creditor to the owner of the vessel.
4  Right?  That's what you're asking me?
5       Q.   That's not what I'm --
6       A.   Okay.
7       Q.   I asked my question, and if the answer is,
8  you cannot tell me based on the facts that I provided
9  to you, that's fine.
10       A.   I can't understand your question.  You're
11  telling me a charterer of a vessel, pursuant to a
12  charter agreement, that doesn't talk about this
13  situation relating to expenses incurs expenses and
14  then attempts later to exercise a maritime lien
15  against the vessel for the expenses.
16       Q.   That's not my question.
17       A.   I'm so sorry.
18       Q.   But let me ask a new question --
19       A.   Okay.
20       Q.   -- okay?
21            SGM claimed to be the owner of the vessel at
22  the time that it was acting as depository; correct?
23       A.   That's my understanding.
24       Q.   And SGM also entered a into a bareboat
25  charter agreement with JRB at the time; correct?

David Lopez
April 09, 2018                                                      90 to 93

Page 90

1    A.   I don't know that.  I'll assume that to be
2    the case.
3        Q.   Okay.  You have a party who believes it's the
4    owner of the vessel and a party who believes it's the
5    charterer of the vessel generating expenses while the
6    vessel is in SGM's possession.
7        A.   Okay.
8        Q.   Can SGM now claim a maritime lien for
9    expenses that it had its agent incur for the benefit
10   of a vessel that it claimed to be -- that it claimed
11   ownership of during the time that it was in its
12   possession?  Can it claim a maritime lien under
13   Mexican law?
14       A.   Right.  And here are the facts that are
15   missing from your hypothetical in order for me to
16   answer it under Mexican law.
17           The first thing I need to know is whether
18   there is an express agreement between the parties
19   concerning the point you're asking me about.  In other
20   words, is there an express agreement that SGM will be
21   liable for the expenses incurred by the charterer?  Is
22   there anything about that in the agreement between
23   them?
24       Q.   I can't answer that.
25       A.   Without that, I can't answer your question.

Page 91

1        Q.   Well, I'm -- let's take the charter agreement
2    outside of the hypothetical; because, frankly, I'm not
3    trying for this to be a hypothetical.  I don't know
4    why you don't have a copy of the charter agreement,
5    but let's just take that out, because you haven't
6    reviewed it.  Okay?
7        A.   All right.
8        Q.   So I don't want this to be a hypothetical, I
9    want this to be based on the facts that we have now
10   and the documents in this case.
11       A.   All right.  Tell me the specific facts.
12       Q.   We do know that SGM was claiming to be the
13   owner of the vessel; correct?
14       A.   I believe that's correct, yes.
15       Q.   And we do know that SGM requested to be
16   designated as the depository of the vessel, because it
17   owned it; correct?
18           MR. RUFTY:  Object to form.
19       A.   That second part of the question I'm not sure
20   about.  All I know is, based on these documents, it
21   requested to be the bailee of the vessel and, in fact,
22   was designated bailee.
23       Q.   (BY MR. SOTO)  And in its request to be
24   designated as the bailee, it stated that it owned the
25   vessel; correct?

Page 92

1        A.   I don't recall.  It may.
2        Q.   Well, can we agree on that, or should I find
3    the document?
4            MR. RUFTY:  Let's find the document.
5        A.   In paragraph 1.7(b), I refer to a May 2015
6    request to be the bailee or to lift the attachment and
7    release it to SGM.  So maybe that's the document we're
8    going to be in.  I'll look at whatever you have.
9            (Exhibit 6 marked/introduced.)
10       Q.   (BY MR. SOTO)  Let me hand you what's been
11   marked as Exhibit No. 6.  This is a document that was
12   produced along with your report and is a document that
13   I believe you refer to in your report as the document
14   in which SGM is requesting to be designated as the
15   bailee.
16           Do you recognize this document?
17       A.   In my affidavit, I referred to something
18   called the Request by the Shipping Group Mexico to the
19   Attorney General of Mexico for removal of attachment.
20   And that's dated May 29, 2015.  This appears to be
21   that document.
22       Q.   Would you please turn to what's Bates-stamped
23   Lopez 0932.
24       A.   Yes, sir, I'm there.
25       Q.   And just to be clear, this was a Word

Page 93

1    document that was produced to us, but I believe it was
2    represented to be a document that was issued by SGM.
3    Okay?
4        A.   Okay.
5        Q.   Is that your understanding as well?
6        A.   Yes.
7        Q.   Okay.  And in this document that's authored
8    by Mr. Garcia, on page Lopez 932, there's a paragraph
9    that begins with:  "These circumstances..."
10           You see that?
11       A.   Again, I'm looking at the Spanish.  Let me
12   find what you're after.
13           It is the fourth full paragraph down on page
14   932.  I'm with you.
15       Q.   And it says:  "These circumstances are shown
16   in this case, by virtue that the vessel called
17   'Caballo Maya', Panamanian, is an asset that has been
18   largely [sic] used, and belongs to the company
19   'SHIPPING GROUP MEXICO SGM S.A. DE C.V.', previously
20   known as 'GGM Shipping S.A. DE C.V.', who acquired the
21   vessel through a purchase contract signed by MARFIELD
22   LTD INC and GGM SHIPPING S.A. DE C.V., through their
23   legal representatives, on October twentieth, two
24   thousand and eleven."
25           So going back to my original question --

David Lopez
April 09, 2018                                    94 to 97

Page 94

1    A.   Okay.
2    Q.   -- in terms of what we know in this case --
3    so it's not a hypothetical -- we know that at the time
4    that SGM was requesting to be designated as a
5    depository, it was claiming ownership of the Caballo
6    Maya.
7    A.   True.
8    Q.   Okay.  So we have a party who claims
9    ownership of the vessel, is asking to be made
10   depository of the vessel and then has an agent who it
11   is authorizing to go out and procure services and
12   expenses for the benefit of that vessel that it claims
13   to own?
14   A.   Correct --
15   Q.   In that situation --
16   A.   -- yes.
17   Q.   -- can the agent who is procuring these
18   services with the understanding that the principal,
19   SGM, is going to reimburse it for those services, can
20   it claim a maritime lien against the vessel?
21   A.   I think the question answers itself.  If your
22   hypothetical, based on these facts -- and it may not
23   be hypothetical, maybe it's factual -- is that there
24   was an understanding that JRB would look only to SGM
25   for reimbursement of the expenses incurred in

Page 95

1    connection with the vessel, then it strikes me that
2    that's the agreement, and that's what they've got to
3    do.
4    Q.   Okay.  And let's take the agreement out of
5    the equation.
6         Now we just have an owner or a claimed owner
7    of the vessel --
8    A.   Sure.
9    Q.   -- asked to be appointed depository, isn't
10   unilaterally appointed -- requests to be appointed
11   depository.
12   A.   Correct.
13   Q.   As an agent that it engages to procure
14   services for the benefit of the vessel that it claims
15   to own, agent go head, does so, does that agent now
16   have a lien against the vessel?
17   A.   To the extent the agent is, in its own right,
18   a creditor, it does, under Mexican law.
19   Q.   In that situation, is the agent a creditor?
20   A.   Yes.  In the situation as you've described it
21   in this last question, it is a creditor.
22   Q.   Okay.  Where that changes is if there was an
23   understanding between the principal and the agent that
24   the agent looked to the principal for payment?
25        MR. RUFTY:  Object to form.

Page 96

1    A.   I believe that's right, yes.
2         MR. RUFTY:  You mean only -- look only
3    to, is that what you mean?
4         MR. SOTO:  I mean what I said.
5    Q.   (BY MR. SOTO)  In your report, you refer to
6    Marfield as the ultimate debtor.
7         And I'll admit that I don't quite understand
8    what you mean by that in the sense that Marfield was
9    contesting ownership of the Caballo Maya against SGM;
10   correct?
11   A.   During the 2015-2016 time period, my
12   understanding is that Marfield was contending in the
13   Mexican courts that it was the owner of the vessel.
14   Q.   And SGM was contending the opposite?
15   A.   Was contending that it was them, correct.
16   Q.   And SGM was requesting to be appointed the
17   depository, and Marfield was opposing that request?
18   A.   The first part, I have clearly seen.  The
19   second part, I'm not sure I have seen.
20   Q.   Assume for me that Marfield was opposing
21   SGM's request to be appointed as a depository.
22   A.   Okay.  I'll assume that.
23   Q.   Okay.  We have a situation, then, where SGM,
24   through an agency relationship, asked its agent to
25   procure services that Marfield does not want to

Page 97

1    happen -- Marfield is against the -- the depository
2    designation.
3         How was Marfield the debtor for those
4    services?
5    A.   Can you tell me where in my report I say
6    "ultimate debtor"?  I just need that context.
7    Q.   On page 9.
8    A.   Where on page 9?
9    Q.   It's the very last paragraph.
10   A.   Oh, okay.
11        Okay.  Right.  And the wording there is very
12   important.  What I say is that under Mexican law,
13   viewing Marfield as the ultimate, quote/unquote,
14   "debtor" on the obligations paid by JRB, JRB had no
15   duty to inform Marfield that it was making the
16   payments.
17        Here's what I'm saying there:  To the extent
18   Marfield, as the party that was determined by the
19   Mexican courts to, in fact, own the vessel, or to be
20   given ownership of the vessel -- assuming that's what
21   happened.  I really haven't looked at that.  I'm
22   taking your word for it.  If Marfield contends at any
23   point that it's not obligated to pay because it was
24   not informed of the expenses in advance, before they
25   were incurred, what my sentence on page 9 going onto

David Lopez
April 09, 2018                                      98 to 101

Page 98

1  page 10 says is that is a matter of Mexican law.
2  That's not the case.
3      Q.   Marfield is contending it's not a debtor.
4      A.   And I'm not contending that it is a debtor.
5  I'm saying if it's viewed as being a debtor.  Okay?
6  Maybe it's not a debtor.
7           In any capacity, if Marfield objects to the
8  reimbursement of JRB on the grounds that it wasn't
9  informed of these expenses and payments in advance,
10  that's not required under Mexican law.  It doesn't
11  defeat JRB's request for reimbursement.
12      Q.   Are we talking about a hypothetical that may
13  not exist?  Because is there anything in the materials
14  that you have reviewed and the information that's been
15  provided to you that leads you to reach the conclusion
16  that Marfield is a debtor in this situation?
17      A.   Here's why I included the paragraph that
18  we're talking about on page 9.  The preceding
19  paragraph is where I refer to Article 2062 of the
20  Mexican Federal Civil Code, which talks about payment.
21  And then there's payment in the prior discussion as
22  well.
23           It occurred to me that somebody may say,
24  "Okay, well, JRB paid, but I shouldn't have to
25  reimburse JRB or compensate JRB, because I was not

Page 99

1  informed of the expenses in advance."
2           I thought that was a relevant point, and so
3  in my affidavit, I put that whether Marfield was
4  informed in advance is not relevant under Mexican law,
5  nor is it relevant under Mexican law whether JRB was
6  authorized by Marfield to make those expenses.  That's
7  simply the point of those two paragraphs -- of that
8  paragraph.
9           MR. SOTO:  I'm going to object as
10  nonresponsive.
11      A.   Okay.
12      Q.   (BY MR. SOTO)  My question is whether or not
13  you are expressing an opinion or the conclusion that
14  Marfield was a debtor in this case.
15      A.   I'm not.
16      Q.   On page 7 of your report, you talk about the
17  statute of limitations for a Mexican maritime lien.
18           And that's one year, I believe; correct?
19      A.   Article 93, as quoted on page 7 of my
20  affidavit, says that "Maritime privileges on vessels
21  shall be extinguished by the passage of one year from
22  the time they become enforceable, unless an action
23  directed at the attachment or detention of the vessel
24  has been exercised."
25      Q.   When does a maritime lien, under Mexican law,

Page 100

1  become enforceable?
2      A.   When the status of creditor has been reached.
3      Q.   Okay.  And when did that happen in this case?
4      A.   When JRB procured a service and paid for the
5  service.  That's when it becomes a creditor of the
6  vessel.
7      Q.   But the maritime lien -- didn't the
8  maritime -- you're talking about the maritime lien
9  being transferred from the -- from the vendor to JRB.
10           So if a vendor provides a service in 2015,
11  that vendor has the maritime lien against the Caballo
12  Maya vessel; isn't that correct?
13      A.   When JRB contracts for the provision of,
14  let's say, a portage service, when the portage service
15  provider provides the service, they become a creditor
16  to JRB.
17           When JRB pays that service provider, it
18  becomes a creditor under Mexican law.  It becomes
19  entitled to repayment under Mexican law.
20      Q.   Who holds --
21      A.   And then --
22      Q.   -- a maritime privilege?
23           MR. RUFTY:  Please let him finish the
24  answer.
25      A.   Well, that's what I'm getting to.

Page 101

1           A creditor of a service provided to the
2  vessel has the ability to exercise maritime privilege
3  under Mexican law.
4      Q.   (BY MR. SOTO)  Let's say a vendor provides
5  portage services in January 1st of 2015.
6      A.   All right.
7      Q.   It is a creditor, and it has a maritime lien
8  that's enforceable against the vessel as of the date
9  it provides those services; correct?
10      A.   It depends on the agreement between JRB and
11  the service provider.
12           This is where I think you're getting lost in
13  the distinction between U.S. law and Mexican law with
14  regard to these maritime privileges.
15      Q.   When a vendor provides services --
16      A.   Yes.
17      Q.   -- on January 1st of 2015 --
18      A.   Okay.
19      Q.   -- the type of services it gives are, I
20  assume, maritime privilege.
21      A.   Okay.
22      Q.   Does that vendor have a maritime privilege
23  when those services are provided?
24      A.   Depends on the agreement between JRB and the
25  vendor.

David Lopez
April 09, 2018                                        102 to 105

Page 102

1     Q.    I'm not talking about JRB.
2     A.    That's -- here's what I'm trying to tell you.
3     You're getting lost in this.
4           In Mexico, in order to exercise the maritime
5     privilege, you have to maintain the status of
6     creditor.  That's very clear from the opening language
7     of Article 91.
8           Is that clear to you?  You have to be a
9     creditor.  That's step one.
10          Merely because somebody provides services to
11    a vessel in Mexico does not, on its own, make that
12    person a creditor that can exercise the maritime
13    privilege.
14          And here's why:  If the agreement between the
15    service provider and JRB was that the service provider
16    would look to JRB, then JRB, when it pays that
17    vendor -- when it pays that vendor becomes the
18    creditor that can exercise the privileges against the
19    vessel.  But the service provider may not be in that
20    status yet.
21    Q.    So if the service provider and JRB have an
22    understanding that JRB is going to be responsible for
23    the cost --
24    A.    To the vendor.
25    Q.    Let me finish my question.

Page 103

1     A.    Okay.
2     Q.    If JRB and the vendor have an understanding
3     that the JRB is going to be responsible for the cost,
4     then does that mean that the vendor does not have a
5     maritime privilege against the vessel?
6     A.    Based on those facts, in my expert opinion,
7     the vendor cannot trigger Article 91.  That's going to
8     be left for JRB to do, once it becomes a creditor by
9     paying the vendor.
10    Q.    Because there's an understanding between the
11    two that JRB is going to pay those expenses?
12    A.    That's right.
13    Q.    If you have a vendor who provides services to
14    JRB and there is no agreement between the two -- not
15    one that's been produced, certainly -- then does the
16    vendor have a maritime lien against the vessel when
17    those services are provided?
18    A.    Not necessarily.  Because in your
19    hypothetical, you say that there's no understanding.
20    But even if there's no written understanding, Mexican
21    law can impose an obligation.
22          In other words, in that context, Mexican law,
23    substantive law that deals with the establishment of
24    debtor/creditor relationships, can say that by merely
25    asking for the provision of the service, JRB is

Page 104

1     agreeing implicitly to compensate the service provider
2     for the service.
3     Q.    So my understanding of your testimony, JRB
4     can order services to be provided for a vessel, wait a
5     year and not pay those vendors.
6           Pay those vendors after a year, and that's
7     when the accrual of the -- or, that's when its
8     maritime lien becomes effective.
9     A.    I think you're getting away from these facts:
10    In this context, the issue is, was there an agreement
11    between JRB and the service provider?  If the
12    agreement was that the service provider would provide
13    the service and seek reimbursement from somebody other
14    than JRB, or that there was no understanding to come
15    and be paid by JRB, then that service provider can
16    seek whatever form of relief it wants.  That can be a
17    contract action against the vessel or the owner, it
18    can be an unjust enrichment action against the vessel
19    or the owner, it can be an action against JRB for an
20    implicit contract.  But the question is, can it
21    exercise this maritime privilege?  And the issue is,
22    if there's completely no understanding between JRB and
23    the service provider, possibly.
24    Q.    What is your understanding of what happened
25    in this lawsuit?  Is JRB seeking to enforce its own

Page 105

1     maritime privilege that -- that arose unique to it, or
2     did it subrogate and take the place of a maritime lien
3     or privilege that belonged to other vendors?
4     A.    And again, you're mixing apples and oranges.
5           In Mexico, you have a two-step process.
6     First, you have to obtain creditor status.  That's a
7     function of substantive law outside of the law of
8     mercantile commerce -- not mercantile commerce,
9     navigation and -- what's the word I'm looking for?
10    Q.    I don't know.
11    A.    Law of commercial maritime commerce.
12          The maritime privilege in Mexico is a
13    creature of a statute, the law of maritime commerce,
14    okay?  You don't find it in the federal civil code,
15    you don't find it in the commercial code, you don't
16    find it in any other statute.  It's there in that
17    particular law.
18          And what it says is that in order to get the
19    privilege, the benefit of this preferential payment
20    process, which is this privilege, you have to be a
21    creditor.
22          To determine under Mexican law whether
23    somebody is a creditor you don't look at the law of
24    maritime commerce.  It's not in that statute.  You've
25    looked in other places like the commercial code or the

David Lopez
April 09, 2018                                    106 to 109

Page 106

1  federal civil code.  And so that's the point of my
2  answer to you.
3          Whether these suppliers out there of whatever
4  might have been to the show, if there is no
5  understanding whatsoever about them getting paid,
6  then, arguably, they could become -- could achieve
7  creditor status that would allow them to exercise the
8  maritime privilege.
9          However, if there's an agreement between JRB
10 and those service providers that they are to look to
11 JRB, then they wouldn't have that ability.
12     Q.   Have you analyzed the invoices made the
13 subject of JRB's lien to determine whether the
14 invoices have been extinguished by limitations?
15     A.   I've analyzed the invoices, I've seen that
16 they have various dates and various amounts.  I did
17 not look at the date of the filing of the lawsuit in
18 the United States and then do an analysis of which of
19 those invoices were incurred and paid within one year
20 before the date of the file.  I did not do that
21 analysis.
22     Q.   You said you reviewed the expert report of
23 Enrique Garza?
24     A.   I've skimmed it.
25     Q.   And have you seen his opinions that several

Page 107

1  of the invoices are barred limitation?
2      A.   I did see that, yes.
3      Q.   Do you dispute his conclusions?
4      A.   I haven't had a chance to perform my own
5  analysis of his conclusion.
6      Q.   Section 4 of your report, pages 6 and 7,
7  discuss the categories of services that give rise to a
8  maritime lien in Mexico.
9      A.   Okay.
10     Q.   Have you analyzed the invoices made the
11 subject of JRB's lien to determine which invoices can
12 support a lien because they do not fall within the
13 statutory categories of services?
14     A.   I have.
15     Q.   Okay.  And when did you do that work?
16     A.   It would have been in December or January in
17 connection with my declaration.
18     Q.   And have you listed or set forth anywhere
19 those invoices that you have determined cannot support
20 a maritime lien because they do not fall within the
21 category services?
22     A.   Yes.
23     Q.   Where did you do that?
24     A.   If you look at 1.7(e) on page 4, I note that
25 during the period July 2015 to July 2016, JRB incurred

Page 108

1  and paid over 66,500,000 pesos in crew salaries and
2  then another 200,000 pesos for pilotage, mooring,
3  towing and other port services.
4          So when I did my analysis, I saw that under
5  Article 91 of the Maritime Commerce Law, only certain
6  types of expenses related to -- in connection with a
7  vessel are granted the privilege; others are not.
8          And so when I went through the invoices, I
9  saw some invoices that did not fit into the categories
10 of Article 91.
11     Q.   And have you listed those invoices that did
12 not fit somewhere?
13     A.   No, I haven't listed them anywhere.
14     Q.   Did you list the invoices that did fit?
15     A.   I didn't list the invoices that did fit, no.
16     Q.   So you can't point me to any document or
17 anyplace in your report where I can determine which
18 invoices you've determined can support a maritime lien
19 and which ones cannot?
20     MR. RUFTY:  Object to form.
21     A.   Not to a list.  But what I could do or what
22 you could do is go through the set of invoices that I
23 received, parse out those that relate to crew
24 salaries, and the total should be in the neighborhood
25 of 6.5 million pesos.  And that's how you would know

Page 109

1  what invoices I'm talking about.
2          Moreover, I specify in paragraph 1.7(e) the
3  time period of those invoices.  So that's another set
4  of facts that can be used to identify which invoices
5  I'm talking about.
6      Q.   (BY MR. SOTO)  So I need to go through the
7  invoices and look for the ones for crew salaries and
8  then go through the ones that look -- that have to
9  deal with pilotage, mooring, towing -- and here's the
10 part that's difficult for me.  You say "other port
11 services."
12          I don't know what that means, so how am I
13 going to identify those invoices?
14     A.   To me, it was obvious on the face of the
15 invoice what the service was that was provided or
16 whether it was a salary.  I was able to make that
17 determination with very little difficulty.
18          And again, I was reading the original Spanish
19 version of the invoices.  It wasn't a problem.
20          Do I include a list, no.  Is it possible to
21 come up with a list, sure.
22     Q.   If I'm going to try to recreate -- strike
23 that.
24          If I'm going to try to determine which
25 invoices you allowed and which ones you disallowed,

David Lopez
April 09, 2018                                                110 to 113

Page 110

1   what I'm going to look for, though, is something that
2   matches those two totals that are on 1.7(e), 6,500,00
3   and then the 200,000?
4       A.   What I would do is, I would take the set of
5   invoices, and I would just create different stacks:
6   crew salaries on one hand, portage services on another
7   hand, and everything else.
8       Q.   Can you tell me the amount of invoices that
9   you found that were not allowed?
10      A.   More or less.  If you look at paragraph
11  1.7(e), there were 17 million pesos of expenses in
12  those invoices.  If you deduct 6.7 million pesos from
13  that number, you end up with approximately 11 -- 10.3
14  million pesos.
15      Q.   That were disallowed?
16      A.   That were disallowed.  Or, not disallowed,
17  but not within the requirements of Article 91 of the
18  Maritime Commerce Law.
19      Q.   That would not give rise to maritime lien or
20  maritime privilege?
21      A.   That's right.
22      Q.   Have you reviewed the opinions by Enrique
23  Garza wherein he concludes that several invoices
24  cannot give rise to a maritime lien under Mexican law?
25      A.   I did see him say that in his declaration,

Page 111

1   yes.
2       Q.   And do you dispute his conclusions?
3       A.   As I sit here today, since I got his expert
4   report only yesterday, I haven't had a chance to
5   perform my analysis.  I may disagree, I may agree, I
6   don't know yet.
7       Q.   You state in your report that some of the
8   services at issue in this lawsuit were provided
9   directly, and some were provided indirectly.
10           Have you taken to identify those services
11  that provided directly by JRB and those that were
12  provided by vendors?
13      A.   As I recall -- and, again, it's been a little
14  while since I've looked at the invoices -- it may
15  be -- you know, I just don't remember which were
16  provided directly or through vendors.  It occurs to me
17  that when I was referring to anything provided direct,
18  that may have been crew salaries.  But I'm not sure,
19  as I sit here today.
20      Q.   It's my understanding that there are no
21  assignments between JRB and the vendors that provide
22  the services.  Is that your understanding as well?
23      A.   I don't know anything about that, whether
24  there are or not.
25      Q.   You haven't reviewed any assignments, have

Page 112

1   you?
2       A.   I have not seen anything that I would view as
3   an assignment to the vendors.
4       Q.   Did you assume an assignment exists?
5       A.   No.
6       Q.   It's my understanding that, in Mexico, there
7   is a database -- tax administration service database
8   which lists invoices.
9            Are you familiar with this database?
10      A.   Yes.
11      Q.   Have you undertaken to search for the
12  invoices at issue in this lawsuit in that database?
13      A.   No.
14      Q.   Are there any opinions in Enrique Garza's
15  report, as we sit here today, that you can tell me
16  that you do dispute or do disagree with?
17      A.   As I said when we began the deposition, he
18  and I have lots of areas of agreement.  There are
19  basically a couple of areas of disagreement.  And I'm
20  not at a point yet, because of -- I only received his
21  report yesterday, where I have opinions either way --
22      Q.   Okay.
23      A.   -- on his -- on his opinions.
24      Q.   You said -- you just said, though, that there
25  are a few areas that you do disagree.

Page 113

1            Can you tell me what those -- what areas
2   those are?
3       A.   Sure.
4            We've referenced today what we're calling the
5   certificate of deposit of the ship July 2015.  It's
6   Exhibit No. 5.
7            Earlier, you and I spent some time discussing
8   this provision in that document, or this phrase in
9   that document, without requesting any refund for the
10  bailment.
11           I noted that that Mr. Garza interpreted that
12  phrase very liberally in favor of Marfield.  In other
13  words, I think he took license with that phrase in a
14  way that is not supported by the documents.
15           So that's one area where he and I don't see
16  things the same way.
17      Q.   Do you have any information to dispute his
18  interpretation of that provision?
19      A.   Sure.
20      Q.   What do you have?
21      A.   His affidavit itself.  In other words, he
22  attributes to it language or intent that I don't think
23  is clear from the face of the document.
24      Q.   And my understanding from our -- when we
25  discussed that provision in-depth was that your

David Lopez
April 09, 2018                                    114 to 117

Page 114

1  opinion today is that you cannot say what the meaning
2  is, because there are different meaning -- different
3  possible meanings?
4      A.   And that's exactly my point.  He attributes
5  to it a particular meaning that I would argue with him
6  is not necessarily the meaning.
7      Q.   Okay.  It might be, but it might not be?
8      A.   Sure.
9           And I think, at the end of the day, the judge
10 is going to decide what it means, and the judge may
11 agree with him or not agree with him.
12     Q.   Any other areas that you disagree with?
13     A.   He discussed some provisions of Mexican law
14 concerning commercial agency and/or subrogation.
15          I talk about those issues.  He references
16 some provisions of Mexican law that I don't.  And so
17 I'm not sure that we disagree on them, I just know
18 that was a difference that I wanted to think about as
19 well.
20     Q.   Okay.  Anything else that you can think of
21 that you disagree with as we sit here today?
22     A.   As I sit here today, that's -- those are the
23 two things that stand out in my mind.
24     Q.   And to be fair, I have his report here.  I
25 can hand it to you, if it would help.  But certainly,

Page 115

1  if --
2      A.   I don't think it would help, because sitting
3  here today, I can't answer your question completely.
4      Q.   I want to ask you about a maritime lien or
5  privilege under Mexican law for the payment of crew
6  wages.  Okay?  And what I want to know is -- and my
7  understanding is, a maritime lien or privilege can
8  arise from the payment of crew wages; is that correct?
9      A.   Yes.
10     Q.   Okay.  My question is -- I want to give you
11 two scenarios.  Okay?  One is where a creditor pays
12 the crew wages himself, and I believe that's probably
13 the standard, easiest way in which a maritime lien
14 would then arise; correct?
15          MR. RUFTY:  Object to form.
16     Q.   (BY MR. SOTO)  Is that not correct?
17     A.   Here's the problem with your question:  You
18 continue to use the word "maritime lien," and --
19     Q.   I'll strike it, and I'll --
20     A.   -- privilege is -- I mean, it is in rem.
21 That's clear.  So it's like a lien.  But I like to
22 stick to the idea of a privilege, because it's really
23 a method of enforcing an obligation.
24     Q.   Fair enough.
25     A.   Okay.

Page 116

1      Q.   A creditor pays for -- pays crew wages
2  directly.
3      A.   Okay.
4      Q.   That gives rise to a maritime privilege;
5  correct?
6      A.   When a person pays crew salaries, other
7  things being equal, they become a creditor.  And under
8  the Maritime Commerce Law, once they achieve creditor
9  status as to the payment of crew salaries, they can
10 exercise the maritime privilege.
11     Q.   What if the creditor does not pay the crew
12 salaries?  What if, instead, the creditor pays a
13 staffing agency, who then goes -- the staffing agency
14 goes and engages the crew and pays the crew salaries?
15     A.   And what is the understanding between the
16 person that hires the staffing company and the
17 staffing company as to their arrangement?
18     Q.   Is that necessary to know?
19     A.   Yes.
20     Q.   Can you explain why?
21     A.   Sure.
22          As I've explained to you, whether somebody is
23 a creditor under Mexican law is a function of Mexican
24 substantive law outside of the Maritime Commerce Law.
25 So if that staffing agency has an understanding with

Page 117

1  the person that engaged it or retained it, that the
2  staffing agency is to look only to that person for the
3  payment, then they're a creditor as to that person
4  that retained them, but not necessarily able -- a
5  creditor that can use the maritime privilege.
6      Q.   And I'm asking with respect to the creditor
7  who engages the staffing agency.
8      A.   Okay.
9      Q.   Does that creditor then have a maritime
10 privilege against the vessel, since it didn't pay the
11 crew wages itself, it has paid a staffing agency?
12 Does that creditor have a maritime privilege against
13 the vessel?
14     A.   In your situation, does the person that
15 engaged the staffing agency actually pay the staffing
16 agency?
17     Q.   Let's assume it does.
18     A.   Yes, then it becomes a creditor that is able,
19 under Mexican law, to exercise the maritime privilege.
20     Q.   So if the staffing agency pays the crew
21 wages, the creditor pays the staffing agency, then, in
22 your opinion, the creditor has a maritime privilege
23 against the vessel?
24     A.   The party that ultimately pays the obligation
25 is going to be the party that is a -- that is the

David Lopez
April 09, 2018                                        118 to 121

Page 118

1    creditor in that circumstance, under Mexican law.
2         Q.   And here -- and this is what I'm getting at:
3    Aren't there two different obligations there?  There's
4    an obligation to pay the crew wages, which is paid by
5    the staffing agency.
6         A.   Okay.
7         Q.   And then there's an obligation to pay the
8    staffing agency, which is paid by the creditor?
9         A.   Sure.
10        Q.   Okay.  So does the creditor have a maritime
11   lien, under Article 91, against the vessel if it did
12   not pay the crew wages, it paid the staffing agency?
13             MR. RUFTY:  Object to form.
14        A.   It does.
15        Q.   (BY MR. SOTO)  Okay.
16        A.   Because it's a creditor as to the provision
17   of a type of expense that is within Article 91 of the
18   Maritime Commerce Law.
19        Q.   Where in Article 91 does it list payment of
20   crew staffing agencies as a type of debt that gives
21   rise to a maritime privilege?
22        A.   Okay.  As I've said several times now, you
23   don't look to the Maritime Commerce Law, which means
24   you don't look to Article 91 to determine whether
25   somebody is or is not a creditor under Mexican law.

Page 119

1    You look to Mexican substantive law, which is either
2    the federal civil code, the commercial code or some
3    other body of Mexican law.
4             In fact, to be honest with you, it can even
5    be a body of foreign law, as long as they obtain a
6    creditor status.
7             What Mexican maritime law says is that
8    somebody who is in a status as a creditor with regard
9    to expenses relating to a vessel has an additional
10   method of enforcing the obligation and getting
11   compensation.  And that is called a maritime
12   privilege.  Which means a proceeding in rem against
13   the vessel, regardless of where it's at.
14        Q.   I'm sorry, but my understanding is that
15   you're saying that Article 91 is that a creditor, with
16   respect to certain types of debts, has a privilege
17   against a vessel; correct?
18        A.   As to certain types of expenditures.
19        Q.   Okay.
20        A.   Whether -- I mean, they are debts in the
21   sense that -- in the context of a situation like we
22   have in this case.
23        Q.   Expenditures that are outside of Article 91
24   or outside of the expenditures listed in Article 91 do
25   not give rise to a maritime privilege; correct?

Page 120

1         A.   If I pay something relating to a vessel or to
2    maintain a vessel that's not within Article 91, I
3    don't have, under Mexican law, a maritime privilege as
4    to that expense.
5         Q.   So where in Article 91 does it list payment
6    of a staffing agency, a crew staffing agency, as the
7    type of expenditure that gives rise to a maritime
8    privilege?
9         A.   And as I said a moment ago, your question
10   doesn't make sense in the way that Mexicans have
11   structured their law in this context.
12             The Mexicans require -- allow this benefit of
13   a maritime privilege to be exercised only by a
14   creditor.  But the Mexican Law of Maritime Commerce
15   doesn't tell you who is or who isn't a creditor.
16   That's totally up to another body of law.  And so
17   you're not going to see, in Article 91, a designation
18   of a staffing agency or a vessel owner or anything.
19   They don't care.  Article 91's purpose is not to do
20   that.
21             Article 91's purpose is to be invoked when
22   somebody has achieved creditor status as a matter of
23   Mexican substantive law or other substantive law.
24        Q.   Creditor status is outside of Article 91;
25   correct?

Page 121

1         A.   That's exactly right.
2         Q.   So if you are a creditor with respect to
3    certain expenditures that are listed within Article
4    91, then you do have a maritime privilege; correct?
5         A.   Absolutely.  You hit it on the head.  That's
6    exactly right.
7         Q.   So if you are a creditor of payment of an
8    expenditure that is payment to a staffing agency, you
9    are -- assuming you are a creditor, where in Article
10   91 does it say that expenditure gives rise to a
11   maritime privilege?
12        A.   You're asking the question wrong.
13             It's not Article 91 that creates creditor
14   status.  Here's how you get -- in the staffing agency
15   example you're asking me, here's how the person that
16   engages the staffing agency becomes the creditor:
17   There probably would be an understanding that the
18   staffing agency is going to make a payment to the crew
19   for salary and will be compensated and reimbursed by
20   the party that engaged it to do so.
21             In that context, the staffing agency is
22   acting as an agent of the person who ultimately pays.
23             When an agent incurs an expense on behalf of
24   the principal and is reimbursed under the
25   understanding it's going to be reimbursed by the

David Lopez
April 09, 2018                                122 to 125

Page 122

1 principal solely, can't look anywhere else, then that
2 situation does not give rise to a maritime privilege
3 by the staffing agency.
4        Once the principal that engages the staffing
5 agency compensates the staffing agency and is out of
6 pocket for that, that principal that engaged the
7 staffing agency becomes the creditor with respect to
8 that payment of salaries. That's how it works.
9    Q.  If I don't have any information as to what
10 happened between staffing agency and the crew and the
11 staffing agency and the creditor, I don't know who
12 paid the crew, I don't know who paid the staffing
13 agency, I don't know what kind of agreement they have
14 between them, in that situation, are we simply lacking
15 enough information to determine whether or not the
16 creditor has a maritime privilege?
17    A.  In that situation, we do know some things.
18 We do know that it was the staffing agency that made
19 the actual payment, right, of salaries?
20    Q.  No, I don't.
21    A.  Oh.
22    Q.  I don't know.
23    A.  Okay. I don't know how to answer your
24 question, then.
25        No, we -- I guess the answer to your question

Page 123

1 would be, we'd need more information.
2    Q.  All I know is that a creditor paid a staffing
3 agency. That's it. I don't know whether that
4 staffing agency paid crew members, I don't know if
5 there's an agreement between them.
6    A.  Oh, okay.
7    Q.  I have no idea.
8    A.  Okay.
9    Q.  Is there enough information there to
10 determine whether or not the creditor has a maritime
11 privilege against the vessel?
12    A.  In other words, we have, in your example, an
13 invoice from a staffing agency saying that it made
14 these payments to the crew. Or we don't even have
15 that?
16    Q.  No.
17    A.  Okay. All we have is the staffing agency
18 telling the principal, for lack of a better
19 description, that it did something with regard to crew
20 salaries? That's all we have?
21    Q.  No. All we have is an invoice from a
22 staffing agency to a creditor.
23    A.  Right.
24    Q.  Didn't say it did anything. Just an invoice.
25    A.  Okay. So you're saying, in your example, the

Page 124

1 staffing agency issues an invoice to the party that
2 engaged it, and this invoice reflects that crew
3 salaries were paid, but we don't have information that
4 the staffing agency actually gave a paycheck to the
5 captain or other crew members?
6    Q.  I don't know whether or not the invoice says
7 the crew salary were paid, because the charge to the
8 creditor may not be dollar for dollar what the crew is
9 being paid. We just have an invoice from a staffing
10 agency to a creditor.
11    A.  I guess I'd have to see the invoice to be
12 able to answer your question more thoroughly. I just
13 don't know. I'm kind of lost in that example, when I
14    Q.  So you can't tell me whether or not a payment
15 of an invoice from a crew staffing agency alone is
16 enough to give rise to a maritime privilege?
17        MR. RUFTY: Object to form.
18    A.  And there's no evidence of payment of the
19 crew or the arrangement between the staffing agency
20 and the principal?
21    Q.  (BY MR. SOTO)  No.
22    A.  Yeah, I would need to know the additional
23 information, yeah.
24    Q.  Do you agree that a maritime privilege that
25 arises from the repair of the vessel is extinguished

Page 125

1 when that vessel is redelivered to the owner?
2    A.  Under Mexican law?
3    Q.  Correct.
4    A.  I don't have any opinion on that. That's not
5 answered by Article 91 or the other provisions of the
6 Maritime Commerce Law relating to the maritime
7 privilege.
8        MR. SOTO: Let's go off the record,
9 because I need to go to the restroom.
10        (Break.)
11        MR. SOTO: Mr. Lopez, I thank you for
12 your time.
13        And I pass the witness.
14        E X A M I N A T I O N
15 BY MR. RUFTY:
16    Q.  In your testimony, you referenced a couple of
17 times unjust enrichment as a possible basis for
18 becoming a creditor.
19        Does that have any potential bearing in this
20 case, as far as you can tell?
21    A.  Potentially. What I saw on the facts of this
22 case were that JRB was engaged as SGM's agent in July
23 of 2015. That immediately led me to think about the
24 agency provisions of the Mexican -- of Mexican law.
25        I then had the understanding that it was JRB

David Lopez
April 09, 2018                                    126 to 129

Page 126

1  that procured services and paid expenses. This was
2  the reason why, when I was doing my work, I asked for
3  confirmation that JRB had made the payments. And
4  again, that's important to my analysis, because you
5  have to achieve creditor status to be able to invoke
6  the maritime privilege under Mexican law.
7         So my affidavit talks about payment,
8  subrogation and agency as the way JRB becomes a
9  creditor.
10        Mexican law, like U.S. law, has claimed a
11 provision in the Federal Civil Code that gives rise to
12 a creditor-debtor relationship based merely on unjust
13 enrichment. It's Article 1882 of the Federal Civil
14 Code. And it's the Federal Civil Code that applies in
15 these situations, because you're dealing with maritime
16 law, which is federal in Mexico.
17        And it is possible to view JRB as a creditor,
18 as achieving creditor status, under an unjust
19 enrichment theory, as well as the agency subrogation
20 and payment theory.
21    Q.   When you say "it's possible to view," what do
22 you mean by that?
23    A.   In other words, if you take the elements of
24 an unjust enrichment claim under Mexican law, it
25 appears that JRB satisfies those elements.

Page 127

1    Q.   And what are those elements?
2    A.   I don't remember the exact wording of Article
3  1882 of the Federal Civil Code; but, basically, it
4  provides that if somebody becomes benefited or
5  enriched at the expense of another party and justice
6  requires that the party that benefited compensate the
7  payor, then the court can authorize where a party's
8  entitled to that reimbursement up to the amount of the
9  enrichment. That's generally what it provides.
10    Q.   You were asked some questions about the -- on
11 a hypothetical basis about the terms of agreement
12 between JRB and SGM, and in particular on the question
13 of whether there may have been an agreement that JRB
14 would pursue payment only against SGM.
15        Do you recall that general line of
16 questioning?
17    A.   Generally, yes.
18    Q.   Am I correct that your view was essentially
19 that if JRB agreed to pursue payment only against SGM,
20 that it would be so limited?
21    A.   Yes.
22    Q.   And does that mean that if JRB did not agree
23 they would pursue payment only against SGM, then JRB
24 would not be limited by their agreement to pursuing
25 payment only against SGM?

Page 128

1    A.   I would answer the question this way: If, at
2  the formation of the relationship between SGM and JRB,
3  the understanding between the parties was that JRB
4  could be a creditor ultimately only as to SGM, nobody
5  else, in that context, JRB, even if it did everything
6  that I understood it did here -- procured services,
7  paid for services, paid for salaries -- then by virtue
8  of agreement, as a matter of Mexican substantive law,
9  it's constrained to that agreement and cannot exercise
10 a maritime privilege.
11        If, however, JRB and SGM did not have that
12 type of express understanding or limitation, then it
13 is possible, under Mexican substantive law, for JRB to
14 become a creditor in its own right.
15    Q.   Okay. Thank you.
16        MR. RUFTY: Bear with me one second. I
17 may be finished already.
18        MR. SOTO: Take your time.
19        THE WITNESS: Easy for you to say.
20        MR. RUFTY: Thank you for answering my
21 questions. That's all I have.
22        MR. SOTO: I'm going to have a few
23 follow-up, I guess.
24
25

Page 129

1         F U R T H E R   E X A M I N A T I O N
2  BY MR. SOTO:
3    Q.   I want to talk about the unjust enrichment
4  theory that you just discussed.
5         Is your opinion and conclusion that there is
6  an unjust enrichment theory, based on the documents,
7  information and assumptions contained within your
8  report?
9    A.   Yes, with one exception. And that is this
10 additional wrinkle about JRB and SGM not having an
11 agreement that JRB can look solely to SGM for
12 reimbursement.
13    Q.   And I understand that what you're saying is,
14 there may be additional evidence which would change
15 that opinion.
16        In terms of whether or not there is an unjust
17 enrichment theory, in your opinion, is the information
18 required to support that theory contained within the
19 documents that are listed in your report and the
20 information that was provided to you by counsel, as
21 set forth in your report discussed today?
22    A.   Yes.
23    Q.   My question to you is, why is that unjust
24 enrichment theory not set forth in your report? If
25 you had the information available to you to support

David Lopez
April 09, 2018                           130 to 133

Page 130

1  that theory, why is it not in your report?
2      A.   I guess, at the time I wrote my report, I
3  viewed that it was unnecessary to go into every
4  possible basis under Mexican substantive law for why
5  JRB may have achieved creditor status.  And the one
6  that I explained, to me, was a very clear one, and
7  that that was sufficient.
8      Q.   Okay.  And when you talk about unjust
9  enrichment and then JRB being the creditor, I suppose,
10 in the unjust enrichment claim --
11     A.   Correct.
12     Q.   -- who is -- who was the debtor in that
13 unjust enrichment claim?
14     A.   Whoever is unjustly enriched by the conduct.
15     Q.   Can the vessel be unjustly enriched?  Can the
16 vessel be the debtor, under Mexican law?
17     A.   It may be that the owner of the vessel is the
18 debtor.
19     Q.   Okay.
20     A.   For purposes of Mexican maritime law, the
21 debt can be enforced as to the vessel under Article
22 91, but the vessel may not necessarily be the debtor.
23     Q.   What I'm -- my question to you is:  In the
24 unjust enrichment theory that you just presented to
25 Plaintiff's counsel --

Page 131

1      A.   Yes.
2      Q.   -- as a potential theory, who were you
3  referring to as the debtor in that theory?
4      A.   Whoever was unjustly enriched.
5      Q.   And do you know that party is?
6      A.   It's whoever derived the benefit of the
7  services and payments by JRB.  And so the vessel's
8  benefited, clearly; but for purposes of the maritime
9  privilege, that's really beside the point.  The issue
10 is, who could have an obligation to repay what was
11 unjustly received?  And it would be the recipient.
12          Let's say -- in the example that we're using,
13 because Marfield, in February 2017, was deemed to be
14 the owner of the vessel, to me, they would be a clear
15 recipient of the enrichment.
16     Q.   I want to -- I want to know, for purposes of
17 this unjust enrichment theory, who it is you are
18 saying received the benefit, if anybody.  Or are you
19 just not making that opinion?  Are you not --
20     A.   Clearly Marfield --
21     Q.   Okay.
22     A.   -- would have received the benefit.
23     Q.   So you believe Marfield is the debtor in this
24 unjust enrichment theory?
25     A.   Marfield clearly is a beneficiary of the

Page 132

1  unjust enrichment, that much I can say today.
2          As to anybody else, I don't have an opinion
3  at this point.
4      Q.   The expenses that were incurred were expenses
5  to fulfill SGM's obligations as a depository; correct?
6      A.   Yes, I agree with that.
7      Q.   So if JRB, as SGM's agent, went out and
8  procured services to fulfill SGM's obligations of the
9  depository, isn't it SGM who benefited from those
10 services?
11     A.   Yes.  But that was pursuant to an agency
12 relationship; and therefore, you don't get to implied
13 obligation for unjust enrichment.
14     Q.   I'm not sure I understand what the applied
15 obligation is.
16     A.   Sure.
17     Q.   But you testified earlier that the party who
18 benefited from the services is the party who is the
19 debtor in an unjust enrichment theory, and the party
20 who benefited from JRB's services was SGM, because
21 those services were procured in fulfillment of its
22 obligations as a depository; correct?
23          MR. RUFTY:  Object to form.
24     A.   It's a very good point.  Under Texas law --
25 you may just know this offhand.  Under Texas law, if

Page 133

1  you have a relationship governed by an express
2  contract, then implied contractual theories like
3  unjust enrichment are not available.  In other words,
4  your relief is under the agreement, not under an
5  implied agreement.
6          And so it's the same in Mexico.  An unjust
7  enrichment theory is kind of an equitable theory
8  applied in a context where there is not an express
9  relationship or express agreement.  Because, as to SGM
10 and JRB, there is an express relationship, an agency
11 relationship, you don't reach unjust enrichment as a
12 basis for creating a creditor-debtor situation.
13          Now, between Marfield and JRB, there is no
14 express contract.  So that's why you would reach an
15 implicit contract theory like unjust enrichment.
16     Q.   (BY MR. SOTO)  So you're saying SGM doesn't
17 have a claim against -- I'm sorry, strike that.
18          JRB does not have a claim at all against SGM
19 for payment of those services?
20     A.   Not based on unjust enrichment --
21     Q.   What would the claim be?
22     A.   -- but based on agency.
23          It would be -- under agency and the Mexican
24 law and Federal Civil Code and the commercial code,
25 there are provisions that talk about the obligation of

David Lopez
April 09, 2018                              134 to 137

Page 134

1  a principal to compensate the agent and reimburse the
2  agent.  So when those provisions of express
3  contractual duty exist, you don't reach implied
4  contractual duties like unjust enrichment.  Same as
5  under Texas law.
6          MR. SOTO:  Pass the witness.  Thank you.
7          THE WITNESS:  Pass the witness?
8          MR. RUFTY:  No further questions.  Thank
9  you.
10         (Discussion off record.)
11     F U R T H E R   E X A M I N A T I O N
12 BY MR. RUFTY:
13     Q.   You mentioned a moment ago that SGM would be
14 a beneficiary of services provided.
15          In what sense would the vessel owner be a
16 beneficiary as well?  In other words, better question
17 is this:  You mentioned that one thing which you're
18 prepared to say today is that clearly Marfield would
19 be a beneficiary.  Please explain.
20     A.   Okay.  Again, I'm not making a factual
21 determination.
22     Q.   Sure.
23     A.   I'm telling you what the law provides.
24          Article 1882 of the Federal Civil Code of
25 Mexico provides for unjust enrichment.  And it says

Page 135

1  that when a party unjustly benefits at the expense of
2  another, the party who was -- who paid is entitled to
3  compensation up to the amount of the enrichment.
4          To me, any party that received a benefit from
5  what JRB did factually -- which I'm not saying they
6  did or didn't -- is a proper debtor under 1882 of the
7  Federal Civil Code.  And so whether Mayfield [sic]
8  benefited factually from what JRB did is a question
9  for the court and the witnesses.  But just as a matter
10 of common sense, it seems to me that if somebody owns
11 something as valuable and complex as a vessel like the
12 Caballo Maya, and things are done during a fairly good
13 period of time that allow the ship to be maintained to
14 any degree, that benefits the owner of the vessel.
15         MR. RUFTY:  Thank you.
16     A.   I'm not saying that happened here factually,
17 I'm just talking about the elements of the claim.
18         MR. RUFTY:  Thank you.
19         MR. SOTO:  I'm afraid I have a follow-up
20 question.  Is that okay?
21         MR. RUFTY:  Sure.
22     F U R T H E R   E X A M I N A T I O N
23 BY MR. SOTO:
24     Q.   I want to talk, then, about what -- the
25 elements of unjust enrichment.  You've analogized it

Page 136

1  to Texas law a couple times.  You said something very
2  similar.
3          You've talked about the requirement that
4  somebody be unjustly enriched, and that is a
5  requirement in Texas law as well.  For instance, a
6  party cannot -- I can't go and paint your house
7  against your wishes and without any expectation of
8  payment and then sue you for unjust enrichment.
9      A.   That's right.
10     Q.   Because there's no unjust element there;
11 correct?
12     A.   Right.  I was -- I painted the wrong house.
13     Q.   So in this situation where Marfield does not
14 want SGM to be the depository, is contesting
15 ownership, Marfield believes it owns the vessel, is
16 asking the court and litigating heavily to have the
17 vessel returned to it, can it be said to have been
18 unjustly enriched if, against its wishes, SGM is
19 appointed depository and voluntarily assumes the
20 obligation of those expenses?  Has Marfield been
21 unjustly enriched in that situation?
22     A.   That's a determination for the finder of
23 fact --
24     Q.   Okay.
25     A.   -- whether it's the judge or the jury, based

Page 137

1  on all the circumstances.
2          MR. SOTO:  Okay.  No further questions.
3          (Deposition concluded at 1:43 p.m.)

Page 138

WITNESS CORRECTIONS AND SIGNATURE

Please indicate changes on this sheet of paper,
giving the change, page number, line number and reason
for the change.  Please sign each page of changes.

PAGE/LINE     CORRECTION     REASON FOR CHANGE

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

            DAVID LOPEZ


Page 139

S I G N A T U R E   O F   W I T N E S S

I, DAVID LOPEZ, solemnly swear or affirm under the
pains and penalties of perjury that the foregoing
pages contain a true and correct transcript of the
testimony given by me at the time and place stated
with the corrections, if any, and the reasons therefor
noted on the foregoing correction page(s), and that I
am signing this before a Notary Public.


            DAVID LOPEZ


STATE OF TEXAS      *
COUNTY OF           *
            SUBSCRIBED AND SWORN TO BEFORE ME BY
DAVID LOPEZ on this, the _____ day of
                    , 2018


            Notary Public, State of Texas

My Commission Expires: _____

Job 1-265117


Page 140

REPORTER CERTIFICATION
THE STATE OF TEXAS :
COUNTY OF HARRIS :
        I, DENYCE SANDERS, a Certified Shorthand
Reporter and Notary Public in and for the State of
Texas, do hereby certify that the facts as stated by
me in the caption hereto are true; that the above and
foregoing answers of the witness, DAVID LOPEZ, to the
interrogatories as indicated were made before me by
the said witness after being first duly sworn to
testify the truth, and same were reduced to
typewriting under my direction; that the above and
foregoing deposition as set forth in typewriting is a
full, true, and correct transcript of the proceedings
had at the time of taking of said deposition.
        I further certify that I am not, in any
capacity, a regular employee of the party in whose
behalf this deposition is taken, nor in the regular
employ of this attorney; and I certify that I am not
interested in the cause, nor of kin or counsel to
either of the parties.
        That the amount of time used by each party at
the deposition is as follows:

        MR. SOTO - 02:50:52
        MR. DUFFY - 00:05:32

        GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
this, the 11th day of April, 2018.


            DENYCE SANDERS, CSR, RDR, CRR, TCRR
            Notary Public in and for
            Harris County, T E X A S
My Commission Expires:  4-14-21
Certification No.:  8628
Expiration Date:  12-31-18
U.S. LEGAL Support, Inc.
363 N. Sam Houston Parkway, 16th Floor,
Houston, Texas  77060, 713.653.7100
Firm No. 122

**Exhibits**

**EX 0001 David Lopez 040918** 4:5 6:20,22 12:10
**EX 0002 David Lopez 040918** 4:6 12:13, 16 21:11 22:23 49:2
**EX 0003 David Lopez 040918** 4:7 42:11, 17 53:18 54:8 57:15 62:19,24 63:6,9,13, 17,21 64:8,20 67:14 69:1
**EX 0004 David Lopez 040918** 4:9 53:22, 24,25 54:5,6,10,17 57:19,23 62:24,25 63:21 64:9,21
**EX 0005 David Lopez 040918** 4:11 71:8, 10,17 73:2 113:6
**EX 0006 David Lopez 040918** 4:13 92:9, 11

**(**

**(a)** 28:16 31:21
**(b)** 28:18 34:1,3
**(c)** 28:19
**(d)** 28:20 30:6
**(e)** 28:22 42:21
**(f)** 28:24
**(g)** 28:25

**0**

**000081740** 59:22
**0431** 42:6
**0932** 92:23

**1**

**1** 6:20,22 12:10 25:20 55:21
**1.6** 21:18 24:13,18 25:13 26:4 27:14, 15,19,24 33:18

**1.6(c)** 41:21
**1.7** 28:6 29:4 31:18
**1.7(a)** 33:5
**1.7(b)** 92:5
**1.7(c)** 41:23 42:8
**1.7(d)** 30:2 36:15 40:10
**1.7(e)** 30:11,14 43:7 44:2 107:24 109:2 110:2,11
**10** 98:1
**10.3** 110:13
**11** 110:13
**12** 55:1
**135** 20:25
**17** 21:15 43:5 110:11
**182-L** 59:24
**1882** 126:13 127:3 134:24 135:6
**1994** 17:25
**1:43 p.m** 137:3
**1st** 101:5,17

**2**

**2** 12:13,16 21:11 22:23 49:2
**20** 19:19
**200,000** 108:2 110:3
**2015** 30:3 41:24 55:8 56:2 67:13 82:9 84:16 92:5,20 100:10 101:5,17 107:25 113:5 125:23
**2015-2016** 96:11
**2016** 55:1 107:25
**2017** 67:4 131:13
**2018** 21:15 24:8,19
**2062** 98:19
**21** 34:19
**29** 92:20

**3**

**3** 21:19 41:23 42:11, 17 53:18 54:8 55:7 56:2 57:15 62:19,24 63:6,9,13,17,21

64:8,20 66:12 67:14 69:1

**4**

**4** 53:22,24,25 54:6, 10,17 57:17,19,23 62:25 63:21 64:9,21 66:12 69:1 107:6,24
**4.3** 36:20 37:15 53:4,7
**477** 25:20

**5**

**5** 71:8,10,17 73:2 113:6

**6**

**6** 92:9,11 107:6
**6,500,00** 110:2
**6.5** 108:25
**6.7** 110:12
**62** 55:11,24
**66,500,000** 108:1

**7**

**7** 49:25 73:7 99:16, 19 107:6
**74** 56:10,15,17 57:2 59:16
**75** 55:14,25
**77** 73:3,5
**78** 75:18
**79** 75:6,7,14,19,20

**8**

**80** 72:15

**9**

**9** 69:21 97:7,8,25 98:18
**91** 48:25 49:5,21 50:22 51:2 52:19 69:14 85:20,22,25 86:2,24 102:7 103:7

108:5,10 110:17 118:11,17,19,24 119:15,23,24 120:2, 5,17,24 121:4,10,13 125:5 130:22
**91's** 120:19,21
**93** 51:6 99:19
**932** 93:8,14
**9453341** 59:21

**A**

**A/011/00** 42:2
**abbreviate** 5:17
**abbreviations** 5:20
**abduction** 13:6
**ability** 28:13 46:20, 21 49:16 51:11 69:5 85:19 101:2 106:11
**absent** 70:4,15
**Absolutely** 121:5
**accepted** 69:1
**accepting** 72:23
**accordance** 70:5
**accrual** 104:7
**accurate** 18:9 28:5, 11 29:5 30:17,19 31:11 32:21 63:9
**achieve** 106:6 116:8 126:5
**achieved** 120:22 130:5
**achieving** 126:18
**acquired** 93:20
**acronym** 35:14
**act** 9:20 39:19 41:6 72:24 82:10 84:16
**acting** 36:13,14,21 37:11 38:21 53:14 60:7 63:11 64:17 67:20 68:13,15 89:22 121:22
**action** 99:22 104:17, 18,19
**actions** 37:15,21,23 39:7
**acts** 35:12 54:22
**actual** 122:19
**added** 21:17 30:23, 25

**adding** 41:1
**addition** 9:7 10:23 22:22
**additional** 21:25 22:3,12 24:20 47:6 119:9 124:22 129:10,14
**additions** 22:7
**address** 61:19 79:13,16
**administration** 112:7
**admit** 96:7
**adopted** 49:7
**advance** 97:24 98:9 99:1,4
**advantage** 19:13
**affect** 23:17,18 60:1, 18 73:11 74:14
**affected** 38:8
**affects** 38:14 85:25
**affidavit** 12:12,15 21:1 22:2,19 24:8,9, 25 44:25 49:3 92:17 99:3,20 113:21 126:7
**aforementioned** 60:3 73:14 74:20
**afraid** 135:19
**agencies** 118:20
**agency** 35:14,20 36:16 38:6,7,10,14 39:6,8 40:14 41:13, 18 82:23 85:3 96:24 114:14 116:13,25 117:2,7,11,15,16, 20,21 118:5,8,12 120:6,18 121:8,14, 16,18,21 122:3,5,7, 10,11,13,18 123:3, 4,13,17,22 124:1,4, 10,15,19 125:24 126:8,19 132:11 133:10,22,23
**agent** 36:13,14,21 37:12,22 38:21 39:2,7,13 41:6 54:23 72:18 82:10, 21,22 84:17,19 90:9 94:10,17 95:13,15, 17,19,23,24 96:24 121:22,23 125:22

132:7 134:1,2
**agents** 39:5
**agree** 19:9,10 39:23, 24 40:3 41:11 53:13 58:1,20 63:17 70:20 92:2 111:5 114:11 124:24 127:22 132:6
**agreed** 37:9 39:19 41:3 55:20 58:23 65:7 75:11 127:19
**agreeing** 77:19,24 104:1
**agreement** 5:15 6:4 7:18 41:13 55:25 56:6 58:9,12 72:12, 13,22 73:6 75:9,14 82:8 83:9 84:15,16, 17 85:24 88:6,7,8 89:12,25 90:18,20, 22 91:1,4 95:2,4 101:10,24 102:14 103:14 104:10,12 106:9 112:18 122:13 123:5 127:11,13,24 128:8, 9 129:11 133:4,5,9
**ahead** 10:7 51:1 53:1 56:25 71:9
**akin** 78:20
**Alfred** 42:12
**alienate** 60:2 63:2, 25 64:16,17 65:1,15 66:15 67:5,23 69:2, 5 73:13 74:19
**alienating** 60:8 74:3
**alienation** 62:7
**allowed** 109:25 110:9
**allowing** 65:20
**alterations** 24:5
**amendments** 22:12
**American** 7:17
**amount** 45:19 77:19 110:8 127:8 135:3
**amounts** 30:12 43:2,12,15 44:16 84:18 106:16
**Amparo** 54:18,19,24 55:3,22
**analogized** 135:25

**analysis** 11:2 12:2 14:2 26:9 36:9 43:11,13,17 44:14, 16,17,19 45:7,16 106:18,21 107:5 108:4 111:5 126:4
**analyzed** 106:12,15 107:10
**and/or** 81:10 114:14
**Andy** 5:6
**answering** 22:15 128:20
**answers** 27:10 52:24 94:21
**anymore** 56:24
**anyplace** 108:17
**appearance** 5:9
**appeared** 12:23 43:10
**appears** 29:2 55:16, 21,25 56:6 57:7 71:18 72:12,22 92:20 126:25
**appendixes** 25:6
**apples** 50:13 105:4
**applicable** 19:4,9
**application** 16:24
**applied** 20:3 34:4 132:14 133:8
**applies** 16:23 17:5 48:18 87:12 126:14
**apply** 6:14 18:7 46:21 67:1 70:15
**applying** 51:6
**appointed** 95:9,10 96:16,21 136:19
**appointing** 39:21 41:4 66:5
**appointment** 55:19
**approach** 69:19
**approximately** 110:13
**arbitration** 32:3 33:7,10,12,17
**arbitrators** 33:24
**area** 16:10,18 17:6, 8,15,18 20:7,9 113:15
**areas** 8:14 12:23 112:18,19,25 113:1 114:12

**arguably** 106:6
**argue** 114:5
**arise** 83:6 115:8,14
**arises** 124:25
**arising** 45:13
**arose** 105:1
**arrange** 30:3 40:11
**arrangement** 85:23 116:17 124:19
**arranges** 86:5
**arrest** 50:17
**arrested** 9:12,15 31:24 35:13
**arresting** 12:5,6
**arrests** 88:16
**art** 78:9
**Article** 48:25 49:5, 21 50:21 51:2,6 52:19 59:24 69:14 85:19,22,25 86:2,24 98:19 99:19 102:7 103:7 108:5,10 110:17 118:11,17, 19,24 119:15,23,24 120:2,5,17,19,21,24 121:3,9,13 125:5 126:13 127:2 130:21 134:24
**asks** 15:20
**aspects** 18:1
**assessing** 18:8
**assessment** 19:16
**asset** 35:13 60:5 73:15 74:22 76:9 93:17
**assets** 35:16
**assignment** 112:3,4
**assignments** 111:21,25
**assume** 14:1 30:18 40:10 44:22 62:13 63:20 70:23 72:17 81:10 82:14 84:15, 20 85:2,6 90:1 96:20,22 101:20 112:4 117:17
**assumed** 44:6 63:6
**assumes** 136:19
**assuming** 86:25 97:20 121:9

**assumption** 30:6
34:3 36:23,25 41:22
42:21 44:10,12,13
64:5 65:14
**assumptions** 28:7,
10 29:11,12,19,25
36:11,19 129:7
**attach** 31:2 35:19
64:23 65:9 66:3,9
83:6
**attached** 26:12 49:3
**attaches** 51:22
**attachment** 92:6,19
99:23
**attempt** 47:6
**attempting** 67:10
**attempts** 89:14
**attend** 7:13
**attended** 7:10
20:17,19
**attorney** 8:11,20 9:4
41:25 53:9,16,17
55:3,17 56:4,7,11
57:3,25 58:13 68:20
72:19 92:19
**attributes** 113:22
114:4
**authenticity** 57:21
**author** 19:20
**authored** 21:14 93:7
**authority** 28:2 37:19
39:19 41:3 53:14
63:10
**authorization** 37:22
**authorize** 41:8
127:7
**authorized** 41:9
99:6
**authorizing** 94:11
**Autonomous** 7:15
8:9
**avoid** 16:18
**award** 33:17
**aware** 21:9 24:4
32:3,6,8,18 33:6,10,
13,21,24 34:4 35:25
36:7

**B**

**back** 7:23 19:23
22:10 42:9 47:8
93:25
**background** 19:15
20:6 54:14 84:4
**bailee** 34:7,10 35:6
40:17,18,21,23
53:8,15 56:19 60:7,
15 62:2 63:11,15,19
64:17,18 65:12
66:6,24 67:20 68:14
70:5,11,16 71:22
72:24 79:12 80:7,
20,22 91:21,22,24
92:6,15
**bailment** 34:10 38:2
40:20,24 57:8,10,12
58:2,9 63:16 67:1,3,
6,9,25 68:6,14 69:1,
3,5 70:6,17,22
71:22 77:2,12,13,
20,25 78:3 79:15
80:5,11,22,23,25
81:8 113:10
**bailor** 40:22
**bankruptcy** 16:5,6,8
**bareboat** 36:4 89:24
**barred** 107:1
**based** 21:25 24:1,8
28:11,20 29:2 36:14
40:9 41:23 45:15
46:24 47:13 67:16
89:8 91:9,20 94:22
103:6 126:12 129:6
133:20,22 136:25
**basically** 56:17
78:15 112:19 127:3
**basis** 9:23 17:24
41:22 42:7 53:7
125:17 127:11
130:4 133:12
**Bates** 25:21,24 26:1
55:10 75:6
**Bates-numbered**
42:6
**Bates-stamped**
25:20 92:22
**Baylor** 7:17

**Bear** 128:16
**bearing** 125:19
**began** 17:25 112:17
**beginning** 17:25
55:23 57:2
**begins** 56:10 75:14,
15,21 93:9
**behalf** 30:5 40:13
66:6 121:23
**believes** 90:3,4
136:15
**belonged** 83:25
105:3
**belongs** 93:18
**beneficiary** 131:25
134:14,16,19
**benefit** 89:2 90:9
94:12 95:14 105:19
120:12 131:6,18,22
135:4
**benefited** 127:4,6
131:8 132:9,18,20
135:8
**benefits** 135:1,14
**bit** 11:15,16
**Board** 8:15
**body** 119:3,5 120:16
**bogged** 79:25
**BP** 10:24 11:20
**break** 9:10 27:1
29:23 53:2,3 69:9
125:10
**bring** 54:21
**British** 11:1
**broadly** 12:22
**brought** 10:25
**buyers** 33:9

**C**

**C-A-R-G-O** 78:4
**C-O-N-D-I-C-O-I-N-
A-N-T-E** 62:14
**C.V.** 5:22 6:2,3,10,
15 93:22
**C.v.'** 59:24 93:19,20
**Caballo** 5:7 25:8,11,
16,20 31:24 33:8,22
36:1 38:20,23 47:11
55:11,14,24 56:10,

15,16,20 57:2,4,8,
25 59:16,20 60:7,16
61:24 63:11 64:10
65:10,13,21 66:19
72:15,23 73:3 75:6,
18 84:11 85:15
93:17 94:5 96:9
100:11 135:12
**calculating** 31:8
**calculation** 30:14,20
31:1 43:2,5,6
**calculations** 42:24
**calculator** 30:24
31:8
**call** 5:22 6:10 28:1
49:7
**called** 8:8 25:15
50:23 92:18 93:16
119:11
**calling** 72:11 113:4
**Canadian** 7:18 8:2
**capacity** 64:18 98:7
**captain** 124:5
**care** 80:8 120:19
**careful** 59:1 78:12
**Cargo** 78:4
**carry** 78:2,4,6 79:12
**carry-out** 78:5
**carrying** 37:21 79:7
82:22
**case** 5:7,21 6:18,20
8:18,24 9:23 10:7,
19,25 11:1,21 19:16
21:14,19 22:1,25
25:9 26:2,6,16 28:1,
4 29:20 31:19 32:13
33:24 34:24 43:10
48:25 54:14,24
55:3,22 79:12 88:9
90:2 91:10 93:16
94:2 98:2 99:14
100:3 119:22
125:20,22
**case-law** 11:3
**cases** 9:3,8,9,18,20,
21 10:3,17,19 11:8,
11,15,18,19,20
12:20 13:1,6,12,15,
17 14:12,16,21 15:5
16:5,8,13 20:25
21:2

categories 107:7,13
108:9
category 107:21
causing 65:20
certificate 20:15
25:2 26:13 27:20
53:19 71:2,19,20,23
72:11 113:5
certification 7:3
20:11
certified 8:14 34:22,
23 61:2,7,23 71:25
challenges 54:22
chance 22:8 26:23
29:8 107:4 111:4
change 23:14,19,20,
22 24:1 29:13 36:9
44:14,19 129:14
changed 6:2 28:10
characterization
73:1
charge 35:20 124:7
charged 51:19
charter 36:4,5 88:7,
8,12 89:12,25 91:1,
4
charterer 85:10
88:1,13 89:2,11
90:5,21
chartering 83:11
88:2,4,14
child 13:5,7
circumstance 18:7
66:9 118:1
circumstances
93:9,15 137:1
citizen 59:22 61:24
75:15,22
City 7:21 8:10
civil 18:25 44:25
98:20 105:14 106:1
119:2 126:11,13,14
127:3 133:24
134:24 135:7
claim 86:8,17 88:3
90:8,12 94:20
126:24 130:10,13
133:17,18,21
135:17
claimed 89:21 90:10
95:6 126:10

claiming 36:1,4
85:9,10 91:12 94:5
claims 88:17 94:8,
12 95:14
clarification 13:16
32:25
clarify 17:11 84:6
class 18:15,19
20:17,19
classes 7:14
clear 5:19 70:13
81:3 92:25 102:6,8
113:23 115:21
130:6 131:14
client 8:18,24 27:5
clients 26:20
closely 48:21
code 44:25 70:1
98:20 105:14,15,25
106:1 119:2 126:11,
14 127:3 133:24
134:24 135:7
collect 52:22
college 7:6,8
commerce 11:4
47:3 49:1 50:22
51:8 69:15 85:20
105:8,11,13,24
108:5 110:18 116:8,
24 118:18,23
120:14 125:6
commercial 70:1
105:11,15,25
114:14 119:2
133:24
common 19:1
135:10
community 14:18
company 6:1,5 64:7
93:18 116:16,17
comparative 7:23
8:2 14:2
compare 43:11
54:8,9
compared 18:25
comparing 79:25
compensate 98:25
104:1 127:6 134:1
compensated
121:19

compensates 122:5
compensation 70:5
119:11 135:3
complaint 21:20
48:4
complete 21:13
24:16,18 54:12
completely 50:12
69:14 104:22 115:3
complex 34:20
135:11
complicated 39:1
comprehensive
27:14
concerned 62:6
concluded 137:3
concludes 110:23
conclusion 37:1,10,
11 56:18 67:24 85:3
98:15 99:13 107:5
129:5
conclusions 23:14,
25 28:8 29:14 38:13
107:3 111:2
condicionante
62:14
condicionantes
60:23
condition 38:4 60:2,
6,20 63:1,3 65:1,13
66:15 69:2 73:12
74:10 75:1 77:5
80:10
conditions 57:9,12
58:2,8 60:4 63:18
72:25 73:14 74:21
75:11 76:6 87:24
conduct 130:14
confirm 31:10 44:1
confirmation 126:3
confirmed 44:4
confirms 19:14
confiscates 35:16
confusing 55:4
Congress 49:7
connection 43:13
78:3 95:1 107:17
108:6
consistent 23:19
56:21

compensates 122:5
Constitution 18:2
constitutional 11:3
54:22
constrained 128:9
contained 37:3
129:7,18
contemplates 39:2,
4
contending 96:12,
14,15 98:3,4
contends 97:22
contesting 96:9
136:14
context 18:11 45:9
48:19 75:5 89:1
97:6 103:22 104:10
119:21 120:11
121:21 128:5 133:8
contexts 87:20
continue 115:18
continues 28:20
67:1
continuing 55:24
contract 30:3 40:11
70:4,15,16,18,22
83:19 87:18 93:21
104:17,20 133:2,14,
15
contracted 45:18
contracting 83:25
contracts 100:13
contractual 133:2
134:3,4
control 39:13
conveyed 37:20
copies 58:8
copy 6:21 49:22
71:3 91:4
Cordova 59:22
61:25 62:1 64:3
65:8,20,24 66:18
72:14 75:16
correct 7:7,11 8:21
24:3,8,17 25:23
26:25 28:17,18,19,
20,23,24 29:1,9
34:9 35:5 36:13
37:12,13,17,18,24
40:7 41:4,9,13,16
48:10 51:14,15 52:2
53:10 54:5 55:6

59:6,9,13 62:3
63:12,22 64:24
65:10,14 66:13
67:11 68:16,17,21
70:3,18,24 72:19,21
73:25 74:1,4,11,23,
24 78:23 82:13
89:22,25 91:13,14,
17,25 94:14 95:12
96:10,15 99:18
100:12 101:9 115:8,
14,16 116:5 119:17,
25 120:25 121:4
125:3 127:18
130:11 132:5,22
136:11
correcting 74:18
corrections 24:5
correctly 62:4,5
cost 51:11 66:23
77:20,24 102:23
103:3
costs 77:21 78:1
82:5,18
counsel 6:11 8:25
9:2,5,9 29:21 30:1,
2,7,10 31:15 43:8,
14,18 56:14 58:12
129:20 130:25
couple 14:8,17 22:3
24:20,22 76:19
80:18 87:20 112:19
125:16 136:1
court 16:22 17:4,14
18:10 20:23 21:7
35:22 48:18 61:14
75:3 81:3 127:7
135:9 136:16
courts 15:16 54:23
67:11,15,22 96:13
97:19
cover 55:21
create 47:4 51:8
110:5
created 38:10 50:16
creates 38:1,3 46:20
50:5 121:13
creating 40:13 83:7
133:12
creation 41:18 47:3
64:10

creature 105:13
creditor 19:12 45:8,
20 47:6 51:9 52:19,
21 81:18 85:19
86:10,24 87:1,4,5,
13,18,21 89:3
95:18,19,21 100:2,
5,15,18 101:1,7
102:6,9,12,18 103:8
105:6,21,23 106:7
115:11 116:1,7,8,
11,12,23 117:3,5,6,
9,12,18,21,22
118:1,8,10,16,25
119:6,8,15 120:14,
15,22,24 121:2,7,9,
13,16 122:7,11,16
123:2,10,22 124:8,
10 125:18 126:5,9,
17,18 128:4,14
130:5,9
creditor-debtor
126:12 133:12
creditors 51:1,12
crew 30:15 43:2
51:4 108:1,23 109:7
110:6 111:18 115:5,
8,12 116:1,6,9,11,
14 117:11,20 118:4,
12,20 120:6 121:18
122:10,12 123:4,14,
19 124:2,5,7,8,15,
19
crime 35:18
criminal 15:11,14,16
35:16,18 56:1
cross-border 9:2
curious 86:22
curriculum 6:17,19,
24 7:4
custody 12:25 13:7,
9
custom 70:6,10
customs 15:5
cut 22:6
CV 12:10

D

D-E-P-O-S-I-T-O-R-I-
O 34:8

damage 76:8
database 112:7,9,12
date 55:2 101:8
106:17,20
dated 41:23 54:25
92:20
dates 10:7,9,13
106:16
David 5:1 12:15
day 114:9
days 28:12
de 5:22 6:2,3,10,15
59:24 93:19,20,22
deadline 23:7,11
deal 109:9
dealing 7:17 8:1
50:22 75:3 126:15
deals 103:23
dealt 10:16
debt 47:7 49:20
50:16 51:13,21,24
83:7,22,24 118:20
130:21
debtor 45:6 81:15,
17,20 82:4,17 84:11
85:16 96:6 97:3,6,
14 98:3,4,5,6,16
99:14 130:12,16,18,
22 131:3,23 132:19
135:6
debtor/creditor
87:15 103:24
debts 119:16,20
December 107:16
decide 66:1 81:3
114:10
decision 54:24
declaration 12:15
24:19 26:12 33:1
107:17 110:25
declarations 21:21
decreed 73:16 74:22
deduct 110:12
deemed 131:13
defeat 98:11
defend 5:9
Defendant 5:7 25:11
27:12
Defendant's 26:25
27:22

defendants 10:24
defended 9:14
defending 12:5
degree 7:6,8 135:14
delegate 40:8,16
delegated 38:21
40:6
delegating 37:19
delineated 30:13
delivered 68:5,9
delivering 35:21
delivery 25:2,3
26:13 53:19 71:2
72:12,23
depend 29:15
depending 51:2
depends 84:14
101:10,24
deposit 34:7 35:19
71:20 76:8 77:9
113:5
deposition 10:14
23:8 78:25 112:17
137:3
depositions 5:10
deposito 34:8
depositorio 34:8
depository 34:5
35:1,12,25 37:17,21
39:21,22 40:1 41:4
53:8,15 55:20 56:12
57:4 58:2,16 59:20
60:7 61:24 63:11,18
68:15 72:24 89:22
91:16 94:5,10 95:9,
11 96:17,21 97:1
132:5,9,22 136:14,
19
depository's 68:6
derived 31:17 41:3
131:6
derives 39:21
describe 47:12
description 123:19
designate 40:21
designated 37:15
60:15 62:2 91:16,
22,24 92:14 94:4
designating 37:16,
20 39:25

**designation** 56:19
58:18 63:18 68:6,14
97:2 120:17
**destination** 60:5
73:15 74:22
**details** 33:11
**detention** 99:23
**determination** 67:24
109:17 134:21
136:22
**determine** 19:4
23:17 105:22
106:13 107:11
108:17 109:24
118:24 122:15
123:10
**determined** 33:22
35:22 60:5 67:22
97:18 107:19
108:18
**device** 54:20
**difference** 17:13
46:4,5,10 69:9
114:18
**differently** 23:21
**difficult** 62:7 109:10
**difficulty** 109:17
**digest** 26:11 29:8
**direct** 74:8 111:17
**directed** 99:23
**directly** 11:25 22:17
111:9,11,16 116:2
**disagree** 19:8 34:11
111:5 112:16,25
114:12,17,21
**disagreeing** 68:24
**disagreement**
112:19
**disallowed** 109:25
110:15,16
**discovery** 25:18
26:16,19,25 27:5,9,
21,22
**discuss** 12:22 36:20
70:10 107:7
**discussed** 48:14
113:25 114:13
129:4,21
**discusses** 70:17
**discussing** 48:4
64:3 113:7

**discussion** 23:8,10
69:8 98:21 134:10
**dispute** 33:7 47:10
55:18 107:3 111:2
112:16 113:17
**disputes** 9:2
**distinction** 17:1,10,
20 32:17 79:20 86:3
101:13
**distinguish** 88:20
**dive** 46:3
**divorce** 13:12,15,17,
24 14:2,3,8,11
**divorced** 14:15
**divorces** 13:22
**docketed** 11:19
**document** 25:1,4,7
26:18 27:2 31:1,6,
13 34:6 41:23 42:1,
2,4,5,7 54:2,3
55:14,17,22,23
56:3,10 57:2,7,11,
24 58:15 59:3,7,12
60:11,13,14 61:16
63:7,13,14 66:10
69:4 71:11,15,18
79:7 80:17 92:3,4,7,
11,12,13,16,21
93:1,2,7 108:16
113:8,9,23
**documentation**
43:15,18
**documents** 24:12,
16,18,21,24 25:14,
19,24 26:5,8 27:19,
23,25 28:11,14 29:3
31:18 32:8 33:19
34:21,25 42:13
43:9,12 44:4 62:10
67:18 91:10,20
113:14 129:6,19
**dollar** 124:8
**dollars** 43:6
**due** 76:9
**duly** 5:2
**duration** 67:6,20
**duties** 134:4
**duty** 82:21 97:15
134:3

**E**

**earlier** 113:7 132:17
**earliest** 21:2
**easiest** 115:13
**Easy** 128:19
**educated** 33:4
**education** 7:2 17:16
18:12 20:6
**effective** 104:8
**elaborate** 51:16
**election** 14:16
**element** 136:10
**elements** 126:23,25
127:1 135:17,25
**eleven** 93:24
**encumber** 52:5,13
60:3 63:2,22,23
64:1,19,23 65:2,15,
21,24 66:10,13,15
67:5 68:16 69:2,5,
13 73:13 74:20
**encumbering** 60:9
62:7 66:19 74:4
**encumbers** 51:9,22
**encumbrance** 49:8,
11 50:18 51:19
68:19
**end** 21:23 35:22
55:13 110:13 114:9
**ended** 67:3
**ends** 67:1,21 69:6
**enforce** 46:22
104:25
**enforceable** 14:18
99:22 100:1 101:8
**enforced** 50:17
130:21
**enforcing** 115:23
119:10
**engage** 83:19
**engaged** 8:17 30:3
40:11 117:1,15
121:20 122:6 124:2
125:22
**engages** 86:13
95:13 116:14 117:7
121:16 122:4
**engaging** 41:6

**English** 25:3 34:18
42:14,15,16,18
53:25 60:25 71:5,25
72:3,7 76:22 77:7
**enriched** 127:5
130:14,15 131:4
136:4,18,21
**enrichment** 87:19
104:18 125:17
126:13,19,24 127:9
129:3,6,17,24
130:9,10,13,24
131:15,17,24 132:1,
13,19 133:3,7,11,
15,20 134:4,25
135:3,25 136:8
**Enrique** 106:23
110:22 112:14
**enter** 83:9 88:22
**entered** 89:24
**entitled** 47:17
100:19 127:8 135:2
**equal** 116:7
**equation** 95:5
**equitable** 133:7
**erroneous** 61:3
**essentially** 77:18
127:18
**establish** 45:8 67:15
**establishment**
103:23
**estate** 15:19 16:2
**evidence** 21:22 81:2
124:18 129:14
**exact** 127:2
**exception** 129:9
**excerpted** 58:14
**exchange** 43:6
**execute** 78:7,8
**Executive** 42:1
**exercise** 89:14
101:2 102:4,12,18
104:21 106:7
116:10 117:19
128:9
**exercised** 99:24
120:13
**exhibit** 6:20,22
12:10,13,16 21:11
22:23 42:10,11,16,
17 49:2 53:18,22,

24,25 54:5,8,10,17
57:15,17,19,23
60:20 62:19,24
63:6,9,13,17,21
64:8,9,20,21 67:14
69:1 71:8,10,17
73:2 75:7 92:9,11
113:6
**exhibits** 49:3,4
**exist** 51:11 98:13
134:3
**existed** 31:13 33:10
**existing** 88:5
**exists** 112:4
**expand** 21:24
**expectation** 136:7
**expenditure** 120:7
121:8,10
**expenditures**
119:18,23,24 121:3
**expense** 118:17
120:4 121:23 127:5
135:1
**expenses** 52:21
65:25 68:18 76:5,23
77:1 78:3,5,8,17,22
79:7,13,14,20 80:5,
8,9,21 81:13 82:19,
22 85:12,16,21 87:2
89:2,13,15 90:5,9,
21 94:12,25 97:24
98:9 99:1,6 103:11
108:6 110:11 119:9
126:1 132:4 136:20
**experience** 12:5,9
17:16 20:7
**expert** 9:8,17 10:4,
23 11:23 12:23,25
13:8,11,14,23 14:9,
20,23 15:2,7,10,13,
16,18,25 16:1,6,11,
13,16,19 17:6,8,15,
18 18:6 19:6,19
20:22 22:4 29:6
32:16,21 34:12
48:17 79:5 81:6
103:6 106:22 111:3
**expertise** 14:3 17:24
34:18
**explain** 17:4 116:20
134:19

**explained** 69:17
116:22 130:6
**explaining** 54:13
**exportation** 15:6
**express** 24:7 87:15,
18 88:5 90:18,20
128:12 133:1,8,9,
10,14 134:2
**expressed** 87:22
**expressing** 99:13
**extends** 66:23
**extensive** 11:2
**extent** 9:3 15:20
16:3 23:22 25:13
29:15 33:25 41:8
72:6,9 95:17 97:17
**extinguished** 99:21
106:14 124:25

---

## F

**face** 109:14 113:23
**fact** 13:6 19:10 29:6
32:5,11,12,16 36:8
37:2 43:16 53:23
56:5 58:22 60:10,11
61:8 81:1 85:7 87:4,
12 91:21 97:19
119:4 136:23
**factor** 23:10
**facts** 16:25 28:7
29:4 32:18 33:3
42:8 89:8 90:14
91:9,11 94:22 103:6
104:9 109:4 125:21
**factual** 18:7 55:18
94:23 134:20
**factually** 135:5,8,16
**fair** 9:24 10:15 12:4,
8 15:1 29:7 35:10
36:24 48:6 73:1
114:24 115:24
**fairly** 59:5 135:12
**faithful** 75:4
**faithfully** 48:20
**fall** 107:12,20
**false** 29:13
**familiar** 112:9
**family** 14:8,10
**faulting** 74:25

**favor** 113:12
**February** 67:21
131:13
**federal** 54:20 98:20
105:14 106:1 119:2
126:11,13,14,16
127:3 133:24
134:24 135:7
**fee** 80:23
**feel** 16:10
**fees** 51:4
**field** 15:8 46:18
**file** 55:1 106:20
**filed** 55:2
**filing** 55:22 106:17
**fill** 22:18
**final** 33:16,17
**find** 10:8,13 18:21
38:12 47:2 92:2,4
93:12 105:14,15,16
**finder** 136:22
**fine** 5:13 6:12 58:21
61:22 89:9
**finish** 22:14 79:17
100:23 102:25
**finished** 128:17
**firsthand** 32:6,12,19
**fit** 108:9,12,14,15
**fix** 46:21
**fleshed** 52:16
**flushes** 55:7
**focused** 19:23 88:24
**focusing** 20:7
**follow** 52:4
**follow-up** 128:23
135:19
**foreign** 119:5
**foreigners** 15:23
**forget** 71:12 79:21
**form** 31:5 41:10
44:21 57:6 66:21
68:22 70:19 84:3,12
85:17 91:18 95:25
104:16 108:20
115:15 118:13
124:17 132:23
**formation** 13:21
128:2
**formula** 87:11

**found** 110:9
**fourth** 93:13
**frankly** 91:2
**Free** 7:17
**Frequently** 13:13
**fulfill** 132:5,8
**fulfillment** 40:24
132:21
**full** 58:13,14 93:13
**function** 105:7
116:23
**functions** 41:7
**future** 22:1

---

## G

**G-R-A-B-A-R** 69:12
**Garcia** 55:8 56:19
57:9 59:22 60:15
61:25 65:15 72:16
75:16 93:8
**Garza** 19:6 22:4
24:25 25:6 64:18
66:5 67:8,17 106:23
110:23 113:11
**Garza's** 26:12 27:20
33:1 112:14
**gave** 124:4
**general** 29:17 35:20
39:4 41:25 46:16
88:25 92:19 127:15
**general's** 53:9,16,17
55:3,17 56:4,7,11
57:3,25 58:13 68:20
72:19
**generally** 20:2 47:17
127:9,17
**generated** 28:4 77:2
78:3
**generating** 90:5
**GGM** 6:2 93:20,22
**give** 10:7,9 22:7,19
24:11 49:22 51:9
67:7 68:19 76:5
83:22 107:7 110:19,
24 115:10 119:25
122:2 124:16
**giving** 88:22
**glad** 32:16
**good** 5:5 26:21
27:16 38:4,25 60:4

63:3 73:14 74:21
76:6 77:4 79:14
80:9 132:24 135:12
**goods** 84:8
**govern** 70:18
**governed** 53:15
133:1
**government** 35:16,
18,23 54:22 66:8
80:21
**grabar** 69:12
**granted** 83:3 85:22
108:7
**grounds** 98:8
**Group** 6:3 59:23
92:18 93:19
**Guadalajara** 7:16
**guess** 11:21 17:21
18:16 36:6 69:18
84:20 122:25
124:11 128:23
130:2
**guessing** 10:12
**guys** 23:9

**H**

**halfway** 69:23
**hand** 6:21 33:9 42:9
53:23 92:10 110:6,7
114:25
**handed** 42:5 54:17
59:4
**hands** 51:21
**happen** 97:1 100:3
**happened** 32:9
97:21 104:24
122:10 135:16
**happening** 40:14
**hard** 29:17
**harm** 76:8
**head** 67:12 95:15
121:5
**hearing** 47:14
**heart** 48:24
**heavily** 136:16
**helping** 18:9
**hires** 116:16
**hit** 121:5

**holder** 51:23 52:6
**holds** 100:20
**honest** 119:4
**honestly** 11:14
**hours** 80:18
**house** 136:6,12
**hypothetical** 86:10
87:9 88:21 90:15
91:2,3,8 94:3,22,23
98:12 103:19
127:11

**I**

**I-T-A-M** 8:8
**idea** 115:22 123:7
**identified** 27:23
**identifies** 56:18
**identify** 10:19 20:3
109:4,13 111:10
**identifying** 18:6,8
**immediately** 28:4
125:23
**IMO** 59:21
**implications** 16:24
40:9
**implicit** 104:20
133:15
**implicitly** 104:1
**implied** 132:12
133:2,5 134:3
**important** 15:21
43:16 45:7 48:17
67:19 69:7,8 97:12
126:4
**importantly** 21:23
**importation** 15:6
**impose** 46:21
103:21
**imposed** 38:16
39:10 50:5 87:22
**impression** 43:25
46:24
**improper** 61:21
**in-depth** 113:25
**incidence** 50:7
**incident** 51:18 83:2
**include** 25:7 36:22
109:20

**included** 7:4 30:13
98:17
**including** 29:4
54:23
**incomplete** 29:13,
17
**incorrect** 29:16
**incur** 90:9
**incurred** 44:24
66:23 68:18 82:22
84:19 90:21 94:25
97:25 106:19
107:25 132:4
**incurs** 89:2,13
121:23
**independent** 44:9,
11
**indicia** 59:6
**indirectly** 111:9
**individuals** 54:21
**inferior** 18:2
**inform** 63:14 97:15
**information** 10:14
24:9 28:21 29:5,20,
25 30:9 31:15,18
32:13 33:23 36:15
43:25 44:3 45:15
66:1 98:14 113:17
122:9,15 123:1,9
124:3,23 129:7,17,
20,25
**informed** 30:2 97:24
98:9 99:1,4
**initial** 38:1
**initially** 39:8
**inject** 48:21
**injury** 9:21 14:21,24,
25
**Inmobiliaria** 5:22,23
**instance** 38:19
39:14 136:5
**Institute** 8:9
**intend** 23:5,14
**intended** 19:1
**intent** 113:22
**interest** 15:21 45:2
73:12 74:15
**interested** 47:14
**interject** 48:22
**international** 7:16
13:5 15:3

**interpret** 18:22 62:4
**interpretation** 48:21
80:1 113:18
**interpreted** 71:22
113:11
**interrogatories**
27:10
**investigating** 18:1
**investigation** 56:2
**invoice** 45:12,14,21
109:15 123:13,21,
24 124:1,2,6,9,11,
15
**invoiced** 43:12
**invoices** 30:12,24
31:7 42:24,25 43:1,
15,19,21 44:1,6,20,
23 106:12,14,15,19
107:1,10,11,19
108:8,9,11,14,15,
18,22 109:1,3,4,7,
13,19,25 110:5,8,
12,23 111:14 112:8,
12
**invoke** 126:5
**invoked** 120:21
**involved** 9:3,5 10:21
11:1,10,22,24,25
35:17
**involvement** 10:21
**involves** 16:3
**involving** 10:17
13:18 16:14
**Israel** 59:22 61:25
75:15
**issue** 18:7 47:10
48:12 60:16 65:5
76:17 81:11,25
104:10,21 111:8
112:12 131:9
**issued** 24:19 27:11
41:24 56:3 57:24
93:2
**issues** 9:4 10:20
13:6,18 15:24 16:3,
8 67:14 73:21 76:19
114:15 124:1
**ITAM** 8:8
**items** 22:3 25:13

**J**

**January** 21:15 24:8,
19 101:5,17 107:16
**job** 48:19
**Jones** 9:20
**JRB** 5:22,23 27:5
30:3 36:3,12,14,21
37:11,15,21 38:6,
16,21 40:6,11 41:6,
8,14 43:16 44:2,4,8,
18 45:8,11,12,13,
18,19 47:16 81:10,
21,24 82:5,9,11
84:7,16,17 85:10,
11,18,24 89:25
94:24 97:14 98:8,
24,25 99:5 100:4,9,
13,16,17 101:10,24
102:1,15,16,21,22
103:2,3,8,11,14,25
104:3,11,14,15,19,
22,25 106:9,11
107:25 111:11,21
125:22,25 126:3,8,
17,25 127:12,13,19,
22,23 128:2,3,5,11,
13 129:10,11 130:5,
9 131:7 132:7
133:10,13,18 135:5,
8
**JRB's** 37:22 85:25
98:11 106:13
107:11 132:20
**judge** 19:16 47:14
114:9,10 136:25
**judicial** 18:5
**July** 23:9 30:3 41:23
55:7 56:2 82:9
84:16 107:25 113:5
125:22
**jump** 5:13
**jury** 136:25
**justice** 127:5

**K**

**keeping** 76:6
**kind** 20:10 33:4 81:1
122:13 124:13
133:7

**knowing** 47:15
**knowledge** 7:1 32:6,
13

**L**

**lack** 123:18
**lacking** 122:14
**language** 46:4,6
62:16 64:9,16,20
65:8 73:19 77:14
81:4 102:6 113:22
**largely** 93:18
**lasts** 69:3
**law** 7:10,12,13,14,
17,18,19,23 8:2,3,6,
14 9:7,23 11:2,4,16,
23 12:24 13:4,9,18,
20,24 14:2,3,6,10,
11,12,24,25 15:3,5,
6,11,14,17,19 16:2,
6,8,14,17,22,24,25
17:5,14,16,19 18:1,
3,6,8,10,13,15,18,
19,21,25 19:1,4,9,
17,18,20 20:1,2,3,8,
9,16,17,18,20 21:2
28:3 35:16 36:17
39:1,2,4 40:17
41:20 45:24 46:1,
11,13,19,20 47:1,2,
16,18 48:6,17,18,20
49:1,4 50:4,22 51:5,
8 52:4 65:5 69:10,
15 75:3 82:21
84:13,22,23,25
85:18,20 86:1,2,4,
22,23 87:4,8,14,17,
22 88:21 89:1
90:13,16 95:18
97:12 98:1,10 99:4,
5,25 100:18,19
101:3,13 103:21,22,
23 105:7,11,13,17,
22,23 108:5 110:18,
24 114:13,16 115:5
116:8,23,24 117:19
118:1,18,23,25
119:1,3,5,7 120:3,
11,14,16,23 122:5,
6,24 126:6,10,16,24
128:8,13 130:4,16,
20 132:24,25

133:24 134:5,23
136:1,5
**lawsuit** 7:3 48:3
81:11,25 82:1 84:8
104:25 106:17
111:8 112:12
**lawsuits** 10:25
11:22
**lawyer** 8:17 12:7
14:7,8 46:17
**lead** 22:25
**leads** 98:15
**led** 125:23
**left** 43:20,25 44:5
103:8
**legal** 8:15 18:5,20,
23 34:9,21 37:1
45:1 59:23 60:4
62:10 64:6 73:15
74:21 93:23
**legitimate** 75:2
**lengthy** 34:20
**letter** 55:8 56:2
**letterhead** 56:7
**letting** 35:10
**level** 11:3
**liability** 51:13 78:16,
20
**liable** 49:20 50:19
83:8,18 85:15 90:21
**liberal** 48:22
**liberally** 113:12
**license** 7:3 113:13
**licensed** 8:11,20,22
**lien** 8:18,24 9:21
11:8,11 16:23 17:19
18:13,14,15 19:11
45:9,13,22,23 46:8,
11,21,22 47:4 48:5,
10,13 49:11 50:5,9
51:8,18,21,23
52:12,17 64:10,22
65:9,21 66:2,9,20
69:10,19,20 83:2,5,
23 86:8,17 88:3,18
89:14 90:8,12 94:20
95:16 99:17,25
100:7,8,11 101:7
103:16 104:8 105:2
106:13 107:8,11,12,
20 108:18 110:19,

24 115:4,7,13,18,21
118:11
**liens** 16:20 17:9
46:15 50:24
**lift** 92:6
**limitation** 107:1
128:12
**limitations** 38:15
39:6,10,25 40:2
99:17 106:14
**limited** 28:13 33:1
38:22 40:1 127:20,
24
**lines** 20:12 38:12
76:16
**list** 21:19 24:16 26:5
36:19 70:22 75:11
108:14,15,21
109:20,21 118:19
120:5
**listed** 24:18 25:13
26:3 27:14,19,25
33:18 107:18
108:11,13 119:24
121:3 129:19
**listing** 27:15
**lists** 112:8
**literal** 79:6
**literally** 66:14 78:11
**litigating** 136:16
**litigation** 9:2
**litigator** 25:25
**live** 20:25
**London** 33:7
**long** 5:16 60:18
75:25 119:5
**longer** 28:10 31:4
54:12
**looked** 25:24 87:9
95:24 97:21 105:25
111:14
**loosely** 73:25
**Lopez** 5:1,5 12:15
60:24 65:17 78:24
92:23 93:8 125:11
**Lopez_0430** 42:6
**lost** 101:12 102:3
124:13
**lots** 112:18
**lower-level** 18:3

**loyal** 49:6

---

## M

**made** 5:8 24:5 28:7
32:17 35:25 44:16,
18 70:7 94:9 106:12
107:10 122:18
123:13 126:3
**maintain** 30:4 38:3
40:12 49:6 60:3
63:2 66:24 73:13
74:20 77:3,4 79:14
80:9 102:5 120:2
**maintained** 135:13
**maintaining** 35:21
**maintenance** 76:6
**Maja** 63:12
**make** 5:18 13:16
23:23 30:7,17
36:11,18,22 45:2,4,
5 47:25 48:7 65:6
78:6 79:8,20 86:2
99:6 102:11 109:16
120:10 121:18
**making** 17:20 34:3
36:23 97:15 131:19
134:20
**malice** 76:9
**manner** 77:4
**Marfield** 5:8 33:9,21
81:18 93:21 96:6,8,
12,17,20,25 97:1,3,
13,15,18,22 98:3,7,
16 99:3,6,14 113:12
131:13,20,23,25
133:13 134:18
136:13,15,20
**marital** 13:18,20
14:12
**maritime** 8:18,24
9:4,7,18 10:3,18
11:2,4,8,11,23 12:7
16:20,23 17:9,19
18:13,14,19 19:11,
13 20:8,16,18,20
45:9,13,23 46:1,7,8,
10,12,15,17,20
47:1,2,16,18 48:5,
25 49:7,8 50:22,23,
25 51:7 65:9 66:2,
20 69:15,16,18,20

83:2,5,23 85:20
86:8,25 88:18,21,23
89:14 90:8,12 94:20
99:17,20,25 100:7,
8,11,22 101:2,7,14,
20,22 102:4,12
103:5,16 104:8,21
105:1,2,11,12,13,24
106:8 107:8,20
108:5,18 110:18,19,
20,24 115:4,7,13,18
116:4,8,10,24
117:5,9,12,19,22
118:10,18,21,23
119:7,11,25 120:3,
7,13,14 121:4,11
122:2,16 123:10
124:16,24 125:6
126:6,15 128:10
130:20 131:8
**mark** 12:12,14 42:9
53:24 71:9
**marked** 62:18 92:11
**marked/introduced**
6:22 12:13 42:11
53:22 71:8 92:9
**marriage** 13:21
14:11
**married** 14:13
**matches** 110:2
**material** 44:15,17
**materials** 21:19
22:1,25 23:3,17,23
24:1 25:15 26:4,12
28:1 29:9,20 70:23
98:13
**matter** 7:21 21:25
29:18 35:18 39:4
41:20 45:2 46:16
51:20 52:8 56:5
84:13 86:23 98:1
120:22 128:8 135:9
**matters** 10:18
11:10,23 45:17 46:6
56:18
**Maya** 5:7 25:16,20
31:24 33:8,22 36:1
38:20,23 47:12
55:11,14,24 56:10,
15,16,20 57:2,5,8
58:1 59:16,20 60:8,
16 61:24 64:11
65:10,13,21 66:19

72:15,24 73:3 75:7,
18 84:11 85:15 94:6
96:9 100:12 135:12
**Maya'** 93:17
**Maya's** 25:8,12
**Mayfield** 135:7
**meaning** 77:18 80:8
114:1,2,5,6
**meanings** 114:3
**means** 18:10 52:17
65:19 66:7,8,18
78:4 79:6,10 80:7,
13,15,20,22,24
81:6,9 84:21,22
109:12 114:10
118:23 119:12
**meant** 67:4
**members** 123:4
124:5
**mentioned** 16:4
134:13,17
**mercantile** 105:8
**messed** 78:14
**met** 5:5
**method** 115:23
119:10
**Mexican** 7:18 8:2,3
10:25 11:2,16,19,23
12:23 13:3,9,12,15,
18,22,23 14:2,10,
11,25 15:10,14,16,
18 16:2,6,8,14,16,
19,23 17:8,18 18:1,
5,13,14,15,18,20
19:18,20 20:1,2,8,
15,17 21:1 28:3
34:20 35:15,23
36:17 39:1,2,4
40:17 41:20 44:25
46:1,12 47:1,16
48:5,17,18,20,24
49:4,6 50:4 51:5
52:4 53:9 55:17
56:4,7,11 57:3,24
58:13 65:5 67:11,
15,22 68:20 69:10
72:19 75:3 80:21
82:21 84:13,22,25
85:18 86:2,4,22
87:4,6,8,14 88:21,
25 90:13,16 95:18
96:13 97:12,19

98:1,10,20 99:4,5,
17,25 100:18,19
101:3,13 103:20,22
105:22 110:24
114:13,16 115:5
116:23 117:19
118:1,25 119:1,3,7
120:3,14,23 125:2,
24 126:6,10,24
128:8,13 130:4,16,
20 133:23
**Mexicans** 18:22
69:19 120:10,12
**Mexico** 6:3 7:7,9,11,
12,13,20 8:6,10,21,
22,24 9:6,12,15
11:24 14:13,17
15:6,22 35:13,14
41:19,24,25 47:3
50:7,17 54:19 59:23
62:9 66:8 69:11
92:18,19 93:19
102:4,11 105:5,12
107:8 112:6 126:16
133:6 134:25
**million** 43:5 108:25
110:11,12,14
**mind** 11:6 23:7
25:25 114:23
**minute** 58:6
**missing** 90:15
**mixing** 105:4
**modify** 21:25
**moment** 59:25
60:17 72:2,4 73:11
120:9 134:13
**Monday** 37:7
**Monterrey** 7:25
**monthly** 76:10
**mooring** 108:2
109:9
**morning** 5:5 25:4
26:14 33:19 37:7
71:13,14,16,19
**mouth** 48:9
**move** 28:6 53:4
58:21
**moved** 14:14
**Moving** 34:1
**multiple** 9:7

## N

names 5:16
national 38:20,24
nature 15:23 36:16
  51:3 52:12
navigation 11:4
  47:2 105:9
necessarily 38:7
  39:13,14 51:8
  103:18 114:6 117:4
  130:22
negligence 76:10
neighborhood
  108:24
nitpicky 65:3
nonresponsive
  99:10
North 7:17
note 107:24
noted 113:11
notice 21:18 45:5
  54:25
number 8:1,4 31:9
  33:3 55:10 58:24,25
  59:21 73:7 80:18,19
  110:13
numbering 25:25
  26:1
numbers 25:21
  30:17,23,25 43:7

## O

oath 58:25 59:8,10
  75:4
object 31:5 41:10
  44:21 57:6 66:21
  68:22 70:19 84:3,12
  85:17 91:18 95:25
  99:9 108:20 115:15
  118:13 124:17
  132:23
objective 19:1
objects 98:7
obligated 45:4,5
  97:23
obligation 38:3
  50:19 51:3 74:12,
  13,19 75:2 103:21

115:23 117:24
118:4,7 119:10
131:10 132:13,15
133:25 136:20
obligations 37:22
  38:15,22 40:5,6,21
  53:14 55:7 63:10,15
  75:12 97:14 118:3
  132:5,8,22
obscured 62:9,24
obtain 67:10 105:6
  119:5
obtained 32:18
obvious 109:14
occasion 10:17
occur 57:10,12
occurred 10:22
  98:23
occurs 111:16
Oceanografía 6:9,
  10,15 10:18 31:23
  33:8
October 47:13 93:23
offhand 11:12
  132:25
office 41:25 53:9
  55:3,18 56:4,8,11
  57:3,25 58:14 68:21
  72:20
official 55:8
oil 10:24
opening 102:6
operation 18:4
  87:17
opinion 36:21 41:17
  69:21 74:18 79:5,10
  80:15 81:6,8 99:13
  103:6 114:1 117:22
  125:4 129:5,15,17
  131:19 132:2
opinions 21:25
  23:13,18,20,22,25
  24:7 26:9 28:8
  29:13 38:13 106:25
  110:22 112:14,21,
  23
opportunity 24:11
  59:11
opposed 17:15 52:7
opposing 96:17,20

opposite 96:14
oranges 105:4
order 19:12 37:16,
  20,24 38:1,3,8,10,
  14,17,19,23 39:10,
  21,25 40:2,6 41:4,7,
  9 42:1 45:7 48:19
  53:9 54:13 58:13,14
  60:2,19 62:4,18
  67:14,21 68:20
  73:12 74:14 79:14
  80:9 90:15 102:4
  104:4 105:18
ordered 86:7
ordering 51:2 86:14
orders 53:16,17
  88:1,13
organized 19:2
original 22:10 54:1
  93:25 109:18
OSA 6:11 10:18 11:9
  32:7
Oscar 55:8 59:22
  60:14 61:25 62:1
  75:15
owned 83:21 91:17,
  24
owner 5:8 9:15
  33:22 51:14 52:7,23
  67:22 83:12 85:9
  86:4,5,10,13,14,16,
  17,22 87:23 89:3,21
  90:4 91:13 95:6
  96:13 104:17,19
  120:18 125:1
  130:17 131:14
  134:15 135:14
ownership 33:8
  67:10,16 86:16
  90:11 94:5,9 96:9
  97:20 136:15
owning 15:22
owns 51:20 52:8
  135:10 136:15

## P

pages 42:17 44:4
  107:6
paid 43:16,22 44:2,
  7,8,20,24 51:3
  52:21 81:10,25 82:6

85:13 86:18 88:17
  97:14 98:24 100:4
  104:15 106:5,19
  108:1 117:11 118:4,
  8,12 122:12 123:2,4
  124:3,7,9 126:1
  128:7 135:2
paint 136:6
painted 136:12
Panamanian 93:17
Panamericana 7:20
paper 30:23
paragraph 21:18
  69:25 75:15,21,25
  92:5 93:8,13 97:9
  98:17,19 99:8 109:2
  110:10
paragraphs 99:7
parse 108:23
part 12:2 27:6,7
  44:24 52:15 74:5
  75:25 78:16 91:19
  96:18,19 109:10
partial 33:17
parties 14:13 21:21
  40:23 54:21 55:25
  57:21 58:23 81:1
  83:7,24,25 88:6
  90:18 128:3
party 81:12 82:2,5
  83:21 84:10 86:9
  90:3,4 94:8 97:18
  117:24,25 121:20
  124:1 127:5,6 131:5
  132:17,18,19 135:1,
  2,4 136:6
party's 127:7
pass 125:13 134:6,7
passage 99:21
past 11:10 19:21
  25:18 82:24
Patent 59:21
pay 45:12,14 77:24
  80:5 88:2 97:23
  103:11 104:5,6
  116:11 117:10,15
  118:4,7,12 120:1
paycheck 124:4
paying 78:16 103:9
payment 43:19 44:4,
  16 45:1,2 49:14

51:1,23 70:11 95:24
98:20,21 105:19
115:5,8 116:9 117:3
118:19 120:5 121:7,
8,18 122:8,19
124:14,18 126:7,20
127:14,19,23,25
133:19 136:8
**payments** 45:4,5
82:18 97:16 98:9
123:14 126:3 131:7
**payor** 127:7
**pays** 86:6,15 88:16
100:17 102:16,17
115:11 116:1,6,12,
14 117:20,21,24
121:22
**people's** 60:21
**perform** 37:15 78:6
107:4 111:5
**performed** 30:20
**performing** 37:23
41:7
**period** 10:10 68:19
96:11 107:25 109:3
135:13
**permission** 40:22
45:3
**person** 45:3,5 78:16
102:12 116:6,16
117:1,2,3,14
121:15,22
**personal** 9:21
14:20,24,25
**personally** 83:14
**pesos** 30:15 43:5
108:1,2,25 110:11,
12,14
**petition** 34:24
**Petroleum** 11:1
**PGR** 41:24 55:17
56:6,7 57:24 65:23
72:19
**phrase** 62:25 77:11
81:7,15 113:8,12,13
**physical** 73:14
74:21
**picture** 88:22
**piece** 30:22
**pilotage** 30:15 43:3
108:2 109:9

**place** 70:6 77:6
105:2
**places** 105:25
**plain** 65:7
**Plaintiff** 5:21 47:11
48:5 58:15 61:13
**Plaintiff's** 26:15
27:9,10 34:24 48:4
61:8 130:25
**pleadings** 12:1
**plenty** 5:10
**pocket** 45:19 122:6
**point** 19:15 28:14,15
68:1,6,11 69:7,11
88:23 90:19 97:23
99:2,7 106:1 108:16
112:20 114:4 131:9
132:3,24
**poorly** 37:6
**port** 30:16 43:3
108:3 109:10
**portage** 51:4 100:14
101:5 110:6
**portion** 75:9,13
**portions** 51:7
**position** 39:20
56:12
**possessing** 35:21
**possession** 31:4,24
32:7 59:25 60:17,19
73:10,11 74:14
90:6,12
**possibly** 104:23
**potential** 125:19
131:2
**Potentially** 125:21
**practice** 8:11,21,22
14:8 46:18
**preceding** 98:18
**preference** 85:22
**preferential** 105:19
**preferred** 51:1
**preliminary** 5:11
**premarked** 6:20
**premised** 38:8
**preparation** 26:8
**prepared** 22:12
42:24 134:18
**presentation** 8:7

**presented** 8:6 22:1,
24 87:10 130:24
**preservation** 40:19
**preserve** 77:4
**pretty** 11:2 12:24
**prevent** 41:18
**previously** 57:21
63:7 93:19
**primarily** 40:18
**principal** 39:3,7,9,
11 82:20 94:18
95:23,24 121:24
122:1,4,6 123:18
124:20 134:1
**printed** 56:6
**prior** 98:21
**priority** 49:14
**privilege** 19:13 46:1,
7,12 47:5,8,11
48:14 49:1,7,8,13,
14 50:7,9,15,25
51:5 52:4,6 64:10,
22 65:9,21 66:3,20
69:10,16,19 86:25
88:23 100:22 101:2,
20,22 102:5,13
103:5 104:21 105:1,
3,12,19,20 106:8
108:7 110:20 115:5,
7,20,22 116:4,10
117:5,10,12,19,22
118:21 119:12,16,
25 120:3,8,13
121:4,11 122:2,16
123:11 124:16,24
125:7 126:6 128:10
131:9
**privileges** 50:23
99:20 101:14
102:18
**problem** 37:7 66:11
109:19 115:17
**problems** 73:23
**procedural** 54:20
**proceed** 35:3
**proceeding** 9:5
33:17 54:19 119:12
**proceedings** 11:24
12:2
**process** 19:11 22:15
33:3 50:17 105:5,20

**procession** 67:16
**procure** 94:11 95:13
96:25
**procured** 81:10,24
82:5 100:4 126:1
128:6 132:8,21
**procuring** 94:17
**produce** 23:1
**produced** 6:18,19
58:15 76:5,23 92:12
93:1 103:15
**production** 25:8,12,
14,16
**productions** 27:11
**professor** 7:24
**program** 7:16
**prohibit** 64:9
**prohibited** 60:8
65:20 66:19 74:3
**prohibits** 38:19
**proper** 61:19 135:6
**property** 13:20
14:12,17,18 15:22
35:19,22 40:20
**protection** 40:19
**provide** 10:14 23:5
66:1 74:7 76:10
81:2 83:10,20 86:13
104:12 111:21
**provided** 23:2 24:2,
24 29:20 30:1,10
31:15 59:14 60:1
70:24,25 71:1,12,
15,18,24 73:11 86:6
89:8 98:15 101:1,23
103:17 104:4
109:15 111:8,9,11,
12,16,17 129:20
134:14
**provider** 100:15,17
101:11 102:15,19,
21 104:1,11,12,15,
23
**providers** 106:10
**providing** 84:7
**provision** 30:4
40:12 47:3 48:24
61:6 62:5,15 66:4,6,
25 67:4 80:20
100:13 103:25
113:8,18,25 118:16

126:11

**provisions** 18:23
45:1 114:13,16
125:5,24 133:25
134:2
**public** 60:1,18 73:12
74:14
**purchase** 93:21
**purely** 32:20
**purpose** 120:19,21
**purposes** 5:18 71:4
130:20 131:8,16
**pursuant** 89:11
132:11
**pursue** 127:14,19,
23
**pursuing** 127:24
**put** 42:15 71:5 99:3
**puts** 77:7
**putting** 28:3 48:9

---

## Q

**qualified** 15:15
16:22 17:4 21:5
**question** 9:22 10:6
15:20 17:7,11,17
19:25 20:5 22:11,
16,17 26:7 32:25
34:15 38:25 39:12
40:16 41:1 45:17
47:20,22 50:4,15,20
52:3,16,24 57:1
58:17 60:12 62:6,
12,25 65:17 68:3,13
80:3 81:1 84:7,14,
25 86:12,21 87:8
88:24,25 89:7,10,
16,18 90:25 91:19
93:25 94:21 95:21
99:12 102:25
104:20 115:3,10,17
120:9 121:12
122:24,25 124:12
127:12 128:1
129:23 130:23
134:16 135:8,20
**questioning** 72:5
127:16
**questions** 13:4
14:15 20:13 32:15
72:10 127:10

128:21 134:8 137:2

**quibble** 77:6
**quibbling** 75:1
**quickly** 42:21
**quote/unquote**
97:13
**quoted** 49:24 99:19

---

## R

**rate** 43:6
**ratification** 39:9
**reach** 45:10 98:15
133:11,14 134:3
**reached** 45:20 100:2
**reaching** 28:8
**reaction** 27:6
**read** 32:8 33:1 46:25
59:19 61:15 64:12,
15,19 69:1 73:24
74:13 75:24 76:18
**reading** 34:20 36:6
60:20 65:8 109:18
**real** 15:19,22 16:2
**reason** 32:24 39:1
54:17 59:10 126:2
**reasons** 80:17
**recall** 25:15 27:4
36:6 42:3 62:17
92:1 111:13 127:15
**receive** 25:6,8,11
26:17 43:1
**received** 18:12
20:10,15 22:3,4
24:25 25:4,5 26:9,
14,22,24 27:22
28:12,21 43:17
63:13 67:9 108:23
112:20 131:11,18,
22 135:4
**receiving** 25:15
**recipient** 131:11,15
**recitals** 73:5
**recitations** 54:13
55:18
**recite** 42:8
**recited** 29:4
**recognize** 92:16
**record** 5:18 8:25 9:5
42:12 50:2 71:5

125:8 134:10

**recording** 15:21
**records** 26:1
**recover** 47:6 51:11
**recovery** 49:19
85:20
**recreate** 109:22
**redelivered** 125:1
**redo** 41:2
**refer** 6:5 11:9 49:5
64:13 92:5,13 96:5
98:19
**reference** 64:6
**referenced** 27:21
113:4 125:16
**references** 114:15
**referred** 6:11 44:1
71:2 92:17
**referring** 9:23 25:17,
19 34:25 42:7 64:2
71:19 111:17 131:3
**refers** 25:2 51:5
**reflect** 43:19
**reflected** 24:9
**reflects** 124:2
**refund** 77:11,12
80:10,21,24 81:8
113:9
**refunded** 77:25 80:6
**regard** 10:18 11:4
13:21 30:11 46:15
47:18 51:10 52:19
63:15 78:12 82:10
86:1,11 87:1 101:14
119:8 123:19
**regime** 14:12,17,18
**regulations** 11:5
**Regulatory** 59:21
**reimburse** 82:21
94:19 98:25 134:1
**reimbursed** 77:21,
25 80:6 82:7
121:19,24,25
**reimbursement**
65:25 66:7 82:12
84:18 94:25 98:8,11
104:13 127:8
129:12
**reimbursements**
76:7 77:8 85:12

**reimbursing** 81:12
82:2 84:10
**relate** 54:24 57:8,9
77:1 108:23
**related** 55:19 56:11
57:4 70:22 108:6
**relates** 54:18 56:1
62:6,25
**relating** 43:2 45:1
89:13 119:9 120:1
125:6
**relationship** 36:16
38:1,2,6,7,10,14
40:14 41:18 85:3
87:16 96:24 126:12
128:2 132:12 133:1,
9,10,11
**relationships**
103:24
**release** 92:7
**relevant** 7:3 14:12
19:9,17 26:6,8,10
27:7 37:11 75:25
99:2,4,5
**relied** 30:16 31:16
**relief** 104:16 133:4
**rely** 60:21,25 72:7
**rem** 69:18 85:21
115:20 119:12
**remain** 29:4 40:18
60:19 78:12
**remains** 28:17
**remember** 7:21 8:4
11:14,18 25:21 26:1
43:23 111:15 127:2
**reminding** 26:18
**removal** 92:19
**removed** 13:7
**repair** 124:25
**repay** 131:10
**repayment** 100:19
**rephrase** 10:1
**report** 12:20 21:10,
13,17 22:4 23:1,6,
14,15 24:6 25:5
26:4 27:20,21 31:2
33:14 36:12,23
37:3,10 40:5 41:12
48:15 49:25 53:5
70:14 76:11 81:16
85:4 92:12,13 96:5

97:5 99:16 106:22
107:6 108:17 111:4,
7 112:15,21 114:24
129:8,19,21,24
130:1,2
**represent** 5:6 8:18,
23 26:5 54:7
**representative**
59:23 64:3,7 72:14
**representatives**
93:23
**represented** 93:2
**request** 27:11 43:14
91:23 92:6,18
96:17,21 98:11
**requested** 26:8 34:7
91:15,21
**requesting** 35:24
76:7 77:8,11,12
80:10 81:7 92:14
94:4 96:16 113:9
**requests** 95:10
**require** 14:3 19:17
45:3,4 120:12
**required** 76:10
98:10 129:18
**requirement** 79:15
136:3,5
**requirements**
110:17
**requires** 127:6
**reserve** 21:24
**resolution** 59:17
**resolutions** 54:8,9,
14 55:19 56:9 57:3
**RESOLVED** 59:19
**respect** 18:13 20:5
38:13 39:20 41:7
45:24 46:7 53:14
117:6 119:16 121:2
122:7
**responses** 25:18
26:15,19,25 27:4,
10,22
**responsibility**
78:19,22
**responsible** 40:19
76:4,8,23,24 77:20,
22 78:18 79:19
82:5,18 102:22
103:3

**rest** 22:18
**restricted** 5:8
**restroom** 125:9
**retained** 8:23 117:1,
4
**returned** 136:17
**review** 26:24 28:14
29:8 42:23 58:6
59:7,12 72:2,5,9
**reviewed** 12:1 21:20
24:12,17 25:22
26:15,22 27:9,23
28:1,2,3,12 31:18
33:16 54:4,5,9
57:14 58:4 63:7
70:23 72:6 91:6
98:14 106:22
110:22 111:25
**rights** 37:22 38:15
53:13 63:10 85:25
**rise** 68:19 83:22
107:7 110:19,24
116:4 118:21
119:25 120:7
121:10 122:2
124:16 126:11
**rocket** 19:3
**rudimentary** 46:14
**Rufty** 22:14 23:11
25:17 30:17 31:5,10
41:10 44:21 50:2
56:14 57:6 58:7
61:18 66:21 68:22
70:19 79:17 84:3,12
85:17 91:18 92:4
95:25 96:2 100:23
108:20 115:15
118:13 124:17
125:15 128:16,20
132:23 134:8,12
135:15,18,21
**rule** 35:21
**ruled** 33:24
**rules** 5:11

---

**S**

**S.A.** 5:22 6:2,3,10,
15 59:24 93:19,20,
22
**SAE** 35:15

**salaries** 30:15 43:3
51:4 108:1,24 109:7
110:6 111:18 116:6,
9,12,14 122:8,19
123:20 124:3 128:7
**salary** 109:16
121:19 124:7
**satisfies** 87:24
126:25
**save** 27:17
**scenario** 82:4
**scenarios** 115:11
**school** 7:11,12,13,
14,17 18:15 20:18
**schools** 8:6
**science** 19:3 78:10
**scope** 39:5
**scratch** 30:22
**search** 112:11
**secondary** 28:2
**section** 21:24 24:13
28:6 36:20 53:4,7
56:17,18 64:2 76:13
107:6
**seek** 51:23 52:6
65:25 66:7 80:20,
23,24 85:20 104:13,
16
**seeking** 104:25
**seized** 60:5 73:15
74:22 76:9
**semicolon** 76:4
**sense** 8:3 45:25
66:5 79:8 82:20
83:19 96:8 119:21
120:10 134:15
135:10
**sentence** 61:20 70:4
74:8,17 76:22
79:10,11 80:4 81:6
97:25
**sentences** 62:3
**separate** 14:17
**serve** 9:1
**service** 45:18,19,21
100:4,5,10,14,15,17
101:1,11 102:15,19,
21 103:25 104:1,2,
11,12,13,15,23
106:10 109:15
112:7

**services** 30:4,13,16
40:12 43:3 44:23
51:10 81:11,25
82:1,3 83:10,20,22
84:7 86:5,7,14,15,
18 88:1,2,13,16,17
94:11,18,19 95:14
96:25 97:4 101:5,9,
15,19,23 102:10
103:13,17 104:4
107:7,13,21 108:3
109:11 110:6 111:8,
10,22 126:1 128:6,7
131:7 132:8,10,18,
20,21 133:19
134:14
**set** 16:25 25:15 26:4
31:1 37:16 53:15
57:11 107:18
108:22 109:3 110:4
129:21,24
**sets** 58:1,7,9,15
63:9,17
**setting** 23:9
**Sgm** 6:3,5 30:3 33:8
34:4,25 35:24 36:5
37:3,15,16,19,20
38:1,6,20,22 39:20
40:1,5,11,17 41:8,
14 55:19 59:23
60:6,8 63:10,22
64:2,4,11,18 65:8,
15,19,24 66:6,18
67:9 68:5 72:14,23
74:3 77:19,24 79:12
80:4 81:12,14,21
82:2,4,9,10,11,17
84:9,10,18,19 85:9,
11,12,16,25 89:21,
24 90:8,20 91:12,15
92:7,14 93:2,19
94:4,19,24 96:9,14,
16,23 127:12,14,19,
23,25 128:2,4,11
129:10,11 132:9,20
133:9,16,18 134:13
136:14,18
**SGM's** 30:5 36:13,
21 37:12 40:13 41:3
53:8,13 56:11 57:4
84:17 90:6 96:21
125:22 132:5,7,8

**ship** 59:20 60:1,3
73:10,14 74:21
76:11 79:14 80:9
86:8,9 113:5 135:13
**Ship's** 59:21
**ship...is** 61:24
**Shipping** 6:2,3
59:23 92:18 93:19,
20,22
**short** 50:20
**shortcut** 27:16
**show** 106:4
**shown** 93:15
**sic** 41:21 57:15
59:17 93:18 135:7
**side** 30:24
**signature** 72:15,16
**signed** 56:1 72:13,
18 93:21
**similar** 52:4,12
69:18 136:2
**similarities** 50:8
**simple** 58:22
**simplified** 19:2
**simply** 99:7 122:14
**sir** 8:16 24:14 31:22
34:2 42:22 86:12
92:24
**sit** 11:6 21:16 23:24
24:4 32:10 36:7
43:4 66:17 80:14,16
81:5 111:3,19
112:15 114:21,22
**sitting** 115:2
**situation** 16:23 17:5
18:9,11 19:10,11
20:4 35:1 67:2
81:14,19 82:17
85:7,15 86:3,23
87:12,16,19,23
89:13 94:15 95:19,
20 96:23 98:16
117:14 119:21
122:2,14,17 133:12
136:13,21
**situations** 35:13,15
51:12 126:15
**skimmed** 106:24
**skip** 5:11
**slightly** 73:22

**sold** 86:9
**sole** 85:16
**solely** 51:14 122:1
129:11
**sort** 7:22 12:22
18:16 46:2 51:16
54:12,13 75:10 76:7
77:8 84:6
**Soto** 5:4,6 6:24
12:14 22:21 25:19
26:3 27:4 31:14
37:25 41:12 42:12,
20 45:11 46:19 50:6
53:1,4,23 56:15,23
57:11 58:11,18,20
59:2,5 61:21 69:21
70:21 71:4,9,11
79:21 84:4,24 86:4
91:23 92:10 96:4,5
99:9,12 101:4 109:6
115:16 118:15
124:21 125:8,11
128:18,22 129:2
133:16 134:6
135:19,23 137:2
**sources** 18:3
**Spanish** 34:9,18
42:14,18 54:1 60:21
61:15,16 62:8 64:14
71:6 72:4,7 75:5
76:14,21,25 77:10,
23 78:11,13,19,21
93:11 109:18
**Spanish-language**
71:17
**speak** 24:11
**speaking** 48:1,11
74:6
**speaks** 74:2
**special** 7:2 18:12
19:17 47:18
**specialization** 8:15
20:11
**specific** 20:9,12
91:11
**specifically** 11:8
13:3 20:7 21:7
37:14 38:15
**spent** 113:7
**spill** 10:24
**sponsored** 7:16

**stacks** 110:5
**staffing** 116:13,16,
17,25 117:2,7,11,
15,20,21 118:5,8,
12,20 120:6,18
121:8,14,16,18,21
122:3,4,5,7,10,11,
12,18 123:2,4,13,
17,22 124:1,4,9,15,
19
**stage** 88:23,25
**stamp** 55:1 62:9
75:6
**stand** 23:13 114:23
**standard** 115:13
**stands** 25:25
**start** 55:10
**starting** 76:21
**starts** 61:23 69:25
**state** 41:12,15 42:23
53:7 76:11 111:7
**stated** 91:24
**statement** 70:20
**states** 10:25 14:14
49:12 63:21 76:4
106:18
**stating** 38:23
**status** 45:20 53:8
57:4 100:2 102:5,20
105:6 106:7 116:9
119:6,8 120:22,24
121:14 126:5,18
130:5
**statute** 99:17
105:13,16,24
**statutory** 107:13
**stay** 75:4
**step** 38:5 45:9 102:9
**stick** 48:20 115:22
**sticker** 42:16
**stipulated** 57:20
**straightforward**
18:24
**strike** 37:4 109:22
115:19 133:17
**strikes** 95:1
**struck** 20:23 21:8
**structure** 18:4
**structured** 18:20
19:2 120:11

**student** 20:2
**studied** 20:9
**studying** 17:25
**stuff** 46:4
**subject** 7:21 37:23
39:9 84:8 106:13
107:11
**subjects** 70:14
**subrogate** 86:5
105:2
**subrogation** 86:18
114:14 126:8,19
**Subsection** 28:16,
18,19,20,22,24,25
**subsequently** 6:2
**substance** 11:14
**substantive** 86:23
89:1 103:23 105:7
116:24 119:1
120:23 128:8,13
130:4
**sue** 136:8
**suffered** 76:9
**sufficient** 130:7
**suggest** 78:15
**suggesting** 80:24
**suit** 48:14
**supplemental** 22:19
23:1,6,15
**supplemented**
21:17
**supplements** 22:13
**suppliers** 106:3
**supplies** 30:4,13
40:12 44:23 51:10
**support** 23:20
107:12,19 108:18
129:18,25
**supported** 113:14
**suppose** 130:9
**sworn** 5:2
**system** 18:5,20,25
19:1 54:21

---

T

**taking** 38:20 97:22
**talk** 6:17 12:9 22:8
24:10,12 42:20
44:25 69:6 76:1

talked 15:5 33:19
48:13 53:12 136:3

talking 5:12,19 13:3
14:1 18:16 19:21
46:6 48:13,15 50:10
69:13 82:24 85:23
98:12,18 100:8
102:1 109:1,5
135:17

talks 28:6 98:20
126:7

tasks 40:23

taught 7:12,15,20,
25 8:5

tax 16:14,17 112:7

teach 7:14

teacher 19:19

technically 40:20
63:25 74:1,6,10,11

Technological 8:9

telling 17:14 24:15
31:7 40:4 59:5
65:11 78:10 84:15
87:7 89:11 123:18
134:23

tend 5:17

term 35:5,20 45:22,
23 48:1,10 69:20

terminate 68:7

terms 6:14 28:16
48:1 58:16 59:24
70:17 94:2 127:11
129:16

testified 5:2 12:25
13:11,17 14:20
15:2,10,18,24 16:6,
7,13 20:25 132:17

testify 14:6 58:25
59:8,10 81:2

testifying 10:4 12:9

testimony 20:22
21:8 104:3 125:16

Texas 8:12,15,18
14:12,19 132:24,25
134:5 136:1,5

theories 133:2

theory 126:19,20
129:4,6,17,18,24

130:1,24 131:2,3,
17,24 132:19 133:7,
15

thing 37:4 46:7
48:15 50:10 54:18
66:8 77:19 90:17
134:17

things 5:14 8:25
15:23 18:17 19:9
21:20 39:5 47:15
51:4 66:22 88:21
113:16 114:23
116:7 122:17
135:12

thought 58:21 99:2

thousand 93:24

time 11:15 13:7
14:14 22:2 26:11
27:17 30:25 33:1
34:21 35:24 36:3
59:7 60:4 61:16,18
62:10 67:8 68:19
89:22,25 90:11 94:3
96:11 99:22 109:3
113:7 125:12
128:18 130:2
135:13

times 8:5 14:22
36:12 37:11 118:22
125:17 136:1

title 27:3

today 11:7 21:16
22:20 23:24 24:4,15
31:12 32:10 33:2
36:7 43:4 54:6
59:11,15 65:22
66:17 71:12 80:14,
16 81:5,9 111:3,19
112:15 113:4 114:1,
21,22 115:3 129:21
132:1 134:18

told 30:18 40:10
43:18,21,23,24 44:3
68:15

top 42:15 54:1 67:12
71:6 75:18

total 108:24

totaling 42:24

totally 120:16

totals 110:2

towing 108:3 109:9

trade 7:18 15:3

training 7:2 17:16
19:17,18 20:6,10
34:17

transcript 47:13

transfer 43:12,17
44:3,4

transferred 100:9

transfers 43:10,19,
22

translate 41:24
61:16 62:5 74:11
77:10

translated 61:7,11
63:1 65:11 69:13

translating 34:18,20
78:19

translation 25:3
34:9,13 42:18 48:22
54:1 61:4,7,20 71:5,
25 73:21,24,25
74:2,8,18 75:2
76:17,20 78:9,23
79:7

translations 60:21
65:6 72:7

translator 34:22,23
61:2,8,9,22,23
74:25 75:1 77:7,15
78:14,15,18 79:2,
18,21

treatment 47:18

trial 23:9

trigger 103:7

trouble 40:15 52:15

true 44:14 45:12
60:6,10 94:7

trusts 15:21

truthfully 56:24

turn 13:6 29:16 75:6
92:22

turned 29:11,12
44:13,20

turns 45:11 57:16,
19,23

twentieth 93:23

twist 35:6

two-page 42:2,5
55:8

two-step 19:11
105:5

trade 7:18 15:3

two-thirds 73:9

type 101:19 118:17,
20 120:7 128:12

types 10:3 52:20
87:1 108:6 119:16,
18

## U

U.S. 7:18 8:2,3 9:23
11:19,20,22 13:17
14:2,6 15:16 16:8
18:10 43:6 45:24
46:11,15,17,19
69:18 75:3 83:3
84:23 86:1 101:13
126:10

Uh-huh 50:11 63:8
70:12

ultimate 81:15 96:6
97:6,13

ultimately 117:24
121:22 128:4

unclear 66:5

underlying 21:21
25:24 30:12

underneath 42:19

understand 6:14
15:16 16:22 18:10,
18,19,21,22 19:16
23:8 28:22,24,25
37:9 45:23 46:16
48:18 50:6,8,16
59:2 67:3,8 77:14
79:11 83:8,13 89:10
96:7 129:13 132:14

understanding
18:1,4 19:3 20:1
32:10,20 46:15,19,
23 54:11 65:7 81:12
82:2,6 83:24 84:9
85:11 89:23 93:5
94:18,24 95:23
96:12 102:22 103:2,
10,19,20 104:3,14,
22,24 106:5 111:20,
22 112:6 113:24
115:7 116:15,25
119:14 121:17,25
125:25 128:3,12

understood 5:23
35:6 46:11,12 84:1

128:6

**undertake** 77:1 80:8

**undertaken** 112:11

**unilaterally** 95:10

**unique** 54:19 105:1

**United** 14:14 49:12
106:18

**universe** 27:25

**University** 7:15,20,
25

**unjust** 87:19 104:18
125:17 126:12,18,
24 129:3,6,16,23
130:8,10,13,24
131:17,24 132:1,13,
19 133:3,6,11,15,20
134:4,25 135:25
136:8,10

**unjustly** 130:14,15
131:4,11 135:1
136:4,18,21

**unnecessary** 130:3

**unpack** 39:16

**unqualified** 21:1,5

**up-to-date** 6:25

**usage** 70:6,11

---

### V

**valid** 48:5

**valuable** 135:11

**vendor** 86:13 100:9,
10,11 101:4,15,22,
25 102:17,24 103:2,
4,7,9,13,16

**vendors** 104:5,6
105:3 111:12,16,21
112:3

**verify** 44:10,12

**version** 42:14,15,16
54:2,12 60:25 62:9
71:17 76:14 78:11
109:19

**versus** 46:7

**vessel** 5:9 9:12,14
30:5 38:2,4 40:13
44:24 46:22 47:5,19
49:9,16,20 50:5,18,
19 51:9,10,19,21,
22,25 52:1,5,7,8,13,
14,19,22,23 60:9,

15,18 62:3 63:3,5,
22,23 64:16,17,23
65:2,16 66:3,13,24
67:10,16,23 68:5,
10,16,20 69:3 74:4
77:3 81:17 82:11
83:6,7,8,12,15,16,
18,21 85:10,11,21
86:6,11,14,15,17
87:24 88:2,3,13,17,
18,19 89:2,3,11,15,
21 90:4,5,6,10
91:13,16,21,25
93:16,21 94:9,10,
12,20 95:1,7,14,16
96:13 97:19,20
99:23 100:6,12
101:2,8 102:11,19
103:5,16 104:4,17,
18 108:7 117:10,13,
23 118:11 119:9,13,
17 120:1,2,18
123:11 124:25
125:1 130:15,16,17,
21,22 131:14
134:15 135:11,14
136:15,17

**vessel's** 131:7

**vessels** 12:5,6 51:6
66:16 99:20

**view** 37:25 40:13
47:19 49:10 84:13
112:2 126:17,21
127:18

**viewed** 98:5 130:3

**viewing** 97:13

**virtue** 17:16 36:4
38:16 87:17 93:16
128:7

**vitae** 6:17,19,24 7:4

**voluntarily** 34:4
136:19

---

### W

**wages** 115:6,8,12
116:1 117:11,21
118:4,12

**wait** 104:4

**wanted** 43:25 49:4
70:13 114:18

**waters** 38:21,24

**week** 25:18

**whatsoever** 80:25
106:5

**wide-ranging** 12:24

**wire** 43:10,12,17,19,
22 44:3

**wishes** 136:7,18

**witnesses** 135:9

**word** 40:8,15 49:1
60:22 62:13 69:12
75:2 76:24 77:22
78:17,19,20 92:25
97:22 105:9 115:18

**wording** 75:4 97:11
127:2

**words** 35:7 45:17
48:9 62:8 67:13
77:7 78:6,10 90:20
103:22 113:13,21
123:12 126:23
133:3 134:16

**work** 6:7 11:9,16
12:3 23:12 27:7
44:10,11 46:18
48:17 107:15 126:2

**working** 61:12 67:15

**works** 122:8

**wrinkle** 40:25
129:10

**written** 22:22 26:16
41:13 67:25 103:20

**wrong** 46:23 121:12
136:12

**wrote** 33:13 130:2

---

### Y

**year** 99:18,21 104:5,
6 106:19

**years** 7:21 8:1,4 9:1,
8 10:10 11:17 14:9
19:19 34:19

**yesterday** 22:5 23:4
24:2 25:1 26:17,18,
22,23,24 29:3 33:2
71:12 111:4 112:21

**young** 14:7

David Lopez
April 09, 2018                                    138

1        WITNESS CORRECTIONS AND SIGNATURE

2        Please indicate changes on this sheet of paper,
   giving the change, page number, line number and reason
3  for the change.  Please sign each page of changes.

4  PAGE/LINE        CORRECTION        REASON FOR CHANGE

5   14/10   change "Mexican" to "Texas"     misstatement or
                                            incorrect transcription

6   15/21   change "interest" to "interests"   incorrect
                                               transcription

7   55/7    change "flushes" to "fleshes"    incorrect
                                             transcription

8   63/1    add quotation mark in front of "with"   "   "

9   63/3    add quotation mark at end of sentence

10  63/5    add quotation marks at beginning + end of sentence

11  65/1    add quotation mark in front of "with"

12  65/2    add quotation mark after "vessel."

13  67/16   change "procession" to "possession"   incorrect
                                                  transcription

14  87/22   change "expressed" to "express"    "   "

15  98/1    change "is" to "as"              incorrect
                                             transcription

16  98/1    change "." (period) at end of sentence to ";" (comma)

17  98/2    change "That's" to "that's"      incorrect
                                             transcription

18  108/1   change "66,500,000" to "6,500,000"    incorrect
                                                  transcription

19  _____

20  _____

21  _____

22  _____

23  _____
          DAVID LOPEZ

24

25                    ORIGINAL

1          S I G N A T U R E   O F   W I T N E S S

2

3       I, DAVID LOPEZ, solemnly swear or affirm under the

4    pains and penalties of perjury that the foregoing

5    pages contain a true and correct transcript of the

6    testimony given by me at the time and place stated

7    with the corrections, if any, and the reasons therefor

8    noted on the foregoing correction page(s), and that I

9    am signing this before a Notary Public.

10

11

12                    DAVID LOPEZ

13

14   STATE OF T E X A S        *

15   COUNTY OF BEXAR           *

16               SUBSCRIBED AND SWORN TO BEFORE ME BY

17   DAVID LOPEZ on this, the 20 day of

18   april        , 2018.

19                                          RACHEL M. JOAQUIN
                                            My Notary ID # 128892698
                                            Expires March 14, 2020
20

21

22               Notary Public, State of Texas

23

24   My Commission Expires: March 14, 2020

     Job 1-265117
25                              ORIGINAL

*CURRICULUM VITAE*

## DAVID LOPEZ

Cacheaux, Cavazos & Newton, L.L.P.
333 Convent Street
San Antonio, Texas 78205
Tel: (210) 222-1642
Fax: (210) 222-2453
*dlopez@ccn-law.com*

### EDUCATION:

HARVARD LAW SCHOOL, Cambridge, Massachusetts
Class of 1988, J.D.
Graduation Honors: **cum laude**
Editor, HARVARD LAW REVIEW, Volumes 100 & 101

GEORGETOWN UNIVERSITY, School of Foreign Service, Washington, D.C.
Class of 1985, B.S.F.S., International Economics Major
Graduation Honors: **magna cum laude**
Member, Phi Beta Kappa

### LEGAL POSITIONS:

CACHEAUX, CAVAZOS & NEWTON, L.L.P., San Antonio, Texas
Partner and Head of International Litigation, September 2017 to the present

PULMAN, CAPPUCCIO, PULLEN, BENSON & JONES, L.L.P., San Antonio, Texas
Partner, January 2008 to July 2017

DAVIS, CEDILLO & MENDOZA, INC., San Antonio, Texas
Partner, January 2003 to December 2007
Of Counsel, June 2001 to December 2002
Senior Litigation Associate, June 1992 to July 1993

GIBSON, DUNN & CRUTCHER, Los Angeles, California
August 1990 to June 1992
Corporate Litigation Associate

SAN ANTONIO COMMUNITY LAW CENTER, San Antonio, Texas
August 1988 to May 1990
Co-Founder, Co-Director and Staff Attorney

### PROFESSIONAL RECOGNITION:

**Rated "AV Preeminent 5.0"** by Martindale-Hubbell



EXHIBIT 1
LOPEZ
April 9, 2018
Reported by:
D. SANDERS, CSR, RDR, CRR, CCR (LA)

Master of the Bench, William S. Sessions American Inn of Court, San Antonio, Texas

Member, The Million Dollar Advocates Forum (since 2006)

## ACADEMIC POSITIONS:

ST. MARY'S UNIVERSITY SCHOOL OF LAW, San Antonio, Texas
Adjunct Professor of Law, Fall 2008, 2009, 2010 & 2012
International Commercial Arbitration Seminar (with Judge John Specia)

ST. MARY'S UNIVERSITY SCHOOL OF LAW, San Antonio, Texas
Full Professor of Law with tenure, June 1997 to May 2003
Associate Professor of Law, August 1993 to May 1997

UNIVERSITY OF CALIFORNIA - DAVIS, Davis, California
August 1997 to May 1998
Visiting Professor of Law

BAYLOR LAW SCHOOL, Study Abroad Program in Guadalajara, Jalisco, México
Summer 1996, 1997, 1998, 1999 and 2000
Visiting Professor, Universidad Autónoma de Guadalajara

## APPOINTMENTS:

Admissions Committee, U.S. District Court, Western District of Texas (2012-2015 Term)
Advisory Board, Center for U.S. and Mexican Law, University of Houston Law Center
(2012 - )

Appointed by Ambassador Charlene Barshefsky, U.S. Trade Representative, to the Roster
of Eligible Binational Panelists under Chapter 19 of the North American Free Trade
Agreement (April 1998 – March 2003)

## BOOKS AND BOOK CHAPTER:

Co-Author, MEXICAN LAW (together with Professor Stephen Zamora of the University
of Houston Law Center and Director José Ramón Cossío Díaz, Professor Leonel
Pereznieto Castro, and Professor José Roldán Xopa of the Instituto Tecnológico
Autónomo de México) (Oxford University Press 2004)

Co-Author, NAFTA: A PROBLEM ORIENTED COURSEBOOK (together with Professor
Ralph Folsom of the University of San Diego School of Law and Professor
Michael W. Gordon of the University of Florida College of Law) (West
Publishing Co. 2000)

Co-Author, 2000 DOCUMENTS SUPPLEMENT TO NAFTA: A PROBLEM ORIENTED
COURSEBOOK (together with Folsom and Gordon) (West Publishing Co. 2000)

Co-Author, TEACHER'S MANUAL TO ACCOMPANY NAFTA: A PROBLEM ORIENTED COURSEBOOK (together with Folsom and Gordon) (West Publishing Co. 2000)

Author, *The Legal System of Mexico*, Chapter 3, MODERN LEGAL SYSTEMS CYCLOPEDIA (William S. Hein & Co. 2000)

## ARTICLES:

Article, *Is Mexico an "Adequate Alternative Forum" for Litigation? The Texas Supreme Court and Fifth Circuit Speak*, 71 TEX. BAR J. 270 (April 2008)

Lead Article, *Dispute Resolution Under NAFTA: Lessons from the Early Experience*, 32 TEX. INT'L L.J. 163 (1997)

Lead Article, *Dispute Resolution Under MERCOSUR from 1991 to 1996: Implications for the Formation of a Free Trade Area of the Americas*, 3 NAFTA LAW & BUS REV. OF THE AMERICAS 3 (Spring 1997)

Article, *Dispute Resolution Under a Free Trade Area of the Americas: The Shape of Things to Come*, 28 U. MIAMI INTER-AM. L. REV. 597 (1997)

Article, *Why Texas Courts are Defenseless Against Frivolous Appeals: A Historical Analysis with Proposals for Reform*, 48 BAYLOR L. REV. 51 (1996)

Note, *Reexamining the Constitutionality of INS Workplace Raids After the Immigration Reform and Control Act of 1986*, 100 HARV. L. REV. 1979 (1987)

## PUBLICATION HONORS:

Nominee, Outstanding Law Review Article - 1997, Texas Bar Foundation (for *Dispute Resolution Under NAFTA: Lessons from the Early Experience*)

## PROFESSIONAL MEMBERSHIPS:

State Bar of Texas (since 1988)
State Bar of California (since 1990)
Court of Appeals for the Second Circuit (since 2014)
Court of Appeals for the Fifth Circuit (since 2003)
Member, American Bar Association (1993-2008)
Member, Bar Association of the Fifth Federal Circuit (since 2003)
Life Fellow, Texas Bar Foundation
Fellow, San Antonio Bar Foundation
Co-Chair, Subcommittee on NAFTA, American Bar Association (1997 - 2001)
Chair, Section on North American Cooperation, AALS (2001)
Member, National Association of College and University Attorneys (2000-2001)
Chief Coodinator, ABA Conference on "Practicing Law in the Era of NAFTA: Mastering the New Global Marketplace," San Antonio, Texas (March 18-19, 1999)

## LECTURES AND PRESENTATIONS:

Speaker, "Jurisdiction and Venue – Where Does the Case Belong?," Advanced Civil Trial Course 2017, State Bar of Texas, San Antonio, Texas (July 21, 2017)

**LECTURES AND PRESENTATIONS (cont.):**

Speaker, "Pitfalls and Opportunities for the (Conscientious) Lawyer in Managing Cross-Border Legal Disputes," International Law Section of the San Antonio Bar Association, San Antonio, Texas (Feb. 10, 2017)

Speaker, "Enforcing Foreign Judgments in Texas Courts and Citation of Process upon Foreign Persons," San Antonio Bar Association, San Antonio, TX (Aug 21, 2014)

Speaker, "Mexican Law and Legal Research: Overcoming the Challenges," American Ass'n of Law Libraries 2014 Annual Meeting, San Antonio, TX (July 15, 2014)

Guest Professor, Federal Courts Class of U.S. District Judge Xavier Rodriguez, St. Mary's University Law School, San Antonio, Texas (Feb. 4, 2014)

Speaker, "Issues Relating to Mexican Law – Plaintiff/Alien," Prosecuting or Defending a Trucking or Auto Accident Case, State Bar of Texas, San Antonio (Oct. 31, 2013)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Sept. 13, 2013)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (May 17, 2013)

Panelist, "Dealing with Foreign Jurisdictional Property Issues," New Frontiers in Marital Property Law, State Bar of Texas, New Orleans, Louisiana (Oct. 5, 2012)

Panelist, *En Juicio: XXIV Simposium Internacional de Derecho,* Instituto Tecnológico y de Estudios Superiores de Monterrey, Monterrey, Mexico (Sept. 21, 2012)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (May 18, 2012)

Speaker, "A Practical Guide to Collecting Debts in Mexico," Mastering the Art of Collecting Debts and Judgments, University of Texas School of Law, Austin, Texas (Sept. 2, 2011)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Sept. 17, 2010)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (May 14, 2010)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Feb. 5, 2010)

Speaker, "What Texas Lawyers Need to Know About Mexican Law," San Antonio Bar Association Int'l Law Section, San Antonio, Texas (Dec. 11, 2009)

Panelist, "The Application of Mexican Law by U.S. Judges in Cross-Border Disputes," U.S-Mexico Bar Association Annual Meeting, San Diego, California (Nov. 12, 2009)

Speaker, "Spoliation and Legal Malpractice," Business Torts Institute, State Bar of Texas, Dallas, Texas (Oct. 30, 2009)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Sept. 18, 2009)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (May 8, 2009)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Feb. 6, 2009)

Speaker, "What Texas Lawyers Need to Know About Mexican Law," Austin Bar Association, Austin, Texas (June 20, 2008)

**LECTURES AND PRESENTATIONS (cont.):**

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (May 9, 2008)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Feb. 1, 2008)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Feb. 2, 2007)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Sept. 8, 2006)

Speaker, Supreme Court Review: The 2004-2005 Term, American Public Power Association Legal Seminar, San Antonio, Texas (Nov. 13, 2005)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (Sept. 16, 2005)

Speaker, "Federal Rules and Local Rules of the Western District of Texas, San Antonio Division," Federal Court Practice Seminar, San Antonio, Texas (March 4, 2005)

Guest Lecturer, "Comparison of the U.S. and Mexican Legal Systems," Baylor Law School Study Abroad Program, Guadalajara, Jalisco, México (August 15, 2003)

Guest Lecturer, "Intellectual Property Protection Under NAFTA," Monterrey Tec Video-conference Course (*Curso de Tratados Comerciales Internacionales de México*). from San Antonio, Texas (April 25, 2001)

"NAFTA: Emerging Issues," Annual Meeting of the State Bar of Texas, Hispanic Issues Section, San Antonio, Texas (June 24, 2000)

"NAFTA - Recent Developments," San Antonio Bar Association International Law Section, San Antonio, Texas (June 9, 2000)

Guest Lecturer, "NAFTA," Mexican Legal Studies Program, University of Houston Law Center, Mexico City, Mexico (June 6, 2000)

"Transnational Legal Practice Under NAFTA," Association of American Law Schools, Annual Meeting, Washington, D.C. (Jan. 9, 2000)

"NAFTA Chapter 11: Resolution of Investments Disputes," Association of American Law Schools, Annual Meeting, Washington, D.C. (Jan. 8, 2000)

"Introducción al Sistema Legal de los Estados Unidos," Summer U.S. Law Program for Mexican Judges, U.T. Law School, Austin, Texas (July 19, 1999)

"The Mexican Legal System," San Antonio Bar Association International Law Section, San Antonio, Texas (July 9, 1999)

Presenter & Facilitator, Workshop on Comparative Law Issues, U.S.-Mexico Judicial Exchange Program Border Conference, San Antonio, Texas (June 18, 1999)

Law Class Simulation, Transformational Youth Leadership Seminar, Office of Community Devel., Texas A&M University, San Antonio, Texas (June 11, 1999)

"Introducción al Sistema de Derecho de los Estados Unidos," Consejo de la Judicatura Federal (Federal Judicial Council), Veracruz, Mexico (May 7, 1999)

"NAFTA," Capstone Course, China External Trade Agency - International Trade Institute, University of the Incarnate Word, San Antonio, Texas (March 25, 1999)

"Derecho Procesal Civil Federal," Programa de Derecho Angloamericano para Abogados Iberoamericanos, Univ. of Texas School of Law, Austin, Texas (July 21, 1998)

"Las Reformas al Poder Judicial Mexicano y el Sistema Judicial de los Estados Unidos," Departamento de Derecho, Universidad de Monterrey, San Pedro Garza García, N.L., México (April 17, 1998)

**LECTURES AND PRESENTATIONS (cont.):**

Guest Lecturer, "International Trade Dispute Resolution," Harvard Law School, Cambridge, Massachusetts (January 15-16, 1998)

"Sistemas de Derecho Contemporáneo: México-Estados Unidos," Instituto de la Judicatura Federal, México City, México (November 7, 1997)

"Introducción al Sistema Legal de los Estados Unidos," Programa de Derecho Angloamericano para Abogados Iberoamericanos, University of Texas School of Law, Austin, Texas (July 21, 1997)

"El Derecho de Agravios ('Torts') en los Estados Unidos," Centro de Estudios de Actualización Jurídica, México City, México (May 16, 1997)

"Frivolous Appeals Under the New Texas Rules of Appellate Procedure," Appellate Practice Before the Fourth and Thirteenth Courts of Appeals, San Antonio & Corpus Christi Bar Associations, Corpus Christi, Texas (May 9, 1997)

"NAFTA and Intellectual Property in Mexico," Spring Conference, International Anti-Counterfeiting Coalition, Austin, Texas (May 8, 1997)

"Ethics for the Appellate Lawyer: Frivolous Appeals," Telephone Seminar, State Bar of Texas, San Antonio, Texas (April 18, 1997)

"Toward a Free Trade Area of the Americas," Monthly Meeting of the International Law Section, San Antonio Bar Association, San Antonio, Texas (April 11, 1997)

"Cuestiones Constitucionales: Estados Unidos," Pt. II, Universidad Panamericana, Guadalajara, Jalisco, México (March 13, 1997)

"Frivolous Appeals," 10th Annual Advanced Civil Appellate Practice Course, State Bar of Texas, Austin, Texas (September 12, 1996)

"How to Avoid and Respond to Frivolous Appeals," Monthly Meeting of the Appellate Law Section, San Antonio Bar Association, San Antonio, Texas (July 26, 1996)

"Introducción al Sistema Legal de los Estados Unidos e Investigación Legal," Derecho Angloamericano para Abogados de Latino América, University of Texas School of Law, Austin, Texas (July 15, 1996)

"Comparison of Civil Law and Common Law Systems," Universidad de Anáhuac, México City, México (March 9, 1995)

"The Common Law Tradition," Universidad de Monterrey, Garza García, N.L., México (January 13, 1994)

**LAW SCHOOL ADMINISTRATIVE DUTIES:**

Associate Dean for Administration (1999-2001)
Director of Foreign Program Development (1998-2001)
Member, University Task Force on Distance Learning (1999-2000)
Member, University Comptroller Search Committee (1999-2000)

**COURSES ORIGINATED AND DEVELOPED:**

NAFTA Virtual Reality Seminar 2000 (Spring 2000)
International Trade Dispute Resolution (Fall 1997)
North American Legal Systems (Spring 1995, Spring 1996, Spring 1997)
Seminar on the North American Free Trade Agreement (Spring 1994, Fall 1995)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| INMOBILIARIA JRB, S.A. de C.V., | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 3:17-CV-194 |
| vs. | § | |
| | § | |
| M/V CABALLO MAYA, HER ENGINES, | § | |
| BOILERS, TACKLE, FURNITURE, | § | |
| APPAREL, APPURTENANCES, ETC. | § | |
| IN REM, et al., | § | |
| | § | |
| Defendants. | § | |

### DECLARATION OF DAVID LOPEZ

I, DAVID LOPEZ, declare, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

### I.
### Introduction

1.1    My name is David Lopez. I am over 18 years of age. I am duly licensed to practice law in the states of Texas and California and have my law office in San Antonio, Texas. A true and correct copy of my curriculum vitae describing my employment and educational background is attached hereto as **Exhibit 1**.

1.2    The Mexican legal system is the central focus of my scholarly and research interests. Beginning in January 1994, I taught courses involving various aspects of the Mexican legal system, including North American Legal Systems (Comparative Law: U.S., Mexico, and Canada) and NAFTA. I wrote the chapter on "The Legal System of Mexico" that appeared in William Hein & Co.'s 20-volume Modern Legal Systems Cyclopedia in 2000. I also wrote the brief chapter on "Mexico's Legal System" that appeared in 2002 in Transnational Publisher's Doing Business in Mexico series. In 2004, the book titled Mexican Law that I co-authored was published by Oxford University Press. My co-authors are a Justice of the Supreme Court of Mexico, two professors at one of Mexico's top law schools (ITAM) and the former Dean of the University of Houston Law Center. In connection with this work, I have, during the past twenty-three years, conducted intensive research into the structure and operation of Mexico's legal system at the national and state levels.

1.3    I have taught and lectured in Mexico concerning matters of U.S. and Mexican law. In 1996, 1997, 1998, 1999 and 2000, I served as a visiting professor at the Universidad Autónoma de Guadalajara in connection with Baylor Law School's Study Abroad Program. I have delivered lectures on various occasions to Mexican judges, lawyers, and law students in

1



EXHIBIT 2
LOPEZ
April 9, 2018
Reported by:
D. SANDERS, CSR, RDR, CRR, CCR (LA)

Mexico City, Guadalajara, Monterrey and Veracruz, Mexico, and Austin and San Antonio, Texas. From 2001 to the present, I have been involved in an international law practice representing Mexican clients in lawsuits pending in the United States and in international arbitration involving issues of Mexican substantive and procedural law, and representing U.S. businesses on matters relating to Mexican law.

1.4    From 1997 to 2018, I have served as a testifying expert on Mexican law in 135 cases around the country, not including this case. This has included cases in the United States Court of Appeals for the Fifth Circuit and United States District Courts for the:

- Southern District of Alabama,
- Central District of California,
- Southern District of California,
- District of Colorado,
- Eastern District of Louisiana,
- Eastern District of Michigan,
- Western District of Michigan,
- District of Nevada,
- Southern District of New York,
- Western District of New York,
- Northern District of Oklahoma,
- Eastern District of Pennsylvania,
- Northern District of Texas,
- Southern District of Texas (Corpus Christi, Galveston, Houston, Laredo, McAllen and Victoria Divisions),
- Western District of Texas (Del Rio, El Paso, Midland-Odessa and San Antonio Divisions), and
- Western District of Washington.

I have testified as an expert on Mexican law in state courts and arbitral proceedings in:

- Arizona,
- California,
- Colorado,
- Delaware,
- Florida,
- Georgia,
- Illinois,
- Minnesota,
- New Mexico,
- New York,
- Pennsylvania, and
- Texas (Aransas, Bexar, Cameron, Dallas, El Paso, Harris, Hidalgo, Jefferson, Maverick, Montgomery, Parker, Starr, Tarrant, Travis, Val Verde, Webb and Wilson counties).

2

I have provided expert testimony on Mexican law on behalf of the United States of America and former Attorney General Lorreta Lynch; on behalf of major institutions, such as the Archdiocese of Los Angeles; on behalf of major companies, such as Aeromexico, Daimler Chrysler, Bell Helicopter, Alcoa Fujikura, Nissan, Siemens Power Corporation, Goodrich Corporation, UPS, Sherwin-Williams and Halliburton Energy Services; and on behalf of many individuals and small companies, including Mexican Boxer Saul "Canelo" Alvarez.

Since 1997, I have been retained as a Mexican law expert by lawyers from Mexico, Canada and Scotland as well as from California, Colorado, Florida, Georgia, Illinois, Louisiana, Minnesota, New York, Oklahoma, Pennsylvania, Texas, Washington and Washington, D.C.

I have served as a <u>consulting</u> expert on Mexican law on hundreds of matters over the years.

1.5     I have been asked to opine on Mexican law relating to maritime liens that is relevant to this proceeding.

1.6     In performing the foregoing task and formulating opinions on this matter, I have relied on my general familiarity with Mexican law and Mexico's legal system. I have consulted the sources of Mexican law cited below. In addition, I have reviewed case-specific materials, including the following:

- Plaintiff's Verified Original Complaint (June 19, 2017),
- Defendant's Motion to Vacate Seizure and Request for Damages for Wrongful Arrest (Aug. 14, 2017),
- Declaration of Francisco de Jesús Riveros Garcia (Aug. 13, 2017),
- JRB's Memorandum Opposing Marfield's Motion to Vacate Arrest,
- Order Vacating Arrest of Vessel (Oct. 13, 2017),
- Unsworn Declaration of Omar Olvera de Luna (June 19, 2017),
- Unsworn Declaration of Omar Olvera de Luna (Sept. 15, 2017),
- Request by Shipping Group Mexico, S.A. de C.V. to the Attorney General of Mexico for removal of attachment on the Caballo Maya (May 29, 2015),
- Letter from Office of the Attorney General of Mexico to Lic. Oscar Israel Garcia Cordova (July 3, 2015),
- various invoices (dated Aug. 2015 – July 2016),
- various wire transfer confirmations, and
- Transcript of Hearing on Motion to Vacate Seizure (Oct. 4, 2017).

The conclusions that follow assume that these documents are authentic, that they accurately portray developments in this case, and that the copies of them in my possession are true and complete. I reserve the right to expand or modify my opinions in this matter based on additional case materials presented to me in the future.

1.7     Based on my review of case materials and information provided to me by counsel, I assume the following facts:

3

(a)     In 2014, the Mexican government confiscated the vessel M/V Caballo Maya, an ocean-going cargo ship, pursuant to Mexican criminal law in connection with an investigation relating to Oceanografía, S.A. de C.V.

(b)     In May 2015, Shipping Group Mexico, S.A. de C.V. ("SGM"), through its legal representative Oscar Israel Garcia Cordova ("Mr. Garcia"), requested that the Attorney General of Mexico lift the attachment of the vessel and release it to SGM.

(c)     On July 3, 2015, the Attorney General of Mexico issued Executive Order A/011/00 appointing Mr. Garcia as legal representative of SGM as bailee ("*depositario*") of the Caballo Maya and ordering SGM to maintain the vessel in good condition until its custody of the vessel was terminated.

(d)     Also in July 2015, SGM engaged Inmobiliaria JRB, S.A. de C.V. ("JRB"), a Mexican commercial entity, to contract and arrange for the provision of services and supplies to maintain the vessel on SGM's behalf, as required by the Executive Order of the Attorney General's Office.  JRB is a full-service company that provides marine services, both directly and through vendors.

(e)     From 2015 to 2017, JRB spent 17,030,745.57 pesos (approximately US$1,065,00.00) to provide various marine supplies and services, either directly or through vendors, for the benefit of the Caballo Maya.  Those supplies and services included marine gas oil, diesel, mooring, towing, potable water, maritime advisory services, spare parts, garbage collection and payment of salaries to the crew.

From July 2015 to July 2016, JRB incurred and paid over 6,500,000 pesos in crew salaries.

Between October 2015 and April 2016, JRB incurred and paid over 200,000 pesos for pilotage, mooring, towing and other port services.

(f)     In February 2017, Executive Order A/011/00 was terminated and the Caballo Maya was released to Marfield LTD, Inc. ("Marfield").

(g)     On June 19, 2017, while the Caballo Maya was docked in Galveston, Texas, JRB initiated this action to recover the amount spent on marine supplies and services for the Caballo Maya, alleging that it possesses a maritime lien under Mexican law against the vessel in that amount.

## II.  The Mexican Legal System Generally

2.1     Structure.  Mexican government operates according to a federal structure.  The federal government maintains a court system with its own body of jurisdictional, procedural and evidentiary rules as do each of the 32 Mexican states (the Federal District of Mexico recently was dissolved and Mexico City was made the country's thirty-second state).  In addition, there exists in Mexico a body of federal substantive law and a separate body of

4

substantive law in each of the 32 states.

2.2   <u>Sources of Mexican law</u>. There are a variety of sources of law in the Mexican legal system, including constitutions, statutes, codes, official norms, regulations and judicial rulings. *See* Stephen Zamora et al., <u>Mexican Law</u> 77-94 (2004). Not all of those sources of law are of equal weight or preeminence; rather, a hierarchy of law exists in the Mexican legal system that dictates the relative importance and ordering of the various sources of law. *See id.* at 94-101.

2.3   The single most important source of law in Mexico is the Mexican Constitution of 1917 (*Constitución Política de los Estados Unidos Mexicanos*). In Mexico's hierarchy of legal sources, the federal Constitution dominates all other laws. Like the Constitution of the United States, the Mexican Constitution contains a Supremacy Clause that renders Mexican federal law supreme over state law. Article 133 of the Constitution states:

*This Constitution, the Laws enacted by Congress pursuant thereto and all Treaties that are in accordance therewith, made or which shall be made by the President of the Republic with the Senate's approval, shall be the Supreme Law of the Union. The judges in every State shall be bound by said Constitution, Laws and Treaties, notwithstanding anything to the contrary in the constitutions or laws of the States.*[1]

2.4   Statutes passed by Mexican legislative bodies are an important body of law in the Mexican legal system. *See* Zamora, *supra*, at 80.

2.5   Because Mexico is a Civil Law country, codes play a primary role in defining the relative legal rights and obligations of parties. Codes are unitary works that attempt to integrate all norms of a distinct branch of law in a systematic, comprehensive, organized and logical manner. Mexico has distinct codes to regulate civil matters, criminal matters, commerce, tax matters, civil procedure and criminal procedure. The federal government and each of the 32 Mexican states possess separate sets of codes. For the most part, state codes parallel the provisions and language of the federal codes.

2.6   Among Mexican codes, none is more central than the civil code. The *Código Civil Federal* ("Federal Civil Code") governs throughout the country in federal matters.

2.7   Mexican civil codes cover all matters in the civil legal realm, including the civil status of individuals, family law, assets, property, succession, contracts and other forms of civil obligations. Mexican civil codes do not provide for a series of torts like those found in Common Law jurisdictions; rather, rules concerning civil liability between private parties are set forth in the portion of the civil codes titled "Obligations" (*De las Obligaciones*). The law of obligations encompasses not only tort theories but also contract and quasi-contract theories of legal duty.

---

[1] Copies of the Mexican law provisions cited in this Declaration are set forth in **Exhibit 2**.

## III. Mexican Maritime Law

3.1     As probably is true in most countries, in Mexico maritime matters are governed by a combination of constitutional law, international treaty, federal codes, federal statutes and federal regulations.

3.2     Constitutional provisions. Article 73 of the Constitution confers on the Mexican Congress the power to legislate in matters of commerce, hydrocarbons and maritime law. Const., Art. 73(X) & (XIII). By virtue of Mexico's Supremacy Clause, federal law concerning these matters controls to the exclusion of state law. Const., Art. 133.

3.3     Federal Maritime Commerce Law. The Maritime Commerce Law (*Ley de Navegación y Comercio Marítimos*) of June 2006 is the statute that regulates Mexican waterways, navigation and services performed therein, as well as acts, events and goods relating to maritime commerce. Maritime Commerce Law ("MCL"), Art. 1.

"Maritime commerce" is defined as activities undertaken by means of the commercial and maritime exploitation of vessels and naval devices for the purpose of transporting persons, goods or things, or of performing activities of exploration, exploitation or capture of natural resources, construction or recreation in an aquatic environment. *Id.*, Art. 2(III). "Vessels" are defined as all constructed items designed to navigate in or under navigable waterways. *Id.*, Art. 2(IV). "Navigable waterways" are defined to include Mexico's territorial sea and Exclusive Economic Zone. *Id.*, Art. 3(a).

The Maritime Commerce Law provides that everything related to Mexican navigable waterways, maritime commerce in Mexico's marine zones, and in general all acts and events that arise therein are within Mexican federal jurisdiction. *Id.*, Art. 4(¶ 1). Foreign vessels found in Mexican waterways are subject to the jurisdiction of and compliance with Mexican law by the mere fact of their presence therein. *Id.*, Art. 5(¶ 2).

Absent an express provision in the Maritime Commerce Law, its regulations or international treaty, other bodies of Mexican law including the Commercial Code (*Código de Comercio*), Federal Civil Code, Federal Code of Civil Procedure (*Código de Procedimientos Civiles*), Federal Labor Law (*Ley Federal del Trabajo*) and international maritime custom and usage (*los usos y las cosumbres marítimas internacionales*) shall apply to maritime commerce in a supplementary fashion. *Id.*, Art. 6.

## IV. Maritime Liens Under Mexican Law

4.1     Title Four, Chapter V of the Maritime Commerce Law is titled "About Maritime Privileges" (*De Los Privilegios Marítimos*) and contains ten provisions, Articles 91 through 100. Of these, Articles 91, 93, 94, 97 and 100(¶ 2) appear to be relevant to this case.

Article 91 states:

*Maritime privileges grant to the privileged creditor the right to be preferred in payment ahead of other creditors in accordance with that provided for in the present Law, according to the following order:*

I.  *Salaries and other amounts due to the crew of the vessel, by virtue of their enrolling on board, including costs of repatriation and social security contributions payable on their behalf;*

II.  *Claims arising from indemnification for causing death or bodily injury on land or water, in direct relation with the operation of the vessel;*

III.  *Claims for the reward for the salvage of the vessel;*

IV.  *Claims charged to the vessel arising from the use of port infrastructure, maritime signaling, inland waterways and pilotage; and*

V.  *Claims arising from indemnification for extracontractual fault, by reason of the loss or material damage caused by the operation of the vessel other than loss of or damage to cargo, containers and passengers' effects transported aboard the vessel.*

*The maritime privileges arising from the last trip shall be preferred to those arising from previous trips.*

MCL, Art. 91.  Article 93 states:

*Maritime privileges on vessels shall be extinguished by the passage of one year from the time they become enforceable, unless an action directed at the attachment or detention of the vessel has been exercised.*

*The termination of the privilege does not imply that of the obligation or indemnification; these shall be extinguished in the form and terms set out in the applicable legislation.[2]*

*Id.*, Art. 93.  Article 94 states:

*The assignment or subrogation of a claim or indemnification guaranteed with a maritime privilege, simultaneously produces the assignment or subrogation of the corresponding maritime privilege.*

---

[2] The second paragraph of Article 93, which provides that termination of the maritime lien does not necessarily mean that the claim underlying the lien also terminates, supports my view, more fully explained below, that the existence of a maritime lien under Mexican law is a two-step process that begins with the existence of a claim or obligation in favor a "creditor."

*Id.*, Art. 94. Article 97 states:

> *Registration of maritime privileges shall not be obligatory, but judicial resolutions that establish an obligation in favor of the creditor shall be susceptible to registration in the National Maritime Public Registry.*

*Id.*, Art. 97. Article 100(¶ 2) states:

> *The privileged maritime obligations will give rise to the execution for their total amount, on the vessel, freight or cargo subject to payment thereof. Therefore, at the request of the plaintiff the attachment will be decreed or the retention will be confirmed upon admitting the complaint. The mortgage creditor may pay or take charge of the privileged obligations that precede it, in which case the mortgage will be in the first rank.*

*Id.*, Art. 100(¶ 2).

4.2     Pursuant to these provisions, the existence of a maritime privilege under Mexican law is a two-step process. The first step in the process requires that a person must be a "creditor," meaning that the person must have a legal right to compensation vis-à-vis a vessel, owner, charterer, manager or operator thereof. For example, a creditor may be entitled to compensation for labor provided as a member of the crew of the vessel, for death or injury arising out of operation of the vessel, as a reward for salvage of the vessel or for the vessel's use of port infrastructure.

Whether a person is a "creditor" is determined by substantive law outside of Chapter V of the Maritime Commerce Law, such as Mexico's Commercial Code, Federal Civil Code, a Mexican statute or regulation or even foreign substantive law.

4.3     In this case, SGM was the bailee for the Caballo Maya appointed by Mexico's Attorney General and was ordered to maintain the vessel in good condition. The apparently valid Executive Order of the Attorney General was the legal basis for SGM's duty to provide supplies and services to the Caballo Maya to keep it in good condition.

SGM in turn engaged JRB to provide services and supplies to maintain the vessel in accordance with the Executive Order. Although there was no written agency agreement between SGM and JRB, Mexico's Commercial Code permits a commercial agency (*i.e.*, an agency between merchants) to be created by oral designation. Commercial Code, Art. 274.

JRB in turn arranged for the provision of services and supplies to the Caballo Maya for the time it was detained pursuant to the Executive Order. Although Mexican law does not permit a commercial agent to delegate its agency absent authorization by the principal, a commercial agent can employee others to perform subordinate matters. *Id.*, Art. 280. Further, Mexican law permits a commercial agent to perform its agency either in its own name or in the name of its principal. *Id.*, Art. 283. Here, the fact that JRB purchased

8

supplies and services directly in its own name and not in SGM's name is permissible under Mexican law.

The July 2015 Executive Order was based on the Mexican Attorney General's authority to secure instruments, objects or products of crime pursuant to Mexico's Federal Code of Criminal Procedure. *See* Executive Order, at 1; Federal Code of Criminal Procedure (*Código Federal de Procedimientos Penales*), Art. 181.[3]  When an object is secured by placing it temporarily in the possession of a third party, a bailment relationship is created under Mexican law. *See id.*, Art. 182-C. Under the Commercial Code, a bailment is "commercial" – and therefore governed by the terms of the Commercial Code – if the subject matter of the bailment is a commercial object. Commercial Code, Art. 332. Here, the Caballo Maya clearly is a commercial object.

Under the Commercial Code, a bailee (*depositorio*) is entitled to compensation for expenses incurred in connection with the bailment. *Id.*, Art. 333. Absent a contract, compensation to the bailee shall be in accordance with the custom and usage of the place where the bailment is made. *Id.* Thus, to the extent it incurred expenses in connection with the deposit of the vessel, SGM, the bailee, was entitled to reimbursement in accordance with the customs of the place of bailment, here Ciudad del Carmen, Campeche, Mexico.

JRB has the right to seek compensation for the amounts paid to maintain the Caballo Mayo based on subrogation and payment provisions set forth in the Federal Civil Code.[4] Article 2058 of the Civil Code provides that subrogation occurs by operation of law and without need of any declaration by the interested parties if the person who pays off a debt has a legal interest in performance of the obligation. FCC, Art. 2058(II). By virtue of its legal duty to act as SGM's agent with respect to the maintenance of the vessel, JRB had a legal interest in the performance of SGM's obligation to comply with the Executive Order by maintaining the vessel in good condition and was legally authorized to make payment. FCC, Art. 2065.

Under the Civil Code, "payment" is defined as delivery of the amount due. FCC, Art. 2062. JRB possesses records showing that it ultimately paid for all of the relevant services and supplies. Thus, as a matter of law, JRB made payment each time it delivered the amounts due in the subject invoices to the third parties who provided the services and supplies.

Under Mexican law, viewing Marfield as the ultimate "debtor" on the obligations paid by JRB, JRB had no duty to inform Marfield that it was making the payments. FCC, Art.

---

[3] The Federal Code of Criminal Procedure has been replaced by Mexico's National Code of Criminal Procedure (*Código Nacional de Procedimientos Penales*).

[4] Absent a relevant legal provision in Mexico's Commercial Code, the provisions of the Federal Civil Code apply and supplement the Commercial Code. Commercial Code, Art. 2. The Commercial Code does not have provisions that deal with subrogation and payment and, therefore, it is appropriate to look to the Civil Code for such law.

2067. Moreover, as a matter of Mexican law, JRB was authorized to make those payments against Marfield's wishes. FCC, Art. 2068.

4.4 Once the first step is satisfied and a person is a "creditor" vis-à-vis a vessel, owner, charterer, manager or operator thereof, the second step is that the creditor may then be entitled to a maritime privilege under Article 91 and the benefits of such a privilege under Chapter V and means for enforcement or satisfaction of the credit obligation.

As noted above, Article 91 of the Maritime Commerce Law confers on certain creditors a maritime privilege – the right to be preferred in payment over other creditors. For example, a crew member owed salary or a creditor who paid salaries of a vessel's crew is entitled to a maritime privilege superior to all other creditors. MCL, Art. 91(I).

Article 100(¶ 2) of the Maritime Commerce Law grants the holder of a maritime privilege the right to request that a court impose an embargo (attachment) on or order the retention of the subject vessel. MCL, Art. 100(¶ 2).

4.5 In this case, as demonstrated by invoices and wire transfer confirmations or other proof of payment, JRB arranged for the crew of the Caballo Maya to be paid salary of over 6,500,000 pesos and in fact paid those amounts. Further, based on such evidence, JRB arranged for and in fact paid for port services for the vessel in excess of 200,000 pesos.

Pursuant to Article 91(I) of the Maritime Commerce Law, JRB possessed a maritime lien with respect to the amounts it paid for crew salaries.

Pursuant to Article 91(IV) of the Maritime Commerce Law, JRB possessed a maritime lien with respect to the amounts it paid for pilotage and other port services.

## V.
## Final Points

5.1 My fee for serving as an expert witness in this case on issues relating to Mexican law is $600.00 per hour. In no event is my expert witness fee contingent upon the substance of opinions rendered by me.

5.2 To the best of my knowledge and information, I have testified live as an expert on Mexican law by deposition, in court or in arbitration during the preceding four-year period (January 2014 to January 2018) in the following cases:

Continental Automotive Systems US, Inc. v. HUF North America Automotive Parts Manufacturing Corporation, No. 10-CH-22202, Circuit Court of Cook County, Illinois, County Department – Chancery Division;

Gloria de los Angeles Trevino Ruiz, Individually and on Behalf of Her Minor Child, Angel Gabriel de Jesus Trevino and Armando Ismael Gomez v. Azteca America, Una Vez Mas, LP d/b/a Azteca America, Un Vez Mas McAllen License, LLC, Azteca International Corporation, TV Azteca, S.A.B. de C.V., Patricia Chapoy, and

10

Publimax, S.A. de C.V., No. C-1027-09-C, 139th District Court, Hidalgo County, Texas;

Leandro Ampudia Rovirosa v. Michelle Vieth Paetau, No. 4:12-CV-01414, U.S. District Court for the Southern District of Texas;

Michelle Berezowsky Gomez v. Pablo Angel Rendon Ojeda, No. 4:12-CV-03496, U.S. District Court for the Southern District of Texas [Houston Division];

Jose de la Rosa Lucio, et al. v. Omar Estrada Adame, et al., No. C-2565-12-I, 398th District Court, Hidalgo County, Texas;

In the Matter of the Marriage of Gloria Araceli Loeza Aceves and Paul James Hudson, No. F-2569-10-B, 93rd District Court, Hidalgo County, Texas;

In re Ruth Villegas Medellin and Carlos Martinez Duncker, No. 2013-D-4946, Circuit Court of Cook County, Illinois, County Department, Domestic Relations Division;

In re the Marriage of Marga Ruth Loaiza and Lorenzo Marquez, No. DS50809, Superior Court of California, County of San Diego;

In the Estate of William F. Trimble, Deceased, No. CIV 13-0523, County Court at Law No. 2, Parker County, Texas;

In the Matter of the Marriage of Susan Elizabeth Ruiz and Matias S. Ruiz, No. 15-04-00198-CVW, 218th District Court, Wilson County, Texas;

Angélica Fuentes Téllez (México) v. Jorge Carlos Vergara Madrigal (México), No. 21077/RD, International Chamber of Commerce, International Court of Arbitration [New York];

Mario Efrain Rosales Barralaga v. Cooper Tire and Rubber Co., et al., No. 2015-03070, 295th District Court, Harris County, Texas; and

In the Matter of the Marriage of Carmen Tarragona Saez and Adrian G. Rosas Solorzano, No. 2014-CI-17095, 285th District Court, Bexar County, Texas.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed in San Antonio, Texas on January **17**, 2018.

_____
DAVID LOPEZ

11





XXXXX
XXXXX
XXXXX
XXXXX
[Seal]

**DEPUTY ATTORNEY GENERAL SPECIALIZED IN ORGANIZED CRIME INVESTIGATION.**
**UNIT SPECIALIZED IN THE INVESTIGATION OF OPERATIONS WITH ILLEGAL RESOURCES AND FALSIFICATION OR ALTERATION OF CURRENCY**

XXXXX
XXXXX
XXXXX
XXXXX
[Seal: {Illegible}
PEÑA NARVAEZ,
NOTARY PUBLIC No.
11, HUIXQUILUCAN,
MEXICO, UNITED
MEXICAN
REPUBLIC]

***NOTIFICATION: CGII/F3/1184/2015***

**THRESHOLD INQUIRY.**
**UEIORPIFAM/AP/065/2014**

Mexico, Distrito Federal, July 3rd, 2015

**OSCAR ISRAEL GARCIA CORDOVA ESQ.**
**Legal Representative of "SHIPPING GROUP MEXICO, SGM,**
**Private Equity Company".**

XXXXXXXXXXXXXXX
XXXXXXXXXXXXXXX
[Signature]

Through this notification, based on Articles 16, 21 and 102, section "A" of the Political Constitution of the United Mexican States; 2 section II, 181, 182, 182-A, 182-L and 208 of the Federal Code of Criminal Procedures; 40 and 41 of the Federal Criminal Code; 1 and 31 of the Federal Law Against Organized Crime; 1 and 4, section A), subsections a), b), c), e), h) and ñ), section B), section b) of the Organic Law of the Attorney General of the Country; 3 section A), section III F) section III and 31 of its Regulation; 1, section I, first paragraph, 2 sections II and VII, 3, 5 first paragraph, 6, 7, 8 and 10 of the Federal Law for the Administration and Alienation of Public Sector Assets, and Agreement A/011/00, issued by the Attorney General in the Country, I inform you of the agreement found on your desk on July second of this year, which says:

**RESOLVES**

**FIRST.** The appointment as the depository of the vessel CABALLO MAYA, with the IMO **9453341**, Regulatory Sailing Patent number 000081740, of Mr. Oscar Israel Garcia Cordova, Legal Representative of "SHIPPING GROUP MEXICO, SGM, Private Equity Company", under the terms of Article 182 L, which will be in his possession from now on, provided that it doesn't affect the public order due to said possession, with the determinant that he may not alienate or encumber and must keep said vessel in good conditions until the legal destination of the insured asset is decreed.

**SECOND.** Personally inform of this ministerial agreement to Mr. Oscar Israel Garcia Cordova, Legal Representative of SHIPPING GROUP MEXICO, SGM, Private Equity Company, with the warnings and conditions established in Article 182 L of the Federal Code of Criminal Procedures.

Paseo de la Reforma Avenue No. 75, Colonia Guerrero, Delegacion Cuauhtemoc, Mexico, D.F.
Phone: (55) 53 46 00 00 extension 8184 and 8178. Postal Code 06300
ww.pgr.gob.mx



EXHIBIT 3
LOPEZ
April 9, 2018
Reported by:
D. SANDERS, CSR, RDR, CRR, CCR (LA)

Lopez_0430
Executive Order 7.3.15 (Spanish)



XXXXX
XXXXX
XXXXX
XXXXX
[Seal]

**DEPUTY ATTORNEY GENERAL SPECIALIZED IN ORGANIZED CRIME INVESTIGATION.**
**UNIT SPECIALIZED IN THE INVESTIGATION OF OPERATIONS WITH ILLEGAL RESOURCES AND FALSIFICATION OR ALTERATION OF CURRENCY**

XXXXX
XXXXX
XXXXX
XXXXX
[Seal: {Illegible}
PEÑA NARVAEZ,
NOTARY PUBLIC No.
11, HUIXQUILUCAN,
MEXICO, UNITED
MEXICAN
REPUBLIC]

**THIRD.** Issue a notification for the General Director of the Merchant Navy of the Secretariat of Communications and Transportation, so that he may perform the corresponding annotations appointing Mr. Oscar Israel Garcia Cordova, Legal Representative of SHIPPING GROUP MEXICO, SGM, Private Equity Company, as the depository of the vessel CABALLO MAYA, with the IMO **9453341,** Regulatory Sailing Patent number 000081740, according to the terms established in Article 182 L. Said vessel will be in his possession from now.

**FOURTH.** Issue a notification addressed to the Admiral Secretary of the Armed Marine in Mexico, in order to inform the appointment of Mr. Oscar Israel Garcia Cordova, Legal Representative of SHIPPING GROUP MEXICO, SGM, Private Equity Company, as the depository of the vessel CABALLO MAYA, with the IMO **9453341,** Regulatory Sailing Patent number 000081740, under the terms in Article 182 L. Th vessel will be in his possession from now so that the requested custody of the aforementioned vessel is considered finished.

**FIFTH.** Issue a notification to the Service of Asset Administration and Alienation so that the corresponding paperwork is performed and to assign a day and time to deliver de CABALLO MAYA vessel, with the IMO **9453341,** Regulatory Sailing Patent number, to Mr. Oscar Israel Garcia Cordova, Legal Representative of SHIPPING GROUP MEXICO, SGM, Private Equity Company, under the terms established in Article 182 L. From this moment, the vessel will be in his possession so that the requested custody of the aforementioned vessel is considered finished.

XXXXXXXXXXXXX
XXXXXXXXXXXXX
[Signature]

This is informed to you for the corresponding legal purposes.

XXXXX
XXXXX
XXXXX
XXXXX
[Seal: UNITED MEXICAN STATES]
DEPUTY ATTORNEY GENERAL
INVESTIGATION OF ORGANIZED CRIME
UNIT SPECIALIZED IN THE
INVESTIGATION OF OPERATIONS WITH
ILLEGAL RESOURCES AND FALSIFICATION

**SINCERELY,**
**EFFECTIVE VOTING, NO REELECTION**
**THIRD ATTORNEY GENERAL, ASSIGNED TO SEIDO**
XXXXXXXXXXXXXXX
XXXXXXXXXXXXXXX
[Signature]
**HECTOR HUGO RIOS TORRES**

[Seal: CERTIFIED — The Spanish Group — TRANSLATION]

Ccp. Felipe de Jesus Muñoz Vazquez, Deputy Attorney General specialized in Organized Crime Investigation – For your knowledge
Ccp. Sergio Antonio Martinez Escalante. Unit Specialized in the Investigation of Operations with Illegal Resources and Falsification or Alteration of Currency – Same purpose.

Paseo de la Reforma Avenue No. 75, Colonia Guerrero, Delegacion Cuauhtemoc, Mexico, D.F.
Phone: (55) 53 46 00 00 extension 8184 and 8178. Postal Code 06300
ww.pgr.gob.mx



**PGR**
PROCURADURÍA GENERAL
DE LA REPÚBLICA



**SUBPROCURADURÍA ESPECIALIZADA EN INVESTIGACIÓN EN DELINCUENCIA ORGANIZADA. UNIDAD ESPECIALIZADA EN INVESTIGACIÓN DE OPERACIONES CON RECURSOS DE PROCEDENCIA ILÍCITA Y FALSIFICACIÓN O ALTERACIÓN DE MONEDA**

**OFICIO: CGII/F3/1184/2015.**

**AVERIGUACIÓN PREVIA. UEIORPIFAM/AP/065/2014**

México, Distrito Federal a 3 de julio de 2015.

**LIC. OSCAR ISRAEL GARCIA CORDOVA,**
**Apoderado Legal de "SHIPPING GROUP MÉXICO, SGM,**
**Sociedad Anónima Promotora de Inversión de Capital Variable".**
**Presente.**

Por medio del presente oficio, con fundamento en los artículos 16, 21 y 102 apartado "A" de la Constitución Política de los Estados Unidos Mexicanos; 2 fracción II, 181, 182, 182-A, 182-L y 208 del Código Federal de Procedimientos Penales; 40 y 41 del Código Penal Federal; 1 y 31 de la Ley Federal Contra la Delincuencia Organizada; 1 y 4 apartado A) incisos a), b), c), e), h) y ñ), apartado B), inciso b) de la Ley Orgánica de la Procuraduría General de la República; 3 inciso A) fracción III F) fracción III y 31 de su Reglamento; 1, fracción I, primero párrafo, 2 fracciones II y VIII, 3, 5 primer párrafo, 6, 7, 8 y 10 de la Ley Federal para la Administración y Enajenación de Bienes del Sector Público y Acuerdo A/011/00 emitido por el C. Procurador General de la República, le hago de su conocimiento el acuerdo que recayó en su escrito de fecha dos de julio del presente año el cual establece:

**RESUELVE**

**PRIMERO.** Se designa como depositario de la embarcación CABALLO MAYA con IMO **9453341**,matrícula Patente Reglamentaria de Navegación número 000081740, al C. Oscar Israel Garcia Córdova, Apoderado Legal de "SHIPPING GROUP MÉXICO, SGM, Sociedad Anónima Promotora de Inversión de Capital Variable" en términos del artículo 182 L, la cual quedara desde este momento en posesión del mismo, toda vez que no se afecta el orden público al quedar en posesión del mismo, con la condicionante que no podrán enajenar o gravar y deberá mantener en buenas condiciones la embarcación señalada, hasta el momento en que se decrete el destino legal del bien asegurado.

**SEGUNDO.** Notifíquese personalmente el presente acuerdo ministerial al C. Oscar Israel Garcia Córdova, Apoderado Legal de SHIPPING GROUP MÉXICO, SGM, Sociedad Anónima Promotora de Inversión de Capital Variable," con los apercibimientos y condiciones establecidas en el artículo 182 L del Código Federal de Procedimientos Penales.

**TERCERO.-** Gírese atento oficio al Director General de Marina Mercante de la Secretaría de Comunicaciones y Transportes, con la finalidad de que se realice las anotaciones

Avenida Paseo de la Reforma No. 75, colonia Guerrero, Delegación Cuauhtémoc, México, D.F
Tel.: (55) 53 46 00 00 extensión 8184 y 8178. C.P. 06300.
www.pgr.gob.mx



**PGR**
PROCURADURÍA GENERAL
DE LA REPÚBLICA

SUBPROCURADURÍA ESPECIALIZADA EN INVESTIGACIÓN EN DELINCUENCIA ORGANIZADA. UNIDAD ESPECIALIZADA EN INVESTIGACIÓN DE OPERACIONES CON RECURSOS DE PROCEDENCIA ILÍCITA Y FALSIFICACIÓN O ALTERACIÓN DE MONEDA.

conducentes de que designa como depositario de la embarcación CABALLO MAYA con IMO **9453341,** matricula Patente Reglamentaria de Navegación número 000081740, al C. Oscar Israel Garcia Córdova, Apoderado Legal de SHIPPING GROUP MÉXICO, SGM, Sociedad Anónima Promotora de Inversión de Capital Variable," en términos del artículo 182 L, la cual quedara desde este momento en posesión del mismo.

**CUARTO.-** Gírese atento oficio al Almirante Secretario de Marina Armada de México, con la finalidad de informar que se designa como depositario de la embarcación CABALLO MAYA con IMO **9453341,** matricula Patente Reglamentaria de Navegación número 000081740, al C. Oscar Israel Garcia Córdova, Apoderado Legal de SHIPPING GROUP MÉXICO, SGM, Sociedad Anónima Promotora de Inversión de Capital Variable", en términos del artículo 182 L, la cual quedara desde este momento en posesión del mismo con la finalidad de que de por terminada la custodia solicitada sobre la embarcación anteriormente señalada.

**QUINTO.-** Gírese atento oficio al Servicio de Administración y Enajenación de Bienes, con la finalidad de que realice los trámites correspondientes y señale día y hora para la entrega en depositaria de la embarcación CABALLO MAYA con IMO **9453341,** matricula Patente Reglamentaria de Navegación número al C. Oscar Israel Garcia Córdova, Apoderado Legal de SHIPPING GROUP MÉXICO, SGM, Sociedad Anónima Promotora de Inversión de Capital Variable", en términos del artículo 182 L, la cual quedara desde este momento en posesión del mismo con la finalidad de que de por terminada la custodia solicitada sobre la embarcación anteriormente señalada

Lo que se le hace del conocimiento para los efectos legales correspondientes



ATENTAMENTE
SUFRAGIO EFECTIVO, NO REELECCIÓN
FISCAL TRES ADSCRITO A LA SEIDO.

PROCURADURÍA GENERAL DE LA REPÚBLICA
SUBPROCURADURÍA **MRTO. HECTOR HUGO RIOS TORRES.**
INVESTIGACIÓN DE DELINCUENCIA ORGANIZADA
UNIDAD ESPECIALIZADA EN INVESTIGACIÓN DE
OPERACIONES CON RECURSOS
DE PROCEDENCIA ILÍCITA Y DE FALSIFICACIÓN

Ccp.- Mtro. Felipe De Jesús Muñoz Vázquez. Subprocurador especializada de Investigación de Delincuencia Organizada.- Para su conocimiento.
Ccp.- Lic. Sergio Antonio Martínez Escalante. Titular de la Unidad Especializada en Investigación de Operaciones con Recursos de Procedencia Ilícita y de Falsificación o Alteración de Moneda.- Mismo fin.

Avenida Paseo de la Reforma No. 75, colonia Guerrero, Delegación Cuauhtémoc, México, D.F.
Tel.: (55) 53 46 00 00 extensión 8184 y 8178. C.P. 06300
www.pgr.gob.mx



A.P. UEIORPIFAM/AP/065/2014

**ATTORNEY GENERAL'S OFFICE**
**SUB-OFFICE SPECIALIZED IN THE INVESTIGATION OF ORGANIZED CRIME**
**UNIT SPECIALIZED IN THE INVESTIGATION OF OPERATIONS WITH ILLEGAL RESOURCES**
**AND CURRENCY ALTERATIONS OR FALSIFICATIONS**

**Amparo: 686/2015**
**Notification: CGII/F3/648/2016**
**Subject: The aforementioned**
**Mexico City, May 12th, 2016**

**TENTH DISTRICT JUDGE OF AMPARO IN CRIMINAL MATTERS**
**MEXICO CITY**

TENTH DISTRICT JUDGE OF AMPARO
IN CRIMINAL MATTERS
IN MEXICO CITY
MAY 12TH, 2016 [illegible]
013017

Regarding your notification **37791/2016** from **April twenty-fifth, two thousand and sixteen,**
XXXXX   regarding the writ of amparo **686/2015** promoted by **MARFIELD LTD INC.,** through which you
XXXXX   require this authority to, within three days, send all documents related to the claimed action –
XXXXX   notification CFII/F3/1184/2015 – in the prior inquiry UEIORPIFAM/AP/065/2014 (an extension was
XXXXX   authorized). In recognition of the above, I now send you certified copies of the documents for any
[Seal]   applicable legal purposes.

In consideration of the foregoing, I respectfully ask you:

**SOLE.** To consider me notified through this notification, in my capacity, with which I send
you certified copies of the requested documents.

**SINCERELY**
**"EFFECTIVE SUFFRAGE. NO REELECTION"**
**AGENT OF THE PUBLIC MINISTRY OF THE COUNTRY**

XXXXXXXXXXXXXXX                    XXXXX
XXXXXXXXXXXXXXX                    XXXXX
[Signature]                       XXXXX
**GABRIEL CRUZ CRUZ ESQ.**             XXXXX
                                  [Seal:
                         ATTORNEY GENERAL'S OFFICE
                        SUB-OFFICE SPECIALIZED IN THE
                      INVESTIGATION OF ORGANIZED CRIME
                     UNIT SPECIALIZED IN THE INVESTIGATION
                           OF OPERATIONS WITH ILLEGAL
                      RESOURCES AND CURRENCY ALTERATIONS
                              OR FALSIFICATIONS]



EXHIBIT 4
LOPEZ
April 9, 2018
Reported by:
D. SANDERS, CSR, RDR, CRR, CCR (LA)

**Caballo Maya 000061**
**(Translated)**



**AV.PREV.: UEIORPIFAM/AP/065/2014**



## AGREEMENT OF PROCEEDINGS

XXXXX
XXXXX
XXXXX
XXXXX
[Seal:
ATTORNEY
GENERAL'S
OFFICE
SUB-OFFICE
SPECIALIZED IN
THE
INVESTIGATION
OF ORGANIZED
CRIME
UNIT SPECIALIZED
IN THE
INVESTIGATION
OF OPERATIONS
WITH ILLEGAL
RESOURCES AND
CURRENCY
ALTERATIONS OR
FALSIFICATIONS]

In Mexico City, Distrito Federal , on July third, two thousand and fifteen.

**WHEREAS**, the status of the certificates and documents that are part of the Prior Inquiry **UEIORPIFAM/AP/065/2014** which investigates facts that are presumably crimes of Operations with Illegal Resources, where the company OCEANOGRAFIA S.A. de C.V. has been used as the instrument of a crime, and any other facts that may result; and

### THEREFORE

**FIRST.** On March nineteenth, two thousand and fourteen, a seizure agreement was pronounced for 62 ships, among which were the ships "CABALLO MAYA" and "CABALLO MARANGO", which had a contractual relationship with OCEANOGRAFIA, through bareboat charter agreements, and on March nineteenth, two thousand and fourteen a notification signed by the Legal Coordination Office of Seized Companies and Commercial Bankruptcy of the Assets Administration and Alienation Service, where I request the seizure of the ships so that they don't disappear and the company is not placed at risk when the work contracts signed with PEMEX EXPLORACION Y PRODUCCION may not operate. Therefore, the following procedures took place:

1.    On April twenty-second, 2014, the shipping company "MARFIELD LIMITED INC." submitted an application requesting lifting the seizure of the "CABALLO MAYA" ship, annexing a property certificate for said ship (note: currently, the GGM SHIPPING company, through an indirect writ of amparo, also claims the ship by claiming to have rights over the ship, which stems from a draft of purchase from the company "MARFIELD LIMITED INC.", and until that time, the return has not been agreed upon.

**Caballo Maya 000062**
**(Translated)**





**PGR**

**Sub-office Specialized in the
Investigation of Organized Crime**
Unit Specialized in the Investigation of Operations with Illegal
Resources and Currency Alterations or Falsifications

2.      On February twenty-fourth, two thousand and fifteen, the Director of the Legal Consultancy of International Commerce of the Sub-secretariat of Foreign Trade received a request informing of the notification dated December third, two thousand and fourteen, of the companies "Shanara Maritime International S.A." and "Marfield Ltd Inc.", to submit them to arbitration according to Article 13 of the Agreement between the United Mexican States and the Republic of Panama for the reciprocal promotion and protection of investments, where they inform their intention to sue the Mexican government requesting a repair of the damage for an approximate of eighty million American dollars.

3.      It is worth mentioning that said ships were judicially seized by the Third District Court of Civil Matters, in the commercial bankruptcy 265/2014, as part of the bankruptcy assets.

4.      On June eleventh, a document by Jose Enrique Castillo Carvallo, Administrative Receiver of the Caballo Marango and Caballo Maya ships was received. Through this document, he informs that, in the aforementioned ships, there is "Coastline" personnel that doesn't belong to the crew and that he has the founded fear that said people might be convincing the crew to take the ships out of national waters. Therefore, he requests the necessary measures are taken for their protection.

5.      On June 15th, 2015, Oscar Israel Garcia Cordova, Legal Representative of "Shipping Group Mexico Sgm S.A. de C.V." appeared and submitted the documentation to credit the property of the Caballo Maya ship, requesting its return.

6.      On June 22nd, 2015, a document by Francisco Riveros Garcia, legal representative of "MARFIELD LIMITED INC and SHANARA MARITIME INTERNATIONAL" was received. The document requested the return of the ships CABALLO MAYA and CABALLO MARANGO, provided that the ships are in bad conditions.

7.      On June 23rd, 2015, this Specialized Unit received the notification DGCJCI.511.48.228.15, signed by Carlos Vejar Borrego Esq.,





**Sub-office Specialized in the
Investigation of Organized Crime**
Unit Specialized in the Investigation of Operations with Illegal
Resources and Currency Alterations or Falsifications

General Director of the Ministry of Economy, through which he states the existence of an international arbitration on the "Caballo Maya and Caballo Marango" ships, which were seized from the company Oceanografia, and requesting the return of the ships and the submission of USD\$80,000,000, for damages caused by said seizure.

XXXXX
XXXXX
XXXXX
XXXXX
[Seal:
ATTORNEY
GENERAL'S
OFFICE
SUB-OFFICE
SPECIALIZED IN
THE
INVESTIGATION
OF ORGANIZED
CRIME
UNIT SPECIALIZED
IN THE
INVESTIGATION
OF OPERATIONS
WITH ILLEGAL
RESOURCES AND
CURRENCY
ALTERATIONS OR
FALSIFICATIONS]

8.      On July second, two thousand and fifteen, a document signed by Oscar Israel Garcia Cordova, legal representative of "Shipping Group Mexico Sgm S.A. de C.V.", was received. Through this document, he requested the delivery as a depository of the "Caballo Maya" ship, because it is deteriorating, and he wants to give it maintenance to preserve the seized asset in good working conditions.

9.      On that same date, Oscar Israel Garcia Cordova, legal representative of "Shipping Group Mexico Sgm S.A. de C.V.", appeared to ratify each and every part of the document through which he requests the delivery as a depository of the "Caballo Maya" ship so that it can be properly taken care of and so that it can receive maintenance.

## WHEREAS

**FIRST.** That, to preform the depository of the "CABALLO MAYA" ship, it is relevant to establish the legal situation of said ship.

**SECOND.** That, according to the certificates that are part of this inquiry regarding the CABALLO MAYA ship, the companies "Shipping Group Mexico Sgm S.A. de C.V." and "Marfield Ltd. Inc." submitted the following writs of amparo.

**Caballo Maya 000064
(Translated)**





**Sub-office Specialized in the
Investigation of Organized Crime**
Unit Specialized in the Investigation of Operations with Illegal
Resources and Currency Alterations or Falsifications

| 814/2014 | 04/25/2014 | SECOND DISTRICT COURT IN THE STATE OF CAMPECHE | MARFIEL LTD | SEIZURE AGREEMENT FOR THE CABALLO MAYA AND LACK OF NOTIFICATION | DENIED | DISMISSED (TO BE RESOLVED, WHICH WAS LODGED EXTEMPO-RANEOUSLY) | REVIEW | PENDING RESOLUTION (ADMISSION 03/12/15) |
|---|---|---|---|---|---|---|---|---|
| 1190/2014 | 12/05/2014 | EIGHT DISTRICT COURT OF AMPARO IN CRIMINAL MATTERS IN THE FD | MARFIEL LTD | DENIAL TO THE RETURN OF CABALLO MAYA | DENIED | NOT APPLICABLE | NOT APPLICABLE | PENDING CITATION OF INTERESTED THIRD PARTY |
| 1473/2014 | 11/03/2014 | FIRST DISTRICT COURT IN THE STATE OF CAMPECHE | SHIPPING GROUP | SEIZURE OF CABALLO MAYA, LACK OF NOTIFICATION AND ABANDONMENT AGREEMENT NOTE: THE LACK OF NOTIFICATION AND ABANDONMENT ARE NEGATIVE | GRANTED FOR REPEAL OF SUPERIOR NOTIFICATION 08/12/2014 | DISMISSED (TO BE RESOLVED, WHICH WAS LODGED EXTEMPO-RANEOUSLY) | REVIEW | PENDING RESOLUTION (ADMISSION 04/14/2015) |

**THIRD.** Regarding the documentation submitted before this Corporate Representative, "Shipping Group Mexico Sgm S.A. de C.V." and "Marfield Ltd. Inc.", submitted the following:

- **DOCUMENTATION SUBMITTED BY "SHIPPING GROUP MEXICO SGM S.A. DE C.V." TO RETURN THE CABALLO MAYA SHIP.**
    1. Certified copy of the purchase agreement dated March 18th, 2011, signed between the company Marfield Ltd. Inc. as a seller and my client as a buyer, regarding the ship called Caballo Maya, performed under the denomination of "Memorandum of Agreement", under the 1993 sale format adopted by the Baltic and International Maritime Council (BIMCO) in 1956, which is kept in English with its appropriate Spanish translation.





**Sub-office Specialized in the**
**Investigation of Organized Crime**
Unit Specialized in the Investigation of Operations with Illegal
Resources and Currency Alterations or Falsifications

2. Certified copy of the Bank Transfer Records for the payment of the price and/or financing credit for the "Caballo Maya" ship, as mentioned in the Purchase Contract, performed through Actinver S.A. to Coastline Maritime Pte. Ltd., Caterpillar Financial Services and Eksportfinans ASA.

3. Certified copy of the letter dated October 21st, 2011, with the letterhead of MARFIELD LTD INC., addressed by Mr. Terry Highlands, in representation of the company Marfield Ltd. Inc. to Caterpillar Financial Services Asia Pte. Ltd. And Eksportfinans ASA, which is included in English and with a Spanish translation, through which Terry Highlands, representing Marfield Ltd. Inc, notifies said financial institutions that, regarding the credit contract signed by Caterpillar, Eksportfinance and Marfield Ltd. Inc. there is a change of ownership of the "CABALLO MAYA" ship in favor of GGM SHIPPING S.A. DE C.V. Therefore, it is requested that the accredited party and the guarantors are changed, which would ratify the purchase dated March 18th, 2011.

4. Certified copy of the Panama Ship Registration proof, where it is stated that the contract mentioned in section 1 was filed in the record for the "Caballo Maya" ship.

5. Certified copy of the contract dated March 21st, 2011, signed by Oceanografia S.A. DE C.V. and my client, through which the first receives the use and enjoyment of the ship to provide services to PEMEX.

And I request the return of the Caballo Maya ship.

- **DOCUMENTATION SUBMITTED BY "MARFIELD LIMITED INC" FOR THE RETURN OF THE CABALLO MAYA SHIP**

1. Ship's Regulatory Patent number 000081740.

2. Shipowner Certificate, issued by the company SATRATEGIC Marine of Henderson, Western Australia on April fourteenth, two thousand and ten in favor of MARFIEL LIMITED INC.

3. Contract of Affreightment as a bareboat charter, signed by OCEANOGRAFIA and MARFIELD LIMITED INC., on May fifth, two thousand and eight.

**FOURTH.** However, based on the certificates that are part of this inquiry, it can be established that the evidence, when analyzed as a whole, can establish a direct relationship between the company OCEANOGRAFIA S.A. de C.V. and the company GGM SHIPPING S.A. DE C.V., provided that there is a business relationship directed directly in the Caballo Maya ship, with which it is possible to see that the company GGM SHIPPING SA DE CV is the owner of the ship.

**Caballo Maya 000066**
**(Translated)**





Also, its body includes the logos of both companies. Whereupon, said evidence must be valued considering the numbers 206, 280, 285, regarding article 286, all of the Federal Code of Criminal Procedures.

By the above, it is necessary to mention that the business relationship between the company CABALLO MAYA S.A. DE C.V. (subsidiary of OCEANOGRAFIA S.A. de C.V.) and the company SHIPPING GROUP MEXICO SGM SAPI DE C.V., provided that the company belongs to the consortium of companies directed by Mr. FRANCISCO JAVIER RODRIGUEZ BORGIO, is born as a project for the acquisition of ships that provide PETROLEOS MEXICANOS of maritime services in general, because said company, in the year two thousand and eleven, **acquired a credit** that had been granted to the company MARFIELD LTD INC by CATERPILLAR FINANCIAL SERVICES ASIA PTE. LTD. And EKSPORTFINANS ASA, whose purpose was the construction of the ship called "CABALLO MAYA". The acquisition of said credit was at first performed by SHIPPING GROUP MEXICO SGM SAPI DE C.V. and then CABALLO MAYA, S.A. DE C.V. (subsidiary of Oceanografia S.A. de C.V.) joined, as 50% co-owners of the rights to the aforementioned ship, and with the same percentage required by the contracted credit.

It is this way that said ship is put to work under the services of OCEANOGRAFIA to develop the services hired by PEMEX EXPLORACION Y PRODUCCION within the PEP contract number 428237849, which was destined for the Assembly of different equipment and structures, structural adaptation and support services for the operation in the P.E.P. facilities in the United Mexican States exclusive area in the Gulf of Mexico. This contractual activity produces legal resources that were put at the disposal of OCEANOGRAFIA S.A. de C.V. by PEMEX EXPLORACION Y PRODUCCION in its different bank accounts.





**Sub-office Specialized in the
Investigation of Organized Crime**
Unit Specialized in the Investigation of Operations with Illegal
Resources and Currency Alterations or Falsifications

However, stemming from the co-ownership between Oceanografia S.A. de C.V. and Shipping Group Mexico SGM SAPI de C.V. before GGM Shipping, S.A. de C.V), performed several transferences to make the payment of the credit amortization by the acquisition of the "Caballo Maya" ship. Therefore, on January thirty-first, two thousand and fourteen, there was a bank transference to the bank account number 5053173 from Citibank New York, Oceanografia S.A. de C.V., the resources were transferred to the account in Banco Mercantil de Norte, S.A., account number 0602787174, which belongs to Shipping Group Mexico SGM SAPI de C.V., for the amount of USD$ 547,844.00 (FIVE HUNDRED AND FORTY-SEVEN THOUSAND, EIGHT HUNDRED AND FORTY-FOUR US DOLLARS 00/100), for the use and enjoyment that was performed on the "Caballo Maya" ship for services rendered to the company Petroleos Mexicanos by Oceanografia, S.A. de C.V., who was the title holder in the contract included in the parastatal. On that same date, from the Banco Mercantil de Norte, S.A. account number 0602787174, which belongs to Shipping Group Mexico SGM, SAPI de C.V., there was a transfer to the account number 0567624752 from Actinver Casa de Bolsa, S.A. de C.V. for the amount of USD$ 547,843.99 (FIVE HUNDRED AND FORTY-SEVEN THOUSAND, EIGHT HUNDRED AND FORTY-THREE US DOLLARS 99/100), to make the payment of 50% of the credit amortization contracted with Caterpillar Financial Service Asia, Pte. Ltd. Lastly, according to the invoice number E 53151 dated January 31st, 2014, issued by Actinver Casa de Bolsa, S.A. de C.V. regarding the aforementioned transaction, the amount that Shipping Group Mexico SGM SAPI de C.V. deposited in the bank account was transferred in whole to Caterpillar Financial Services for the amount of USD$ 547,843.99 (FIVE HUNDRED AND FORTY-SEVEN THOUSAND, EIGHT HUNDRED AND FORTY-THREE US DOLLARS 99/100).

**SIXTH.** Because of the above, and considering what is established in Articles 20, 21, 40 and 111 of the Law of Maritime Navigation and Trade, which establishes:

XXXXX
XXXXX
XXXXX
XXXXX
[Seal]
ATTORNEY
GENERAL'S
OFFICE
SUB-OFFICE
SPECIALIZED IN
THE
INVESTIGATION
OF ORGANIZED
CRIME
UNIT SPECIALIZED
IN THE
INVESTIGATION
OF OPERATIONS
WITH ILLEGAL
RESOURCES AND
CURRENCY
ALTERATIONS OR
FALSIFICATIONS





**Sub-office Specialized in the
Investigation of Organized Crime**
Unit Specialized in the Investigation of Operations with Illegal
Resources and Currency Alterations or Falsifications

"... **Article 20.** To act as a Mexican operator, it is necessary to:

(...)

**IV.** Own or possess one or several ships whose total tonnage is a minimum of 500 gross registered tons.

... "

"... **Article 21.** It is presumed that the owner or co-owners of the ship are their shipowners or operators, except when proven otherwise.

The operator who assumes the operation or exploitation of a ship that doesn't belong to his or her property must make a shipowner statement before the maritime authority in the port where it is registered, according to the regulatory stipulations on the matter.

Said statement will be written down on the margin of the registration at the National Maritime Public Registry, and when said quality stops, the cancellation of the annotation must be requested. This statement may also be provided by the ship's owner.

If the statement is not provided, the owner and the operator will be jointly liable for the obligations stemming from the exploitation of the ship..."

**Article 40.** Without detriment to what is established in the International Treaties, the operation and exploitation of ships in internal navigation and cabotage will be reserved to Mexican operators with Mexican ships (...)

If there are no Mexican ships available with the same technical conditions or due to a public interest reason, the Ministry will have the power to grant temporary permissions for cabotage navigation, according to the following priority:

I.      Mexican operator with a foreign ship, under a **lease or bareboat charter contract; and**

II.     Mexican operator with a foreign ship under any charter contract.

Each temporary cabotage navigation permit will last for three months and no permit for the same ship may be renewed more than seven times.

"**...** **Article 111.** The following are considered contracts for the use of ships:

I.      Bareboat lease;

XXXXX
XXXXX
XXXXX
XXXXX
[Seal]
ATTORNEY
GENERAL'S
OFFICE
SUB-OFFICE
SPECIALIZED IN
THE
INVESTIGATION
OF ORGANIZED
CRIME
UNIT SPECIALIZED
IN THE
INVESTIGATION
OF OPERATIONS
WITH ILLEGAL
RESOURCES AND
CURRENCY
ALTERATIONS OR
FALSIFICATIONS





**Sub-office Specialized in the
Investigation of Organized Crime**
Unit Specialized in the Investigation of Operations with Illegal
Resources and Currency Alterations or Falsifications

II.   Time charter;

III.  Trip charter;

IV.   Maritime transportation of merchandise;

V.    Maritime transportation of passengers;

VI.   Transport trailer, and

VII.  Any other maritime contract through which a ship or a certain space in it are used.

<div style="float:left">
XXXXX
XXXXX
XXXXX
XXXXX
[Seal]
ATTORNEY
GENERAL'S
OFFICE
SUB-OFFICE
SPECIALIZED IN
THE
INVESTIGATION
OF ORGANIZED
CRIME
UNIT SPECIALIZED
IN THE
INVESTIGATION
OF OPERATIONS
WITH ILLEGAL
RESOURCES AND
CURRENCY
ALTERATIONS OR
FALSIFICATIONS
</div>

Therefore, it is necessary to consider that the **bareboat charter** is a type of <u>maritime transportation</u> <u>contract</u>, which is included in the Enactment Decree for the United Nations Agreement regarding the Conditions for the Registration of Ships, which was adopted in the city of Geneva, Switzerland, on February 7th, 1986, which mainly establishes in Articles 2 and 12 -----------------------------------------

... ARTICLE 2 ...

"Ship" means any self-propelled sea-going vessel used in international seaborne trade for the transport of goods, passengers or both, with the exception of vessels of less than 500 gross registered tons;

"Flag State" means a State whose flag a ship flies and is entitled to fly; (...)

**"Operator" means the owner or bareboat charterer, or any other natural or juridical person to whom the responsibilities of the owner or bareboat charterer have been formally assigned;**

*"Bareboat charter" means a contract for the lease of a ship, for a stipulated period of time, by virtue of which the lessee has complete possession and control of the ship, including the right to appoint the master and crew of the ship, for the duration of the lease;*

Article 12 Bareboat charter

1.  Subject to the provisions of article 11 and in accordance with its laws and regulations a State may grant the registration and the right to fly its flag to a ship bareboat chartered-in by a charterer in that State, for the period of that charter.

2.  When shipowners or charterers in States Parties to this Convention enter into such bareboat charter activities, the conditions of registration contained in this Convention should be fully complied with.

will affect the public order or the social interest. Therefore, it is relevant to agree in favor of the request filed by said person, because if this Corporate Representative omitted to agree to said request, damage could be done to the company Shipping Group Mexico Sgm S.A. de C.V.", and other groups of companies that depend on the CABALLO MAYA ship and the company who owns it, who are at risk of default in the payments and contracts agreed before the ministry's seizure measures for this ship; therefore, in order to prevent material damage and provided that the ship is performing legal activities that don't affect the public order and social interest, it is relevant to grant the depository in favor of Oscar Israel Garcia Cordova, Legal Representative of "Shipping Group Mexico Sgm S.A. de C.V.", for the CABALLO MAYA ship to be in his possession so that it may receive the appropriate maintenance and care and so that it may continue performing its





**Sub-office Specialized in the
Investigation of Organized Crime**
Unit Specialized in the Investigation of Operations with Illegal
Resources and Currency Alterations or Falsifications

regular contractual and work activities in order to not affect the negotiation taking place, which has a legal purpose and so that said person may maintain the work positions produced directly and indirectly, serving as support the thesis that corresponds to the Ninth Judicial Journal of the Federation and its XXII Journal, August 2005, Common Matters, Thesis 14o A 63 K, Page 1956, which says:

XXXXX
XXXXX
XXXXX
XXXXX
[Seal]
ATTORNEY
GENERAL'S
OFFICE
SUB-OFFICE
SPECIAUZED IN
THE
INVESTIGATION
OF ORGANIZED
CRIME
UNIT SPECIALIZED
IN THE
INVESTIGATION
OF OPERATIONS
WITH ILLEGAL
RESOURCES AND
CURRENCY
ALTERATIONS OR
FALSIFICATIONS

"... PUBLIC ORDER: IT IS AN UNDETERMINED LEGAL CONCEPT THAT IS UPDATED IN EVERY SPECIFIC CASE, TAKING INTO CONSIDERATION THE MINIMUM SOCIAL COHABITATION RULES. The public order does not constitute a notion that may be configured from a formal declaration contained in a law. On the contrary, it has been a constant criterion of the Supreme Justice Court in the Country, and so the judge is the one who examines its presence in each specific case, in such a way that it is considered an undetermined legal concept with an impossible definition whose content may only be outlined by the circumstances of time and place that prevail at the time in which the valuation takes place. In any case, to give some meaning to it, the judge must consider the essential conditions for the harmonic development of the community. In other words, the decision taken in this specific case may not rest in mere subjective statements, but rather in objective elements that translate the fundamental concerns of the society, always procuring not to obstruct the efficacy of third party's rights. FOURTH DISTRICT COURT OF ADMINISTRATIVE MATTERS OF THE FIRST CIRCUIT. Direct amparo 312/2004. Alberto Salmeron Pineda, January 12th, 2005. Unanimity of votes. Reporting Judge, Jesus Antonio Nazar Sevilla. Secretary, Ernesto Gonzalez Gonzalez. Direct amparo 453/2004. Hospital Angeles del Pedregal, S.A. de C.V., February 23rd, 2005. Unanimity of votes. Reporting judge, Jesus Antonio Nazar Sevilla. Secretary, Indira Martinez Fernandez..."

Likewise, taking into consideration what was requested by Jose Enrique Castillo Carvallo, Judicial Depository of the Caballo Marango and Caballo Maya ships, who stated that the aforementioned ships contain "Coastline" personnel who are not part of the crew and he has the founded fear that said people are convincing the crew to take the ships outside of national waters, it is requested that the necessary measures are taken to protect them. It is considered that proceedings must be started to protect the ships, especially the "Caballo Maya" ship.

**Caballo Maya 000072
(Translated)**



**PGR**

**Sub-office Specialized in the
Investigation of Organized Crime**
Unit Specialized in the Investigation of Operations with Illegal
Resources and Currency Alterations or Falsifications

**SEVENTH.** In the same way, taking into consideration that the company "Shipping Group Mexico Sgm S.A. de C.V., which is dedicated to the acquisition of ships that provide PETROLEOS MEXICANOS of maritime services in general, has enough means to maintain and preserve the ship to prevent the deterioration of the seized asset, it is deemed appropriate to grant the depository requested by the citizen Oscar Israel Garcia Cordova, Legal Representative of "Shipping Group Mexico Sgm S.A. de C.V.".

xxxxx
xxxxx
xxxxx
xxxxx
[Seal]
ATTORNEY
GENERAL'S
OFFICE
SUB-OFFICE
SPECIALIZED IN
THE
INVESTIGATION
OF ORGANIZED
CRIME
UNIT SPECIALIZED
IN THE
INVESTIGATION
OF OPERATIONS
WITH ILLEGAL
RESOURCES AND
CURRENCY
ALTERATIONS OR
FALSIFICATIONS

Said depository must be developed by considering what is established in the Federal Criminal Procedures Code in Article 182-L, which establishes: "... The seized property may be in the possession of the owner, possessor or any of its occupants, provided that this doesn't affect the social interest or public order. Whoever is in possession of the property may not alienate or encumber the property, and if it produces any income or products, they will be governed by the terms of the Articles 12 and 15 of the Federal Law for the Administration and Alienation of Public Sector Assets..."

Also, in order for the citizen Oscar Israel Garcia Cordova, Legal Representative of "Shipping Group Mexico Sgm S.A. de C.V. to correctly develop the depository for which he is responsible, any other depositaries that may be related to the CABALLO MAYA ship are deemed null and void from this moment.

The foregoing is performed because it is necessary for the appropriate integration of this Prior Inquiry, and based on Articles 16, 21 and 102, Section "A" of the Political Constitution of the United Mexican States; 2 section II, 181, 182, 182-A, 182-L and 208 of the Federal Code of Criminal Procedures; 40 and 41 of the Federal Criminal Code; 1 and 31 of the Federal Law Against Organized Crime; 1 and 4, section A), subsections a), b), c), e), h) and ñ), section B), subsection b) of the Organic Law of the Attorney General

Sub-section A), section III F) section III and 31 of its [Illegible] section I, first paragraph, 2, sections II and VIII, 3, 5, first paragraph, 6, 7, 8 and 10 of the Federal Law for the Administration and Alienation of Public Sector Assets and Agreement A/011/00 issued by the Attorney General of the Country, it must be resolved and it is

### RESOLVED

**FIRST.** The depository of the CABALLO MAYA ship, with the IMO **9453341**, Ship's Regulatory Patent number 000081740, is the citizen Oscar Israel Garcia Cordova, Legal Representative of "Shipping Group Mexico Sgm S.A. de C.V.", under the terms of Article 182-L, who from this moment will be in the possession of the ship, provided that this doesn't affect the public order, with the condition that he may not alienate or encumber, and must maintain the aforementioned ship in good conditions until the time in which the legal destination of the seized asset is determined.

**SECOND. To p**ersonally notify the citizen Oscar Israel Garcia Cordova, Legal Representative of "Shipping Group Mexico Sgm S.A. de C.V. of this ministry agreement, with the warnings and conditions established in Article 182 L of the Federal Criminal Procedures Code.

**THIRD. To s**end a notification to the General Director of Merchant Navy of the Ministry of Communications and Transportation so that the corresponding annotations may be performed to appoint the citizen Oscar Israel Garcia Cordova, Legal Representative of "Shipping Group Mexico Sgm S.A. de C.V. as the depository of the CABALLO MAYA ship, with the IMO **9453341,** Ship's Regulatory Patent number 000081740, under the terms of Article 182-L, and from this moment, he will be in possession of the ship.

XXXXX
XXXXX
XXXXX
XXXXX
[Seal]
ATTORNEY
GENERAL'S
OFFICE
SUB-OFFICE
SPECIALIZED IN
THE
INVESTIGATION
OF ORGANIZED
CRIME
UNIT SPECIALIZED
IN THE
INVESTIGATION
OF OPERATIONS
WITH ILLEGAL
RESOURCES AND
CURRENCY
ALTERATIONS OR
FALSIFICATIONS

of it, so that the custody requested over the aforementioned ship may end.

**FIFTH.** To send a notice to the Service of Administration and Alienation of Assets so that the corresponding proceedings may take place, and so that a day and time may be established to give as depository the ship CABALLO MAYA, with the IMO **9453341,** Ship's Regulatory Patent number 000081740 to the citizen Oscar Israel Garcia Cordova, Legal Representative of "Shipping Group Mexico Sgm S.A. de C.V., according to the terms of Article 182 L. The ship will be in his possession from this moment so that the custody requested over the aforementioned ship may end.

XXXXX
XXXXX
XXXXX
XXXXX
[Seal]
ATTORNEY
GENERAL'S
OFFICE
SUB-OFFICE
SPECIALIZED IN
THE
INVESTIGATION
OF ORGANIZED
CRIME
UNIT SPECIALIZED
IN THE
INVESTIGATION
OF OPERATIONS
WITH ILLEGAL
RESOURCES AND
CURRENCY
ALTERATIONS OR
FALSIFICATIONS

**IT IS SO ORDERED**

IT IS SO AGREED AND SIGNED BY THE UNDERSIGNED ATTORNEY, GABRIEL CRUZ CRUZ, PUBLIC MINISTRY AGENT IN THE FEDERATION, ASSIGNED TO THE UNIT SPECIALIZED IN THE INVESTIGATION OF OPERATIONS WITH ILLEGAL RESOURCES AND CURRENCY ALTERATION OR FALSIFICATION, WHO ACTS LEGALLY WITH TWO WITNESSES, WHO SIGN AND ATTEST.

XXXXXXXXXXXXX
XXXXXXXXXXXXX
[Signature]

**WE ATTEST**

| EYEWITNESS | EYEWITNESS |
|---|---|
| XXXXXXXXXXXXX | XXXXXXXXXXXXX |
| XXXXXXXXXXXXX | XXXXXXXXXXXXX |
| [Signature] | [Signature] |
| C. CESAR MEJIA TOME | LUIS FERNANDO GALINDO VERA ESQ. |

Case 3:17-cv-00194 Document 75-2 Filed on 06/02/18 in TXSD Page 92 of 130



A.P. UEIORPIFAM/AP/065/2014

PROCURADURÍA GENERAL DE LA REPÚBLICA.
SUBPROCURADURÍA ESPECIALIZADA EN INVESTIGACIÓN DE DELINCUENCIA ORGANIZADA
UNIDAD ESPECIALIZADA EN INVESTIGACIÓN DE OPERACIONES CON RECURSOS DE PROCEDENCIA ILÍCITA Y DE FALSIFICACIÓN O ALTERACIÓN DE MONEDA.

Amparo: 686/2015
Oficio: CGII/F3/648/2016
Asunto: El que se indica
Ciudad de México, a 12 de mayo de 2016.

C. JUEZ DECIMO DE DISTRITO DE AMPARO EN MATERIA PENAL
EN LA CIUDAD DE MÉXICO
P R E S E N T E:

En atención a su oficio **37791/2016**, de veinticinco de abril de **dos mil dieciséis**, relativo al juicio de amparo **686/2015**, promovido por **MARFIELD LTD INC.**, por medio del cual, requiere a esta autoridad para que en el término de tres días remita todas las actuaciones que guarden relación con el acto reclamado –oficio CGII/F3/1184/2015- dentro de la averiguación previa UEIORPIFAM/AP/065/2014 (se autorizó prorroga) en mérito de lo anterior, remito a Usted para los efectos legales a que haya lugar, copias certificadas de las constancias de mérito.

Por lo anterior expuesto y fundado, a Usted atentamente pido:

ÚNICO.- Tenerme por presentado en términos del presente oficio, con la calidad que me ostento, con el que remito a Usted copias certificadas de las constancias solicitadas.

A T E N T A M E N T E
"SUFRAGIO EFECTIVO. NO REELECCIÓN"
AGENTE DEL MINISTERIO PÚBLICO DE LA FEDERACIÓN

LIC. GABRIEL CRUZ CRUZ

PROCURADURÍA GENERAL DE LA REPÚBLICA
SUBPROCURADURÍA ESPECIALIZADA EN
INVESTIGACIÓN DE DELINCUENCIA ORGANIZADA
UNIDAD ESPECIALIZADA EN INVESTIGACIÓN DE
OPERACIONES CON RECURSOS
DE PROCEDENCIA ILÍCITA Y DE FALSIFICACIÓN
O ALTERACIÓN DE MONEDA

Caballo Maya 000061



## ACUERDO DE DILIGENCIAS

En la ciudad de México, Distrito Federal, a tres de julio de dos mil quince

**V I S T O**, el estado que guardan las constancias y actuaciones que integran la Averiguación Previa **UEIORPIFAM/AP/065/2014**, en la cual se está investigando hechos presumiblemente constitutivos del delito de Operaciones con Recursos de Procedencia Ilícita, en la cual se ha utilizado como instrumento del delito la persona moral OCEANOGRAFIA S.A. de C.V y lo que resulte; y

## RESULTANDO

**PRIMERO.-** En fecha diecinueve de marzo de dos mil catorce, se dictó acuerdo de aseguramiento de 62 barcos entre ellos las embarcaciones "CABALLO MAYA" y "CABALLO MARANGO" los cuales mantenían relación contractual con OCEANOGRAFIA por medio de contratos de fletamento a casco desnudo, toda vez que en fecha diecinueve de marzo de dos mil catorce se recibió oficio signado por la Coordinadora Jurídica de Empresas Aseguradas y Concursos Mercantiles del Servicio de Administración y Enajenación de Bienes, en el cual solicito el aseguramiento de las embarcaciones con la finalidad de que no fueran desaparecidas dichas embarcaciones y se colocara en riesgo a la empresa al no poder operar los contratos de obra que tenía celebrados con PEMEX EXPLORACIÓN Y PRODUCCIÓN.

Por lo se realizaron entre otras las siguientes diligencias:

**1.-** En fecha veintidós de abril 2014, se presentó promoción por parte de la empresa naviera "MARFIELD LIMITED INC.", solicitando el levantamiento del aseguramiento de la embarcación "CABALLO MAYA", anexando certificado de propiedad de dicha embarcación. (Nota: actualmente la empresa GGM SHIPPING, mediante amparo indirecto, también reclama la embarcación al alegar que tiene derechos sobre la embarcación derivado de una minuta de compra a la empresa "MARFIELD LIMITED INC.), siendo que hasta este momento no se ha acordado procedente la devolución.



**PGR**

2.- En fecha veinticuatro de febrero de dos mil quince, se recibió promoción por parte de la Directora de Consultoría Jurídica de Comercio Internacional de la Subsecretaría de Comercio Exterior, en el cual informa sobre la notificación de fecha tres de diciembre de dos mil catorce de las empresas "Shanara Maritime International B A" y "Marfield Ltd Inc", de sometimiento a arbitraje de conformidad con el artículo 13 del Acuerdo entre los Estados Unidos Mexicanos y la República de Panamá para la promoción y protección recíproca de las inversiones, en el cual informan su intención de demandar al gobierno mexicano por la afectación que han sufrido sobre el aseguramiento de sus buques, solicitando una reparación del daño por un aproximado de ochenta millones de dólares americanos

3.- Cabe señalar que dichas embarcaciones fueron aseguradas judicialmente por el Juzgado Tercero de Distrito en Materia Civil, dentro del concurso mercantil 265/2014, como parte de la masa concursal

4.- Con fecha once de junio se recibió escrito José Enrique Castillo Carvallo, Depositario Judicial delas embarcaciones Caballo Marango y Caballo Maya, por medio del cual hace del conocimiento que en las embarcaciones antes mencionadas hay personal de "Coastline" las cuales no pertenecen a la tripulación y tiene el temor fundado de que dichas personas estén convenciendo al a tripulación para que saquen las embarcaciones fuera de aguas nacionales por lo que solicita se tomen las medidas necesarias para su protección.

5.- Con fecha 15 de junio del 2015, compareció Oscar Israel Garcia Cordova, Apoderado Legal de "Shipping Group México Sgm S.A de C.V.", quien exhibió la diversa documentación para acreditar la propiedad de Caballo Maya y solicita su devolución.

6.- En fecha 22 de junio del año 2015, se recibió escrito por parte de Francisco Riveros Garcia, representante legal de "MARFIELD LIMITED INC y SHANARA MARITIME INTERNATIONAL", solicitando la devolución de las embarcaciones CABALLO MAYA y CABALLO MARANGO, toda vez que las embarcaciones se encuentran en malas condiciones.

7.- En fecha 23 de junio del 2015, se recibió en esta Unidad Especializada, el oficio DGCJCI.511.48.228.15 signado por el Licenciado Carlos Vejar Borrego,

Caballo Maya 000063



**PGR**
PROCURADURIA GENERAL
DE LA REPUBLICA

Director General de la Secretaría de Economía, con el cual manifiesta la existencia de un arbitraje internacional por las embarcaciones "Caballo Maya y Caballo Marango", que fueron aseguradas a la empresa Oceanografía, y que solicita la devolución de las embarcaciones más una cantidad de $80,000,000 de USD, por los daños ocasionados por dicho aseguramiento

8.- Con fecha dos de julio del año dos mil quince, se recibió escrito signado por el C. Oscar Israel Garcia Cordova, Apoderado Legal de "Shipping Group México Sgm S.A de C.V.", por medio del cual solicita la entrega en depositaria de la embarcación "Caballo Maya" debido a que el mismo se está deteriorando y para estar en posibilidad de darle el mejor mantenimiento posible y preservar en buenas condiciones el bien mueble asegurado.

En la misma fecha compareció el C. Oscar Israel Garcia Cordova, Apoderado Legal de "Shipping Group México Sgm S.A de C.V.", a efecto de ratificar en todas y cada una de sus partes el escrito por medio del cual solicita la entrega en depositaria de la embarcación "Caballo Maya" para su debido cuidado y mantenimiento

## CONSIDERANDO

**PRIMERO.-** Que para realizar la depositaria de la embarcación "CABALLO MAYA" es pertinente establecer la situación jurídica que tienen dicha embarcación.

**SEGUNDO.-** que de acuerdo con las constancias que integran la presente indagatoria respecto de la embarcación CABALLO MAYA, las empresas "Shipping Group México Sgm S.A de C.V.", y "Marfield Ltd. Inc"., presentaron los siguiente juicios de amparos

Caballo Maya 000064



**PGR**
PROCURADURÍA GENERAL DE LA REPÚBLICA

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 814/2014 | 25/04/2014 | JUZGADO SEGUNDO DE DISTRITO EN EL ESTADO DE CAMPECHE | MARFIEL LTD | ACUERDO DE ASEGURAMIENTO DEL CABALLO MAYA Y FALTA DE NOTIFICACIÓN | NIEGA | SOBRESEE (POR RESOLVER QUE FUE INTERPUESTO EXTEMPORANEAMENTE) | REVISIÓN | PENDIENTE DE RESOLVER (ADMISIÓN 12/03/15) | |
| 1190/2014 | 05/12/2014 | JUZGADO OCTAVO DE DISTRITO DE AMPARO EN MATERIA PENAL EN EL DF | MARFIEL LTD | NEGATIVA DEVOLUCIÓN DE CABALLO MAYA | NIEGA | NO APLICA | NO APLICA | SE ENCUENTRA PENDIENTE EL EMPLAZAMIENTO TERCERA INTERESADA | |
| 1473/2014 | 03/11/2014 | JUZGADO PRIMERO DE DISTRITO EN EL ESTADO DE CAMPECHE | SHIPPING GROUP | ASEGURAMIENTO CABALLO MAYA, FALTA DE NOTIFICACIÓN Y ACUERDO DE ABANDONO NOTA BON NEGATIVOS LA FALTA DE NOTIFICACIÓN Y EL ABANDONO | CONCEDE POR REVOCACIÓN DE SUPERIOR NOTIFICACIÓN 12/08/2014 | SOBRESEE (POR RESOLVER QUE FUE INTERPUESTO EXTEMPORANEAMENTE) | REVISIÓN | PENDIENTE DE RESOLVER (ADMISIÓN 14/04/2015) | |

TERCERO.- Por lo que respecta a la documentación presentada ante esta Representación Social de la Federación, "Shipping Group México Sgm S.A de C.V.", y "Marfield Ltd. Inc.", presentaron lo siguiente

- **DOCUMENTACIÓN PRESENTADA POR "SHIPPING GROUP MÉXICO SGM S.A DE C.V.", PARA LA DEVOLUCIÓN DE LA EMBARCACIÓN CABALLO MAYA**

  1.- Copia certificada del acuerdo de compraventa de fecha 18 de marzo de 2011, celebrado entre la empresa Marfield ltd inc. Como vendedor y mi representada como comprador, respecto de la embarcación denominada Caballo Maya, realizado bajo la denominación de "Memorandum del Acuerdo" bajo el formato de venta 1993 adoptado por el consejo Baltico Marítimo Internacional (BIMCO) en 1956, el cual se tiene en ingles con su debida traducción al Español.

**PGR**

PROCURADURÍA GENERAL
DE LA REPÚBLICA

Subprocuraduría Especializada en
Investigación de Delincuencia Organizada

2.- Copia certificada de las Constancias de Transferencias Bancarias del pago del precio y/o crédito del financiamiento de "Caballo Maya", a que se refiere el Contrato de Compraventa, realizadas mediante actinver S.A a Coastline Maritime Pte Ltd Caterpillar Financial Services y Eksportfinans ASA

3.- Copia certificada de la Carta de fecha 21 de octubre de 2011, con el membrete de MARFIELD LTD INC, dirigida por el Sr. Terry Highlands en representación de la empresa Marfield ltd/inc a Caterpillar Financial Services Asia Pte Ltd y Eksportfinans ASA, la cual consta en inglés y su traducción al Español, mediante el cual Terry Highlands en representación de Marfield ltd inc, notifica a dichas instituciones financieras que en relación con el contrato de crédito entre Caterpillar, Eksportfinance y Marfield ltd Inc, existe un cambio de propietario del barco "CABALLO MAYA", a favor de GGM SHIPPING S.A DE C.V por lo que solicita cambiar a el acreditado y los garantes, con lo cual se ratifica la compraventa de fecha 18 de Marzo de 2011.

4.- Copia certificada de la Constancia del Registro Marítimo de Panamá donde se hace constar que el contrato referido en el numeral 1 fue archivado en el expediente relativo a la nave "Caballo Maya".

...copia certificada del Contrato de fecha 21 de Marzo de 2011, celebrado ...Oceanografía S.A DE C.V, y mi representada mediante el cual se ...a la primera el uso y goce de la embarcación para la prestación de ...a PEMEX

...solicito la devolución de la Embarcación caballo Maya

- **DOCUMENTACIÓN PRESENTADA POR, "MARFIELD LIMITED INC PARA LA DEVOLUCIÓN DE LA EMBARCACIÓN CABALLO MAYA**

  1.- Patente Reglamentaria de Navegación número 000081740.

  2.- Certificado de Armador emitida por la empresa SATRATEGIC Marine de Henderson, Western Australia, en fecha catorce de abril de dos mil diez, a favor del de la persona MARFIEL LIMITED INC.

  3.-Contrato de Fletamento a casco desnudo celebrado entre OCEANOGRAFIA y MARFIELD LIMITED INC., en fecha cinco de mayo de dos mil ocho.

**CUARTO.-** Ahora bien de las constancias que integran la presente indagatoria se establece que de los Medios probatorios que al analizarse en conjunto se puede establecer una relación directa entre la empresa OCEANOGRAFIA S.A de C.V., con la empresa GGM SHIPPING SA DE CV, toda vez que existe un vínculo comercial dirigido directamente en la embarcación Caballo Maya, con lo cual se puede apreciar que la empresa GGM SHIPPING SA DE CV, se sustenta

**PGR**



como dueña de dicha embarcación, asimismo en el cuerpo de la misma se pueden apreciar el logotipo de las dos personas morales Ante lo cual dichos indicios deben de ser valorados tomando en consideración los numerales 206, 280, 285, en relación con el artículo 286, todos del Código Federal de Procedimientos Penales

Por lo anterior mente expuesto es necesario señalar que la relación comercial que existe entre la persona moral CABALLO MAYA S.A de C V de OCEANOGRAFIA S.A de C.V.) y la persona moral SHIPPING GROUP MÉXICO SGM SAPI, DE C.V., toda vez que esta empresa perteneciente al consorcio de empresas dirigidas por el señor FRANCISCO JAVIER RODRIGUEZ BORGIO, nace como proyecto para la adquisición de embarcaciones que provean a PETRÓLEOS MEXICANOS de servicios Marítimos en general, es así que dicha empresa en el año dos mil once adquirió un crédito que había sido otorgado a la empresa MARFIELD LTD INC por parte de CATERPILLAR FINANCIAL SERVICES ASIA PTE. LTD. y EKSPORTFINANS ASA, la finalidad fue la construcción de la embarcación denominada "CABALLO MAYA". Es así que la adquisición de dicho crédito fue en un primer momento por parte de SHIPPING GROUP MÉXICO SGM SAPI, DE C.V. y posteriormente se unió CABALLO MAYA, S.A. DE C.V. (empresa filial de Oceanografia, S.A. de C.V.) siendo copropietarios al 50% sobre los derechos de la embarcación señalada, y en el mismo porcentaje obligados del crédito contraído.

Es así que dicha embarcación es puesta a laborar bajo los servicios de OCEANOGRAFIA, para desarrollar los servicios contratados por PEMEX EXPLORACIÓN Y PRODUCCIÓN, dentro del contrato PEP número 428237849, el cual fue destinado para el Montaje de equipos y estructuras diversas, adecuaciones estructurales y servicios de apoyo a la operación en las instalaciones P.E.P. en la zona exclusiva de los Estados Unidos Mexicanos en el Golfo de México; es así que esta actividad contractual es generadora de recursos lícitos que fueron puestos a disposición de OCEANOGRAFIA S.A. de C.V.; por parte de PEMEX EXPLORACIÓN Y PRODUCCIÓN en sus diversas

Caballo Maya 000067



**PGR**

PROCURADURÍA GENERAL
DE LA REPÚBLICA



cuentas bancarias. Ahora bien derivado de la copropiedad entre Oceanografía, S. A. de C V y Shipping Group México SGM SAPI de C.V , antes GGM Shipping, S.A. de C.V ), realizó diversas transferencia para realizar el pago de la amortización del crédito por la adquisición del barco "Caballo Maya", es así que en fecha treinta y no de enero de dos mil catorce se realizó una transferencia a la cuenta número 5053173, que en citibank New York, Oceanografía, S.A de C.V. fueron transferidos los recursos a la cuenta en Banco Mercantil de Norte, S A. numero 0602787174 perteneciente a Shipping Group México SGM SAPI de C V. la cantidad de Usd $ 547,844.00 (QUINIENTOS CUARENTA Y SIETE MIL OCHOCIENTOS CUARENTA Y CUATRO DÓLARES 00/100 USD) por concepto del uso y aprovechamiento que se realizaba del barco 'Caballo Maya" con motivo de servicios prestados a la empresa Petróleos Mexicanos por parte de Oceanografía, S.A. de C.V. quien era la titular del contrato celebrado con la paraestatal. En esa misma fecha, de la cuenta en Banco Mercantil de Norte, S.A. numero 0602787174, perteneciente a Shipping Group México SGM, SAPI de C.V. se realizó la transferencia que tuvo como destino la cuenta de 0567624752 perteneciente a Actínver Casa de Bolsa, S.A. de C.V. por la cantidad de USD $ 547,843.99 QUINIENTOS CUARENTA Y STETE MIL OCHOCIENTOS CUARENTA Y TRES DÓLARES 99/100 USD) para el efecto de realizar el pago del 50% de la amortización del crédito contraído con Caterpillar Financial Service Asia, Pte. Ltd. Por último, de acuerdo con la factura numero E 53151 de fecha 31 de enero del 2014 emitida por Actínver Casa de Bolsa, S.A. de C.V. relacionada con el movimiento antes detallado, el monto que Shipping Group México SGM SAPI de C.V. depositó en su cuenta bancaria, fue a su vez íntegramente transferido a Caterpillar Financial Services por un monto de Usd $ 547,843.99 QUINIENTOS CUARENTA Y SIETE MIL OCHOCIENTOS CUARENTA Y TRES DÓLARES 99/100 USD).

**SEXTO.-** Por lo anteriormente expuesto y tomando en consideración lo establecido en los artículos 20, 21, 40 y 111 de la Ley de Navegación y Comercio Marítimos, el cual en lo conducente establece:

Caballo Maya 000068

**PGR**
PROCURADURÍA GENERAL
DE LA REPÚBLICA

**Artículo 20.-** Para actuar como naviero mexicano se requiere
(...)

IV. Ser propietario o poseedor de una o varias embarcaciones cuyo
tonelaje total sea de un mínimo de 500 toneladas de registro bruto.
...

**Artículo 21.-** Se presume que el propietario o los copropietarios
de la embarcación son sus armadores o navieros, salvo prueba en
contrario

El naviero que asuma la operación o explotación de una embarcación
que no sea de su propiedad, deberá hacer declaración de armador
ante la autoridad marítima del puerto de su matrícula, de conformidad
con las disposiciones reglamentarias al respecto.

Dicha declaración se anotará al margen de su inscripción en el
Registro Público Marítimo Nacional y cuando cese esa calidad,
deberá solicitarse la cancelación de la anotación. Esta declaración la
podrá hacer también el propietario de la embarcación.

Si no se hiciere esa declaración, el propietario y el naviero
responderán solidariamente de las obligaciones derivadas de la
explotación de la embarcación.

**Artículo 40.-** Sin perjuicio de lo previsto en los Tratados
Internacionales, la operación y explotación de embarcaciones en
navegación interior y de cabotaje estará reservada a navieros
mexicanos con embarcaciones mexicanas. (...)

En caso de no existir embarcaciones mexicanas disponibles en
igualdad de condiciones técnicas o bien cuando impere una causa de
interés público, la Secretaría estará facultada para otorgar permisos
temporales para navegación de cabotaje, de acuerdo con la siguiente
prelación:

I. Naviero mexicano con embarcación extranjera, bajo contrato de
**arrendamiento o fletamento a casco desnudo; y**

II. Naviero mexicano con embarcación extranjera, bajo cualquier
contrato de fletamento.

Cada permiso temporal de navegación de cabotaje tendrá una
duración de tres meses y ningún permiso para una misma
embarcación podrá ser renovado en más de siete ocasiones.

**...Artículo 111.-** Se consideran contratos de utilización de
embarcaciones:

I. De arrendamiento a casco desnudo;

Caballo Maya 000069



**PGR**
PROCURADURÍA GENERAL
DE LA REPÚBLICA



II. De fletamento por tiempo;

III. De fletamento por viaje;

IV. De transporte marítimo de mercancías;

V. De transporte marítimo de pasajeros;

VI. De remolque transporte, y

VII. Cualquier otro contrato de naturaleza marítima en virtud del cual se utilice una embarcación o un determinado espacio de ésta.

- - - Es así que es necesario tomar en consideración que el **fletamento a casco desnudo** es un tipo de contrato del transporte marítimo, el cual se encuentra previsto en el Decreto de promulgación del convenio de las Naciones Unidas sobre las Condiciones de Inscripción de los Buques, adoptado en la ciudad de Ginebra, Suiza, el 7 de febrero de 1986, el cual en lo principal en sus artículos 2 y 12 establecen - - - - - - - - - - - - - - - - - - - - - - - - - - -

ARTICULO 2...

Se entiende por "buque" cualquier embarcación con medios de propulsión propios destinada a la navegación marítima que se utiliza en el comercio marítimo internacional para el transporte de carga o pasajeros, o de ambos, con excepción de las embarcaciones de menos de 500 toneladas de registro bruto;

Se entiende por "Estado del pabellón" el Estado cuya bandera enarbola y está autorizado a enarbolar un buque; (...)

Se entiende por "naviero" el propietario o el arrendatario a casco desnudo, o cualquier otra persona natural o jurídica a la que se hayan asignado formalmente las obligaciones del propietario o del arrendatario a casco desnudo;

Se entiende por "arrendamiento a casco desnudo" un contrato de arrendamiento de un buque por un tiempo determinado, en virtud del cual el arrendatario tiene la posesión y el control plenos del buque, incluido el derecho a designar el capitán y la tripulación por el periodo de arrendamiento;

Artículo 12 Arrendamiento a casco desnudo

1. Sin perjuicio de lo dispuesto en el artículo 11 y de conformidad con sus leyes reglamentos, un Estado podrá conceder la inscripción y el derecho de enarbolar su pabellón, a un buque tomado en arrendamiento a casco desnudo por un arrendatario en ese Estado, durante el periodo del arrendamiento.

2. Cuando propietarios o arrendatarios en Estados Partes en el presente Convenio realicen tales actividades de arrendamiento a casco desnudo, se deberán cumplir plenamente las condiciones de inscripción contenidas en el presente Convenio.

afectar el orden público, ni el interés social, es por ello que resulta pertinente acordar a favor a la solicitud realizada por tal persona, ya que en el caso que esta Representación social de la federación fuera omiso al acordar a tal solicitud, se pone en riesgo de causar un perjuicio patrimonial a la persona moral Shipping Group México Sgm S.A de C.V.", y demás grupo de empresas que dependen de la embarcación CABALLO MAYA y la empresa propietaria de la misma, se encuentran en un riesgo latente que los mismos puedan caer en incumplimiento de sus pagos y contratos pactados con anterioridad a la medida de aseguramiento ministerial de esta embarcación; ante lo cual con la finalidad de evitar un daño patrimonial y toda vez que esta embarcación se encuentra desarrollando actividades licitas que no afectan al orden público e interés social resulta pertinente conceder la depositaria a favor del Oscar Israel Garcia Cordova, Apoderado Legal de "Shipping Group México Sgm S.A de C.V.", con la finalidad de que la embarcación CABALLO MAYA, quede bajo su posesión para que en primer lugar tenga el mantenimiento y los cuidados adecuados y puedan seguir desarrollando sus



**PGR**

actividades laborales y reinvindicaciones de manera formal, con la finalidad de no afectar la negociación que desarrolla la cual tiene un fin licito y que está a indirecta. Habiendo de apoyo, la tesis aislada correspondiente a la Novena Semanario Judicial de la Federación y su Gaceta XXII, Agosto de 2005,

Materia(s) Laboral, tesis I 4o A 63 K, Página 1986, la cual a la letra señala

"...**ORDEN PÚBLICO. ES UN CONCEPTO JURÍDICO INDETERMINADO QUE SE ACTUALIZA EN CADA CASO CONCRETO, ATENDIENDO A LAS REGLAS MÍNIMAS DE CONVIVENCIA SOCIAL** [el orden público no constituye una noción que pueda configurarse a partir de la declaración formal contenida en una ley ... de cultura, ni es criterio constante de la ... de la justicia de la Nación que corresponde al ... presente en cada caso concreto, de tal ... como un concepto jurídico indeterminado de tal ... cuyo contenido sólo puede ser delimitado por ... de modo, tiempo y lugar que prevalezcan en el ... realice la valoración La todo caso, para darle ... desarrollo armónico de la comunidad, es decir, ... convivencia social, en la inteligencia de que ... subjetivos, sino en elementos objetivos que ... no obstaculizar la eficacia de los derechos de ... fundamentales de la sociedad,

tercero CUARTO TRIBUNAL COLEGIADO EN MATERIA ADMINISTRATIVA DEL PRIMER CIRCUITO Amparo directo 312/2004 Alberto Salmerón Pineda 12 de enero de 2005. Unanimidad de votos Ponente Jesús Antonio Nazar Sevilla. Secretario Ernesto González González Amparo directo 453/2004. Hospital Ángeles del Pedregal, S.A. de C.V. 23 de febrero de 2005. Unanimidad de votos Ponente Jesús Antonio Nazar Sevilla. Secretaria Indira Martínez Fernández. "

Así mismo tomando en consideración lo solicitado por José Enrique Castillo Carvallo, Depositario Judicial delas embarcaciones Caballo Marango y Caballo Maya, el cual manifestó que en las embarcaciones antes mencionadas hay personal de "Coastline" las cuales no pertenecen a la tripulación y tiene el temor fundado de que dichas personas estén convenciendo al a tripulación para que saquen las embarcaciones fuera de aguas nacionales por lo que solicita se tomen las medidas necesarias para su protección, se considera que se debe de realizar diligencia para la protección de la embarcación en particular "Caballo Maya"



 

**PGR**
PROCURADURÍA GENERAL
DE LA REPÚBLICA

Subprocuraduría Especializada en
Investigación de Delitos contra la Organizada
[...]

**SEPTIMO.-** En ese orden de ideas, tomando en consideración que la empresa "Shipping Group México Sgm S A de C V, de dicada a la adquisición de embarcaciones que provean a PETRÓLEOS MEXICANOS de servicios Marítimos en general, tiene los medios suficientes para el mantenimiento y preservación de la embarcación evitando con ello el deterioro del bien mueble asegurado, por lo que se considera procedente acordar la depositaria solicitada por C. Oscar Israel Garcia Cordova, Apoderado Legal de "Shipping Group México Sgm S A de C V

Dicha Depositaria deberá ser desarrollada tomando en cuenta en todo momento, lo establecido en el Código Federal de Procedimientos Penales en el Articulo 182-L, el cual establece " . . . Los inmuebles que se aseguren podrán quedar en posesión de su propietario, poseedor o de alguno de sus ocupantes, siempre y cuando no se afecte el interés social ni al orden público, o quienes queden en posesión de los inmuebles no podrán enajenar o gravar los inmuebles a su cargo, y en caso de que generen frutos o productos, estarán obligados en los términos de los articulos 12 y 15 de la Ley Federal para la Administración y Enajenación de Bienes del Sector Público..."

Asimismo con la finalidad que el C. Oscar Israel Garcia Cordova, Apoderado Legal de "Shipping Group México Sgm S.A de C.V., pueda desarrollar de manera correcta la depositaria que tiene a su cargo, desde este momento se dejan sin efectos otras depositarias que podrian estar llevándose a cargo sobre la embarcación CABALLO MAYA

Lo anterior, por ser necesario para la debida integración de la presente Averiguación Previa, y con fundamento en los articulos 16, 21 y 102 apartado "A" de la Constitución Politica de los Estados Unidos Mexicanos; 2 fracción II, 181, 182, 182-A, 182-L y 208 del Código Federal de Procedimientos Penales; 40 y 41 del Código Penal Federal; 1 y 31 de la Ley Federal Contra la Delincuencia Organizada; 1 y 4 apartado A) incisos a), b), c), e), h) y ñ), apartado B), inciso b) de la Ley Orgánica de la Procuraduría

Caballo Maya 000073

Párrafo, 6, 7, 8 y 10 de la Ley Federal para la Administración y Enajenación ··· ', fracción I, primero párrafo, 2 fracciones II y VIII, 3, 5 primer ··· inciso A) fracción III F) fracción III y 31 de su de Bienes del Sector Público y Acuerdo A/011/00 emitido por el C. Procurador General de la República es de resolverse y se

## R E S U E L V E

**PRIMERO.** Se designa como depositario de la embarcación CABALLO MAYA con IMO **9453341**, matricula Patente Reglamentaria de Navegación número 000081740, al C. Oscar Israel Garcia Cordova. Apoderado Legal de "Shipping Group México Sgm S.A de C V en términos del artículo 182 L, la cual quedara desde este momento en posesión del mismo, toda vez que no se afecta la orden público al quedar en posesión del mismo, con la condicionante que no podrán enajenar o gravar y deberá mantener en buenas condiciones la embarcación señalada, hasta el momento en que se decrete el destino legal del bien asegurado.

**SEGUNDO.** Notifíquese personalmente el presente acuerdo ministerial al C. Oscar Israel Garcia Cordova. Apoderado Legal de "Shipping Group México Sgm S.A de C.V con los apercibimientos y condiciones establecidas en el artículo 182 L del Código Federal de Procedimientos Penales.

**TERCERO.-** Gírese atento oficio al Director General de Marina Mercante de la Secretaría de Comunicaciones y Transportes, con la finalidad de que se realice las anotaciones conducentes de que designa como depositario de la embarcación CABALLO MAYA con IMO **9453341**, matricula Patente Reglamentaria de Navegación número 000081740, al C. Oscar Israel Garcia Cordova. Apoderado Legal de "Shipping Group México Sgm S.A de C.V en términos del artículo 182 L, la cual quedara desde este momento en posesión del mismo.

la embarcación anteriormente señalada [...] terminada la custodia solicitada sobre

**QUINTO.** Gírese atento oficio al Servicio de Administración y Enajenación de Bienes, con la finalidad de que realice los trámites correspondientes y señale [...] y [...] la entrega en depositaría de la embarcación CABALLO MAYA con IMO 9453341, matrícula Patente Reglamentaria de Navegación número al [...] de [...] Cordova, Apoderado Legal de "Shipping Group México" [...] en términos del artículo 182 L, la cual quedara desde este [...] del mismo con la finalidad de que de por terminada la custodia solicitada sobre la embarcación anteriormente señalada

## CUMPLASE

ASÍ LO ACORDO Y FIRMA EL SUSCRITO LICENCIADO GABRIEL CRUZ CRUZ, AGENTE DEL MINISTERIO PÚBLICO DE LA FEDERACIÓN, ADSCRITO A LA UNIDAD ESPECIALIZADA EN INVESTIGACIÓN DE OPERACIONES CON RECURSOS DE PROCEDENCIA ILÍCITA Y DE FALSIFICACION O ALTERACION DE MONEDA, QUIEN ACTUA LEGALMENTE CON DOS TESTIGOS DE ASISTENCIA QUIENES AL FINAL FIRMAN Y DAN FE.

## DAMOS FE

| TESTIGO DE ASISTENCIA. | TESTIGO DE ASISTENCIA. |
|---|---|
| C. CESAR MEJIA TOME | LIC. LUIS FERNANDO GALINDO VERA |

Caballo Maya 000075



**Sub-office Specialized in the**
**Investigation of Organized Crime**
Unit Specialized in the Investigation of Operations with Illegal
Resources and Currency Alterations or Falsifications

**pA.P UEIORPIFAM/AP/065/2014**

**CERTIFICATE OF DELIVERY AS DEPOSITORY OF THE "CABALLO MAYA" SHIP, PERFORMED BY THE ATTORNEY GENERAL'S OFFICE (PGR) TO SHIPPING GROUP MEXICO, SGM, VARIABLE-CAPITAL PRIVATE EQUITY FIRM.** ----------------------------------------------------------------------------------------------------

In Ciudad del Carmen, state of Campeche, on July twentieth, two thousand and fifteen, meeting in the Sub-Office of the General Attorney's Office, located on Calle 41 B, numero 2, colonia Centro, Ciudad del Carmen, state of Campeche, the **Attorney, Gabriel Cruz Cruz,** in his capacity as Public Ministry Agent assigned to the Unit Specialized in the Investigation of Operations with Illegal Resources and Currency Alterations or Falsifications, in the Sub-Office Specialized in the Investigation of Organized Crime, of the Attorney General's Office, who identifies himself with the institutional ID issued by the Attorney General's Office, number 567428 and the Attorney **OSCAR ISRAEL GARCIA CORDOVA**, legal representative of the company **"SHIPPING GROUP MEXICO, SGM, Variable-Capital Private Equity Firm"**, under the terms of the notarial instrument number 108,946, book 1426, page 099, year 2014, witnessed by the Notary Public number 79 of the State of Mexico, Raul Name Neme, who identifies himself with the voting credential with photograph and elector code GRCROS74081009H900, issued by the Federal Electoral Institute to perform the depository of the ship called **"CABALLO MAYA"**. Also, the attorney Norma Romero Mendoza, Legal Coordination Office of Seized Companies and Commercial Bankruptcy of the Assets Administration and Alienation Service (SAE). ----------------------------------------------------------------------------------------------------

--- The eyewitnesses are, according to what is established on Article 16 of the Federal Criminal Procedures Code, the citizens Jose Alberto Cruz Lemus and Hector Hugo Rios Torres, who identify themselves with the institutional credential number 566395 and 589264, respectively, according to the following: ----------------------------------------------------------------------------------------------------
------------------------------------------------ **RECITALS** ------------------------------------------------

1.  On February 27th, 2014, the Attorney General decreed the seizure, within the prior inquiry UEIORPIFAM/AP/065/2014, of the company called Oceanografia S.A. de C.V., and everything that by fact and by law belongs to it, including the seizure of the ship **"CABALLO MAYA"**, which is the subject of this certificate as depository. -----------------------------------------------------------------

2.  On February 28tth, 2014, the Legal Coordination Office of Seized Companies and Commercial



EXHIBIT 5
LOPEZ
April 9, 2018
Reported by:
D. SANDERS, CSR, RDR, CRR, CCR (LA)

**Caballo Maya 000076**
**(Translated)**

**Sub-office Specialized in the
Investigation of Organized Crime**
Unit Specialized in the Investigation of Operations with Illegal
Resources and Currency Alterations or Falsifications

Bankruptcy of the Assets Administration and Alienation Service (SAE), issued a legal sentence number DCEAF/DEAECM/CJEACM/017/2014 to perform the transfer of the Oceanografia S.A. de C.V. company along with everything that belongs to it by fact and by law.

3. On March 2nd, 2014, through the certificate number A/PGR/ADM/DEAECM/DEAECM/001/14/03, the Assets Administration and Alienation Service (SAE), received from the Sub-office Specialized in the Investigation of Organized Crime (SEIDO), of the Attorney General's Office (PGR), the company Oceanografia S.A. de C.V., along with everything that belongs to it by fact and by law. ----------------------------------

4. Through the notification CGII7F3/0565/2014 (sic) from April 1st, 2014, the Unit Specialized in the Investigation of Operations with Illegal Resources and Currency Alterations or Falsifications (UEIORPIFAM), sent to the Assets Administration and Alienation Service (SAE) the related ministry proceedings, among others, with the ship that is the subject of this certificate. ----------------------------------------------------------------------------------------------------

5. On July 2nd, 2015, a document signed by the citizen Oscar Israel Garcia Cordova, legal representative of "Shipping Group Mexico SGM, Variable-Capital Private Equity Firm" was received. In this document, he requests the delivery in depository of the "CABALLO MAYA" ship, so that he can give it the best maintenance possible and to preserve the seized asset in good conditions, because it is suffering physical deterioration. ----------------------------------

6. On that same date, the citizen Oscar Israel Garcia Cordova, legal representative of "Shipping Group Mexico SGM, Variable-Capital Private Equity Firm" appeared to ratify each and every part of the document dated July 2nd, 2015, which requests the delivery as depository of the **"CABALLO MAYA"** ship. ----------------------------------------------------------------------------

7. On July 3rd, 2015, it was agreed within the prior inquiry A.P. UEIORPIFAM/AP/065/2014, that the depository of the "CABALLO MAYA" ship, with the IMO **9453341,** Ship's Regulatory Patent number 000081740, will be the citizen Oscar Israel Garcia Cordova, legal representative of "Shipping Group Mexico SGM, Variable-Capital Private Equity Firm", under the terms established in Article 182-L of the Federal Criminal Procedures Code. The ship will be in his possession from this moment, provided that the possession doesn't affect the public order or interest, with the condition that he may not alienate or encumber it and must maintain the aforementioned ship in good physical conditions, until the legal destination of the seized asset is decreed. ------------------------------------------------------------------

**Caballo Maya 000077
(Translated)**



**Sub-office Specialized in the
Investigation of Organized Crime**
Unit Specialized in the Investigation of Operations with Illegal
Resources and Currency Alterations or Falsifications

8. Through the appearance on July 7th, 2015, the citizen Oscar Israel Garcia Cordova, legal representative of "Shipping Group Mexico SGM, Variable-Capital Private Equity Firm" stated that he doesn't reserve any legal action against the Attorney General's Office and the Assets Administration and Alienation Service, which belongs to the Ministry of Finances and Public Credit. He also accepts the work load he will receive along with said delivery as depository.-

------------------------------------------------------- **FACTS** -------------------------------------------------------

**FIRST.** Based on Articles 16, 21 and 102, Section "A" of the Political Constitution of the United Mexican States; 2, section II, 181, 182, 182-A, 182-L and 208 of the Federal Criminal Procedures Code, 40 and 41 of the Federal Criminal Code, 1 and 31 of the Federal Law Against Organized Crime; 1 and 4, section A) subsections a), b), c), e), h) and ñ), section B), subsection b) of the Organic Law of the Attorney General's Office; 3, section A), section III F) section III and 31 of its Regulations; 1, section I, first paragraph, 2 sections II and VIII, 3, 5, first paragraph, 6, 7, 8 and 10 of the Federal Law for the Assets Administration and Alienation Service of the Public Sector and Agreement A/011/00 issued by the Attorney General, Gabriel Cruz Cruz, as agent of the Public Ministry, assigned to the Unit Specialized in the Investigation of Operations with Illegal Resources and Currency Alterations or Falsifications, in the Sub-office Specialized in the Investigation of Organized Crime of the Attorney General's Office, delivers as depository to the citizen Oscar Israel Garcia Cordova, legal representative of "Shipping Group Mexico SGM, Variable-Capital Private Equity Firm", the ship called **"CABALLO MAYA"**, so that he may guard it, protect it and keep it in good conditions. He is informed that he may not alienate or encumber the ship, and he must hire the necessary insurance for any incident that may be suffered by the aforementioned ship. He must provide a monthly report of the state of the ship and how it's been used and must make things convenient for the ship called **"CABALLO MAYA"** to be supervised and monitored. Also, he will not turn the Automatic Identification System (AIS) off and must report its geographical location and destination at most every twelve hours to "Maritime Control" of Petroleos Mexicanos; he may continue using the ship as the prior administrator had been doing it, and if said use produces income, he will be bound by the terms established in Articles 12 and 15 of the Federal Law for the Assets Administration and Alienation of the Public Sector and 182-E of the Federal Criminal Procedures Code. In any case, the legitimate rights of third parties over the ship called **"CABALLO MAYA"** will be respected. The ship has the following specifications: ------------------------------------------------------------------------------------------------

**Caballo Maya 000078
(Translated)**



**Sub-office Specialized in the**
**Investigation of Organized Crime**
Unit Specialized in the Investigation of Operations with Illegal
Resources and Currency Alterations or Falsifications

| TYPE OF DELIVERY | IMO | DESCRIPTION | PHYSICAL CONDITION |
|---|---|---|---|
| DEPOSITORY | 9453341 | **SHIP CALLED CABALLO MAYA,** REGISTRATION 4243011 WITH THE FOLLOWING SPECIFICATIONS: LENGTH OVERALL 141.1 M, BEAM 25.0 M, HEIGHT TO MAIN DECK 90 M, OPERATION DRAFT 9.0 M, DEAD WEIGHT 7,920.5 TON, GROSS TONNAGE 12,901, NET TONNAGE 3,670. | REGULAR |

Also, it is informed that the ship called **"CABALLO MAYA"** must remain in National Waters and must be delivered, returned or restituted when this Corporation Representative requests it.------------------

The citizen Oscar Israel Garcia Cordova, legal representative of "Shipping Group Mexico SGM, Variable-Capital Private Equity Firm", receives to his full satisfaction and accepts the depository, and agrees to guard and protect the ship called **"CABALLO MAYA"**, to keep it in National Waters, and to deliver it, return it or restitute it when requested by the Representation; he will be responsible for any expenses produced, and will give it the best maintenance possible, keeping it in good conditions, without requesting any sort of reimbursements for the deposit, he will be responsible for any damage or harm suffered by the seized asset due to his malice or negligence, and is required to provide a monthly report of the state of the ship and how it has been used. And he will do anything necessary for the ship to be supervised and monitored. He also states that he will hire any insurance necessary to protect it against any incident that may be suffered by the ship called **"CABALLO MAYA"**. He also won't turn off the Automatic Identification System (AIS) and will report its geographical location to "Maritime Control" at Petroleos Mexicanos at the most every twelve hours. He also agrees to perform activities according to the legal stipulations, understanding that if this is not fulfilled, the depository will be removed, and he will be required to return the ship called **"CABALLO MAYA"**, within twenty-four hours from the moment in which the corresponding notification is received, regardless of the legal actions that may be updated. ------------------------------

**SECOND.** The attorney, Gabriel Cruz Cruz, agent of the Public Ministry assigned to the Unit Specialized in the Investigation of Operations with Illegal Resources and Currency Alterations or Falsifications, in the Sub-office Specialized in the Investigation of Organized Crimes of the Attorney General's Office, and the citizen Oscar Israel Garcia Cordova, legal representative of "Shipping Group Mexico SGM, Variable-Capital Private Equity Firm", jointly state that, before signing this certificate, the ministry's personnel, with the help of the official experts of the valuation institution, who issued the Valuation Sentence on April first, two thousand and fourteen regarding the ship, performed the validation and verification of the assets on board, and in general, of the **"CABALLO MAYA"** ship, regarding the aforementioned sentence, and the corresponding inventory. No elements were missing and there is nothing to be reported in this certificate. ------------------------------------------

**Caballo Maya 000079**
**(Translated)**



c/12
19

**Sub-office Specialized in the**
**Investigation of Organized Crime**
Unit Specialized in the Investigation of Operations with Illegal
Resources and Currency Alterations or Falsifications

**THIRD.** Also, the citizen Oscar Israel Garcia Cordova, legal representative of "Shipping Group Mexico SGM, Variable-Capital Private Equity Firm", is informed of the legal and operational process regarding the ship. These are described in (ANNEX 1). ----------------------------------------------------------

XXXXX
XXXXX
XXXXX
XXXXX
[Seal]
ATTORNEY GENERAL'S OFFICE
SUB-OFFICE SPECIALIZED IN THE INVESTIGATION OF ORGANIZED CRIME
UNIT SPECIALIZED IN THE INVESTIGATION OF OPERATIONS WITH ILLEGAL RESOURCES AND CURRENCY ALTERATIONS OR FALSIFICATIONS

**FOURTH.** The citizen Oscar Israel Garcia Cordova, legal representative of "Shipping Group Mexico SGM, Variable-Capital Private Equity Firm", receives from the attorney Gabriel Cruz Cruz, in his capacity as agent of the Public Ministry assigned to the Unit Specialized in the Investigation of Operations with Illegal Resources and Currency Alterations or Falsifications, in the Sub-office Specialized in the Investigation of Organized Crime of the Attorney General's Office, the ship called "**CABALLO MAYA**", which is the subject of this certificate, under the physical and legal conditions in which it is found, releasing the Attorney General's Office, the Assets Administration and Alienation Service to Oceanografia S.A. de C.V. to the officers, representatives, assistants and administrators of the, related directly or indirectly to the ship's administration, of any responsibility stemming from said administration, and agrees to hold them harmless of any controversy that may arise. -----------

**FIFTH.** Also, it is established that all the elements necessary to prepare this certificate were provided without any omissions, and no issue or relevant aspects were omitted. -----------------------------------

---------------------------------------- **CERTIFICATE CLOSING** ----------------------------------------------------------

After having read this certificate in depository, and with nothing left to state, the certificate is deemed concluded on the date noted, with all the intervening parties signing all pages on the margin and at the end of this page. ------------------------------------------------------------------------------------------

| DELIVERED | RECEIVED |
|---|---|
| **Public Ministry Agent of the Attorney General's Office** | **Legal Representative of "Shipping Group Mexico Sgm, Variable-Capital Private Equity Firm"** |
| XXXXXXXXXXXXXXX | XXXXXXXXXXXXXXX |
| XXXXXXXXXXXXXXX | XXXXXXXXXXXXXXX |
| [Signature] | [Signature] |
| **GABRIEL CRUZ CRUZ ESQ.** | **C. OSCAR ISRAEL GARCIA CORDOVA** |

**Sub-office Specialized in the**
**Investigation of Organized Crime**
Unit Specialized in the Investigation of Operations with Illegal
Resources and Currency Alterations or Falsifications

### PARTICIPATES

Legal Coordination Office of Seized Companies and Commercial Bankruptcy of the SAE.

XXXXXXXXXXXXXXX
XXXXXXXXXXXXXXX
[Signature]

**NORMA ROMERO MENDOZA ESQ.**

### EYEWITNESSES

| **EYEWITNESS** | XXXXX | **EYEWITNESS** |
|---|---|---|
| | XXXXX | |
| XXXXXXXXXXXXXXX | XXXXX | XXXXXXXXXXXXXXX |
| XXXXXXXXXXXXXXX | XXXXX | XXXXXXXXXXXXXXX |
| [Signature] | [Seal] | [Signature] |
| | ATTORNEY GENERAL'S | |
| | OFFICE | |
| **HECTOR HUGO RIOS TORRES ESQ.** | SUB-OFFICE SPECIALIZED IN | **JOSE ALBERTO CRUZ LEMUS ESQ.** |
| | THE INVESTIGATION OF | |
| | ORGANIZED CRIME | |
| | UNIT SPECIALIZED IN THE | |
| | INVESTIGATION OF | |
| | OPERATIONS WITH ILLEGAL | |
| | RESOURCES AND | |
| | CURRENCY ALTERATIONS | |
| | OR FALSIFICATIONS | |

Last page of the certificate of delivery as depository of the "Caballo Maya" ship, signed on July
twentieth, 2015. ----------------------------------------------------------------------------------------------------

**Caballo Maya 000081**
**(Translated)**

IN MEXICO CITY,   ELEVEN   - ON   MAY 11ᵀᴴ, 2016                                                    ,
THE UNDERSIGNED ATTORNEY          Gabriel Cruz Cruz                                                 ,
PUBLIC MINISTRY AGENT ASSIGNED TO THE UNIT SPECIALIZED IN THE INVESTIGATION OF
OPERATIONS WITH ILLEGAL RESOURCES AND CURRENCY ALTERATIONS OR FALSIFICATIONS, WHO
ACTS LEGALLY BEFORE THE EYEWITNESSES WHO SIGN AT THE BOTTOM AND ATTEST.
-------------------------------------------------- C E R T I F I E S --------------------------------------------------------
THAT THIS COPY CONSISTS OF   20   USED PAGES AND IT IS A FAITHFUL AND EXACT COPY OF THE
ORIGINAL, WHICH WAS AVAILABLE AND IS FOUND AT THE   A.P. UEIORPIFAM/AP/065/2014      ,
WHICH IS ATTESTED UNDER THE TERMS OF ARTICLE 208 OF THE FEDERAL CRIMINAL PROCEDURES
CODES. ------------------------------------------------------------------------------------------------------------------------
-------------------------------------------------- WE ATTEST ----------------------------------------------------------------
THE PUBLIC MINISTRY AGENT

EYEWITNESS --------------------------------------------------------------------------------------------------- EYEWITNESS

|  | XXXXXXXXXXXXXX | |
|---|---|---|
| XXXXXXXXXXXXXX | XXXXXXXXXXXXXX | XXXXXXXXXXXXXX |
| XXXXXXXXXXXXXX | [Signature] | XXXXXXXXXXXXXX |
| [Signature] | | [Signature] |

**LEONARDO DANIEL ARAUJO SANCHEZ ESQ.**

XXXXX
XXXXX
XXXXX
XXXXX
[Seal]

**TANIA MAGALY AGUILERA**

ATTORNEY GENERAL'S OFFICE
SUB-OFFICE SPECIALIZED IN THE
INVESTIGATION OF ORGANIZED
CRIME
UNIT SPECIALIZED IN THE
INVESTIGATION OF OPERATIONS
WITH ILLEGAL RESOURCES AND
CURRENCY ALTERATIONS OR
FALSIFICATIONS

Caballo Maya 000082
(Translated)

*Subprocuraduría Especializada en
Investigación de Delincuencia Organizada
Unidad Especializada en Investigación de Operaciones con
Recursos de Procedencia Ilícita y de Falsificación o Alteración de
Moneda.*

**ACTA DE ENTREGA EN DEPOSITARÍA DE LA EMBARCACIÓN DENOMINADA "CABALLO MAYA", QUE REALIZA LA PROCURADURÍA GENERAL DE LA REPUBLICA (PGR), A LA EMPRESA SHIPPING GROUP MÉXICO, SGM, SOCIEDAD ANÓNIMA PROMOTORA DE INVERSIÓN DE CAPITAL VARIABLE.** - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**PA.P. UEIORPIFAM/AP/065/2014**

En Ciudad del Carmen, Estado de Campeche, en el día veinte de julio del año dos mil quince, reunidos en la Subsede de la de la Procuraduría General de la República, sito en Calle 41 B, número 2, colonia Centro, Ciudad del Carmen, Estado de Campeche, el **Licenciado Gabriel Cruz Cruz**, con el carácter de agente del Ministerio Público de la Federación adscrito a la Unidad Especializada en Investigación de Operaciones con Recursos de Procedencia Ilícita y de Falsificación o Alteración de Moneda, en la Subprocuraduría Especializada en Investigación de Delincuencia Organizada, de la Procuraduría General de la República, quien se identifica con credencial institucional expedida por la Procuraduría General de la República número 567428 y el Licenciado **OSCAR ISRAEL GARCIA CORDOVA**, apoderado legal de la empresa **"SHIPPING GROUP MÉXICO, SGM, Sociedad Anónima Promotora de Inversión de Capital Variable"**, en términos del instrumento notarial número 108,946 libro 1,426 folio 099, año 2014, pasada ante la fe pública del Titular de la Notaría número 9 del Estado de México, Licenciado Raúl Name Neme, quien en este acto se identifica con credencial para votar con fotografía con clave de elector GRGRQS74081009H900, expedida por el Instituto Federal Electoral, con el objeto de llevar a cabo la depositaria de la embarcación denominada **"CABALLO MAYA"**. Participa también la Licenciada Norma Romero Mendoza, Coordinadora Jurídica de Empresas Aseguradas y Concursos Mercantiles del Servicio de Administración y Enajenación de Bienes (SAE).- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

- - - - Intervienen como testigos de asistencia de conformidad con lo dispuesto en el artículo 16 del Código Federal de Procedimientos Penales, los CC. José Alberto Cruz Lemus y Hector Hugo Ríos Torres, quienes se identifican con credencial institucional número 566395 y 589264, respectivamente, al tenor de los siguientes:- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

- - - - - - - - - - - - - - - - - - - - **ANTECEDENTES** - - - - - - - - - - - - - - - - -

1.- El 27 de febrero de 2014, la Procuraduría General de la República decretó el aseguramiento, dentro de la averiguación previa UEIORPIFAM/AP/065/2014, de la empresa denominada Oceanografía, S.A. de C.V., con todo lo que de hecho y por derecho le corresponde, incluyendo el aseguramiento de la embarcación **"CABALLO MAYA"**, que es objeto de la presente acta en depositaria.- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

2.- El 28 de febrero de 2014, la Coordinación Jurídica de Empresas Aseguradas y Concursos Mercantiles del Servicio de Administración y

Caballo Maya 000076



Enajenación de Bienes (SAE), emitió dictamen jurídico de procedencia número DCEAF/DEAECM/CJEACM/017/2014, para la transferencia de la empresa Oceanografía, S A de C.V., con todo lo que de hecho y por derecho le corresponde. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

3.- El 2 de marzo de 2014, mediante acta número A/PGR/ADM/DEAECM/DEAECM/001/14/03, el Servicio de Administración y Enajenación de Bienes (SAE), recibió de la Subprocuraduría Especializada en Investigación de Delincuencia Organizada (SEIDO) de la Procuraduría General de la República (PGR), la empresa Oceanografía S A de C V, con todo lo que de hecho y por derecho le corresponde. - - - - - - - - - - - - - - - - - - - - - - - -

4.- Mediante oficio CGII7F3/0565/2014 (sic) del 01 de abril de 2014, la Unidad Especializada en Investigación de Operaciones con Recursos de Procedencia Ilícita y de Falsificación o Alteración de Moneda (UEIORPIFAM), envió al Servicio de Administración y Enajenación de Bienes (SAE) las diligencias ministeriales relacionadas, entre otros, con la embarcación que es objeto de la presente acta. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

5.- El 02 de julio del año 2015, se recibió escrito signado por el C. Oscar Israel García Córdova, apoderado legal de "Shipping Group México SGM Sociedad Anónima Promotora de Inversión de Capital Variable, por medio del cual solicita la entrega en depósito de la embarcación "CABALLO MAYA", para estar en posibilidad de darle un mejor mantenimiento posible y preservar en buenas condiciones al bien mueble asegurado, ya que el mismo se está deteriorando físicamente. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

6.- Con esa misma fecha compareció el C. Oscar Israel García Córdova, apoderado legal y en representación de la empresa "Shipping Group México SGM Sociedad Anónima Promotora de Inversión de Capital Variable, a efecto de ratificar en todas y cada una de sus partes el escrito de 02 de julio de 2015, por medio del cual solicita la entrega en depositaria de la embarcación "CABALLO MAYA". - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

7.- El 03 de julio del año 2015, se acordó dentro de la averiguación previa A.P. UEIORPIFAM/AP/065/2014, designar como depositario de la embarcación "CABALLO MAYA" con IMO 9453341, matrícula Patente Reglamentaria de Navegación número 000081740, al C. Oscar Israel García Córdova, apoderado legal, en representación de "Shipping Group México SGM Sociedad Anónima Promotora de Inversión de Capital Variable, en términos del artículo 182-L del Código Federal de Procedimientos Penales, la cual quedará desde este momento en posesión del mismo, toda vez que no se afecta el orden o interés público al quedar en posesión del mismo, con la obligación de que no podrán enajenar o gravar, y deberá mantener en buenas condiciones físicas la embarcación señalada, hasta el momento en que se decrete el destino legal del bien asegurado. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -



Subprocuraduría Especializada en
Investigación de Delincuencia Organizada.
Unidad Especializada en Investigación de Operaciones con
Recursos de Procedencia Ilícita y de Falsificación o Alteración de
Moneda.

8.- Mediante comparecencia de 07 de julio del 2015, C. Oscar Israel García Córdova, apoderado legal y en representación de "Shipping Group México SGM Sociedad Anónima Promotora de Inversión de Capital Variable, manifestó que no se reserva cualquier acción legal en contra de la Procuraduría General de la Republica y del Servicio de Administración y Enajenación de Bienes perteneciente a la Secretaria de Hacienda y Crédito Público, así mismo acepta la carga laboral que se suscite con dicha entrega en depositaría - - - - - - - - - -

- - - - - - - - - - - - - - - - - - - - - - -H E C H O S- - - - - - - - - - - - - - - - - - - - - -

**PRIMERO.-** Con fundamento en los artículos 16, 21 y 102 apartado "A" de la Constitución Política de los Estados Unidos Mexicanos; 2 fracción II, 181, 182, 182-A, 182-L y 208 del Código Federal de Procedimientos Penales, 40 y 41 del Código Penal Federal, 1 y 31 de la Ley Federal Contra la Delincuencia Organizada; 1 y 4 apartado A) incisos a), b), c), e), h) y ñ), apartado B), inciso b) de la Ley Orgánica de la Procuraduría General de la República; 3 inciso A) fracción III F) fracción III y 31 de su Reglamento; 1, fracción I, primero párrafo, 2 fracciones II y VIII, 3, 5 primer párrafo, 6, 7, 8 y 10 de la Ley Federal para la Administración y Enajenación de Bienes del Sector Público y Acuerdo A/011/00 emitido por el C. Procurador General de la República, el Licenciado Gabriel Cruz Cruz, como agente del Ministerio Publico de la Federación, adscrito a la Unidad Especializada en Investigación de Operaciones con Recursos de Procedencia Ilícita y de Falsificación o Alteración de Moneda, en la Subprocuraduría Especializada en Investigación de Delincuencia Organizada de la Procuraduría General de la República, entrega en depositaria al C. Oscar Israel García Córdova, apoderado legal y en representación de "Shipping Group México SGM Sociedad Anónima Promotora de Inversión de Capital Variable, la embarcación denominada **"CABALLO MAYA"**; con el propósito de que la custodie, resguarde, preserve en buenas condiciones, haciéndole del conocimiento que no podrán enajenar o gravar la embarcación a su cargo, además que deberá contratar los seguros necesarios para cualquier siniestro que pudiera sufrir la embarcación de referencia, deberá rendir un informe mensual sobre el estado que guarde la embarcación y sobre la utilización de la misma, y dar todas las facilidades para su supervisión y vigilancia del barco de nombre "CABALLO MAYA"; de la misma forma no apagar el Sistema de Identificación Automática (AIS) y reportar su ubicación geográfica y destino máximo cada doce horas a "Control Marítimo de Petróleos Mexicanos"; y podrá realizar su explotación como lo venía haciendo su anterior administrador; y en caso de que con motivo de dicha explotación se generen frutos o productos, estará obligado en los términos de los artículos 12 y 15 de la Ley Federal para la Administración y Enajenación de Bienes del Sector Público y 182- E del Codigo Federal de Procedimientos Penales. En todo caso, se respetarán los derechos legítimos de terceros de la embarcación denominada **"CABALLO MAYA"**, que tiene las siguientes especificaciones:- - - - - - - - - - - - - - - - - - -

Subprocuraduría Especializada en
Investigación de Delincuencia Organizada
Unidad Especializada en Investigación de Operaciones con
Recursos de Procedencia Ilícita y de Falsificación e Alteración de
Moneda

| TIPO DE ENTREGA | IMO | DESCRIPCIÓN | ESTADO FÍSICO |
|---|---|---|---|
| | | BUQUE DENOMINADO CABALLO MAYA MATRICULA 424831 11 CON LAS SIGUIENTES ESPECIFICACIONES ESLORA 141.1 M MANGA 28.0 M PUNTAL A CUBIERTA PRINCIPAL 9.0 M CALADO DE OPERACIÓN 9.0 M PESO MUERTO PANS 8 TON ARQUEO BRUTO 12,001 ARQUEO NETO TO 3,670 | REGULAR |
| DEPOSITARIA | 9453341 | | |

Así mismo se le hace del conocimiento que la embarcación denominada
"CABALLO MAYA", deberá permanecer en Aguas Nacionales y entregarla,
devolverla o restituirla cuando así se lo solicitare esta Representación Social de
la Federación - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

El C. Oscar Israel García Córdova, apoderado legal. en representación de
"Shipping Group México SGM Sociedad Anónima Promotora de Inversión de
Capital Variable, recibe a su entera satisfacción y acepta la depositaria
encomendada y se obliga a custodiar, resguardar la embarcación denominada
"CABALLO MAYA" tenerlo o permanecer en Aguas Nacionales y entregarla,
devolverla o restituirla cuando se lo solicite la Representación de la Federación,
haciéndose cargo de los gastos que genere, darle el mejor mantenimiento
posible y preservar en buenas condiciones la embarcación sin solicitar
reembolso alguno por el depósito, responder del menoscabo, daño y perjuicio
que el bien depositado sufriere por su malicia o negligencia, así mismo se
obliga a rendir un informe mensual sobre el estado que guarde la embarcación
y sobre la utilización de la misma, y dar todas las facilidades para su
supervisión y vigilancia, igualmente manifiesta que contratara los seguros que
sean necesarios para cualquier siniestro que pudiera sufrir la embarcación
denominada "CABALLO MAYA", de la misma forma no apagar el Sistema de
Identificación Automática (AIS) y reportar su ubicación geográfica máximo cada
doce horas a "Control Marino de Petróleos Mexicanos", igualmente se
compromete a realizar actividades de acuerdo a las disposiciones legales;
entendiendo que en caso contrario, se revocará la depositaria y deberá
entregar la embarcación denominada "CABALLO MAYA". en un término de
veinticuatro horas, contados a partir de que reciba la notificación
correspondiente, independientemente de las acciones legales que pudieran
actualizarse en su momento. - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SEGUNDO.- El Licenciado Gabriel Cruz Cruz, como agente del Ministerio
Publico de la Federación adscrito a la Unidad Especializada en Investigación
de Operaciones con Recursos de Procedencia Ilícita y de Falsificación o
Alteración de Moneda, en la Subprocuraduría Especializada en Investigación
de Delincuencia Organizada de la Procuraduría General de la República, y el
C. Oscar Israel García Córdova, apoderado legal y en representación de
"Shipping Group México SGM Sociedad Anónima Promotora de Inversión de
Capital Variable, manifiestan conjuntamente que previo a la firma de la
presente acta, el personal ministerial auxiliado por peritos oficiales de la
institución en materia de Valuación, quienes emitieron el dictamen de Valuación
del día uno de abril del dos mil catorce, respecto de la embarcación que nos
ocupa; realizaron la validación y verificación de los bienes que se encuentran a

*Subprocuraduría Especializada en
Investigación de Delincuencia Organizada
Unidad Especializada en Investigación de Operaciones con
Recursos de Procedencia Ilícita y de Falsificación o Alteración de
Moneda.*

bordo y en general de la embarcación "CABALLO MAYA respecto del citado dictamen, así como del inventario respectivo, no habiendo ningún faltante o hecho que señalar en la presente acta.- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**TERCERO.** Así mismo se le informa al C. Oscar Israel García Córdova, apoderado legal y en representación de "Shipping Group México Sgm Sociedad Anónima Promotora de Inversión de Capital Variable, los procesos jurídicos y operativos relacionados la embarcación; mismos que se describen en el (ANEXO 1).- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**CUARTO.** El C. Oscar Israel García Córdova, apoderado legal y en representación de "Shipping Group México SGM Sociedad Anónima Promotora de Inversión de Capital Variable, recibe del Licenciado Gabriel Cruz Cruz, con carácter de agente del Ministerio Publico de la Federación adscrito a la Unidad Especializada en Investigación de Operaciones con Recursos de Procedencia Ilícita y de Falsificación o Alteración de Moneda, en la Subprocuraduría Especializada en Investigación de Delincuencia Organizada de la Procuraduría General de la República, la embarcación de nombre "CABALLO MAYA", materia de la presente acta, en las condiciones físicas y jurídicas en que se encuentra, liberando al Procuraduría General de la República, al Servicio de Administración y Enajenación de Bienes, a Oceanografía, S.A de C.V., a los funcionarios, representantes, asesores y administradores de uno y otro, relacionados directa o indirectamente con la administración de la embarcación, de cualquier responsabilidad derivada de dicha administración y se compromete a sacarlos en paz y a salvo de cualquier controversia que pudiere suscitarse.- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**QUINTO.-** Así mismo se establece haberse proporcionado sin omisión alguna, todos los elementos necesarios para la elaboración de la presente acta y que no fue omitido ningún asunto o aspecto relevante.- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - **CIERRE DEL ACTA** - - - - - - - - - - - - - - - - - -

Previa lectura de la presente acta en depositaria y no habiendo más que hacer constar, se da por concluida, el día de su fecha, firmando para constancia en todas sus fojas al margen y al calce los que en ella intervinieron- - - - - - - - - - -

**ENTREGA**
agente del Ministerio Público de la Federación de la PGR

**LIC. GABRIEL CRUZ CRUZ**

**RECIBE**
Apoderado Legal de "Shipping Group México Sgm Sociedad Anónima Promotora de Inversión de Capital Variable

**C. OSCAR ISRAEL GARCIA CORDOVA**

Subprocuraduría de Especialización en
Investigación de Delincuencia en
Unidad Especializada en Investigación de Operaciones con
Recursos de Procedencia Ilícita y de Falsificación o Alteración de
Moneda

Coordinadora Jurídica de Empresas Aseguradas y Concursos Mercantiles del SAE

**PARTICIPA**

**LIC. NORMA ROMERO MENDOZA**

**TESTIGOS DE ASISTENCIA**

**TESTIGO**

**LIC. HECTOR HUGO RIOS TORRES**

**TESTIGO**

**LIC. JOSE ALBERTO CRUZ LEMUS**

Última hoja del acta de entrega en depositaría de la embarcación "Caballo Maya", celebrada el día veinte de julio del año 2015.

EN LA CIUDAD DE MEXICO, ONCE - A 11 DE Mayo de 2016
EL SUBCRITO (A) LICENCIADO (A) Gabriel Cruz Cruz
AGENTE DEL MINISTERIO PUBLICO DE LA FEDERACION, ADSCRITO A LA UNIDAD
ESPECIALIZADA EN INVESTIGACION DE OPERACIONES CON RECURSOS DE
PROCEDENCIA ILICITA Y DE FALSIFICACION O ALTERACION DE MONEDA, QUIEN ACTUA
EN FORMA LEGAL ANTE TESTIGOS DE ASISTENCIA QUE AL FINAL FIRMAN Y DAN FE.

C E R T I F I C A

QUE LA PRESENTE COPIA QUE CONSTA DE 20 FOJA (S) UTIL (S) ES FIEL Y EXACTA
REPRODUCCION DE SU ORIGINAL QUE SE TUVO A LA VISTA QUE OBRA EL LA
A.P. UEIORPIFAM/AP/065/2014

DE LA CUAL SE DA FE EN TERMINOS DEL ARTICULO 208 DEL CODIGO FEDERAL DE
PROCEDIMIENTOS PENALES.

D A M O S   F E

EL C. AGENTE DEL MINISTERIO PUBLICO DE LA FEDERACION
TESTIGO DE ASISTENCIA          TESTIGO DE ASISTENCIA

Lic. Leonardo Danil
Araujo
Sanchez

Tania Magali
Aguilar

PROCURADURÍA GENERAL DE LA REPÚBLICA
SUBPROCURADURÍA ESPECIALIZADA EN
INVESTIGACIÓN DE DELINCUENCIA ORGANIZADA
UNIDAD ESPECIALIZADA EN INVESTIGACIÓN DE
OPERACIONES CON RECURSOS
DE PROCEDENCIA ILICITA Y DE FALSIFICACIÓN
O ALTERACIÓN DE MONEDA

Caballo Maya 000082

A.P. UEIORPIFAM/AP/065/2014

INCUMBENT OFFICER AT THE UNIT SPECIALIZED
ON THE INVESTIGATION OF OPERATIONS WITH
ILLEGAL RESOURCES AND FALSIFICATION OR
ALTERATION OF CURRENCY OF THE DEPUTY
ATTORNEY GENERAL SPECIALIZED IN THE
INVESTIGATION OF ORGANIZED CRIME OF THE
ATTORNEY GENERAL OF THE COUNTRY.



**OSCAR ISRAEL GARCIA CORDOVA,** in my capacity as the legal representative of the company
**"SHIPPING GROUP MEXICO SGM S.A. DE C.V.",** previously known as **"GGM SHIPPING S.A. DE C.V.",**
which is credited through the notarial instrument number 108,946, dated May twenty-third two
thousand and fourteen, passed before Raul Name Neme, of the Notary Public number 79 in the
state of Mexico, noting as the address to receive notifications and all kinds of documents the one
located at Avenida de las Palmas No. 425, floor 8, Lomas de Chapultepec, Delegacion Miguel
Hidalgo, Mexico, Distrito Federal, authorizing for these purposes the attorney Raul Rodriguez
Resendiz, respectfully appear to:

### STATE

That, through this petition, based on Articles 40 of the Federal Criminal Code; 182-N,
section I and 182-N of the Federal Criminal Procedures Code, it is requested to **LIFT THE
PRECAUTIONARY SEIZURE** of the vessel called **"CABALLO MAYA", which is Panamanian, and
whose OMI is 9453341**, decreed on March sixth, two thousand and fourteen, by this company, and
**THEREFORE, FOR IT TO BE RETURNED** because, it is the property of a third party who is not related
to the facts being investigated, and is not in any of the ass3eumptions established in Articles 400
and 400 Bis of the Federal Criminal Code.

Said vessel is under the jurisdiction of the **Military Government of Isla del Carmen,
Municipality of Ciudad del Carmen, Campeche**, who will be instructed to restrict the dispatch to
the navigation by virtue of the aforementioned seizure.



1

Lopez_0931
WRIT OF LIFTING OF THE SEIZURE OF A VESSEL

Indeed, under the terms of the aforementioned articles, it is appropriate to lift the precautionary seizure of the vessel, and therefore, the asset subject to the inquiry must be returned because, an interpretation to the contrary by logical inference of Article 40 of the Federal Criminal Code, it is warned that any legal objects, instruments or products may only be seized when they belong to a third party who has obtained them under the assumptions established in Article 400 Bis of the Federal Criminal Code.

In other words, any interpretation to the contrary of the logical inference of said article of the Substantive Code in the Matter, which establishes that the objects, instruments or products of the crime may not be seized when they've been used legally and belong to a third party who didn't obtain them under any of the assumptions of Article 400 Bis of the aforementioned Code.

Therefore, if the precautionary seizure doesn't meet the requirements, it is obvious that the seizure must be lifted and the seized objects must be returned, as per Articles 182-N and 182-Ñ of the Federal Criminal Procedures Code.

These circumstances are shown in this case, by virtue that the vessel called **"CABALLO MAYA"**, Panamanian, is an asset that has been legally used, and belongs to the company **"SHIPPING GROUP MEXICO SGM S.A. DE C.V."**, previously known as **"GGM SHIPPING S.A. DE C.V."**, who acquired the vessel through a purchase contract signed by MARFIELD LTD INC and GGM SHIPPING S.A. DE C.V., through their legal representatives, on October twentieth, two thousand and eleven.

Said vessel was used to provide maritime services to the parastatal company, Petroleos Mexicanos [Mexican Petroleum] (PEMEX), through the company OCEANOGRAFIA S.A. DE C.V., who had signed contracts with the latter. Hence why Oceanografia had the right to use and enjoy the vessel called CABALLO MAYA. However, that doesn't mean that Oceanografia owned the aforementioned seized vessel.



2

Therefore, it is appropriate to lift the seizure of the aforementioned vessel and to return it to my client because it owns the vessel. In order to credit the above, the following proof is provided:

1. Purchase contract dated March 18th, 2011, entered into by the company Marfield Ltd Inc., as the seller, and my client as the buyer, regarding the vessel called "Caballo Maya", and officialized under the category "Agreement Memorandum", under the sale format 1993, adopted by the Baltic and International Maritime Council (BIMCO) in 1956, which can be found in English and translated to Spanish, and which says:

The following is transcribed from the contract's foreword:

*"Marfield Ltd. Inc., hereinafter .........., have today sold, and GGM Shipping S.A. de C.V., hereinafter called the Buyers, have today bought...."*

*".. 1. Purchase Price US$130,000.00 (ONE HUNDRED AND THIRTY MILLION AMERICAN DOLLARS) ..... "*

*".. 2. Deposit*

*As a security for the correct fulfillment of this contract, the Buyers shall pay a deposit of US$5,000,000.00 (ONLY FIVE MILLION AMERICAN DOLLARS) .... any further payments must be made as detailed in clause 21.*

*All payments must be made to:*
*JP Morgan Chase Bank New York*
*For the account kept at the Oversea-Chinese Banking Corporation*
*Account No. 0011746047*
*Swift Code OCBCSGSG*
*Accountholder's name: Coastline Maritime Pte Ltd.*
*Account No. 501-216758-201..."*

*From the former, it is understood that the aforementioned contract, according to its nature, is a sale contract, and, in a supplementary manner, the Articles 1858, 2248 and 2249 of the Federal Civil Code are applied. Said Articles say:*

3

*Article 1858. The contracts that are not specially regulated in this Code will be governed by the general contract rules; by the stipulations established by the parties, and, if omitted, by the stipulations in the contract with which they have more analogy, from those regulated in this ordinance.*

*Article 2248. A sale exists when one of the contracting parties agrees to transfer the ownership of an object or a right, and the other party agrees to pay a monetary price for it.*

*Article 2249. As a rule, the sale is perfect and mandatory for the parties when they have agreed on the object and the price, even if the former has not been delivered yet and the later payment has not been made.*

2.  Proof of Bank Transfers for the payment of the price and/or financing credit of "Caballo Maya", which is mentioned in the Sale Contract described in the previous section, performed through Actinver S.A. to ***Coastline Maritime Pte Ltd, Caterpillar Financial Services and Eksportfinans ASA (the last two according to the documents mentioned in the following number 3).***

3.  Letter dated October 21st, 2011, with the letterhead of MARFIELD LTD INC, directed by Mr. Terry Highlands, in representation of the company Marfield Ltd Inc, to Caterpillar Financial Services Asia Pte Ltd and Eksportfinans ASA, which is in English and translated to Spanish, through which Mr. Terry Highlands, in representation of Marfield Ltd Inc., notifies said financial institutions that, regarding the credit contract between Caterpillar, Eksportfinance and Marfield Ltd Inc., there is a change of ownership for the vessel **"CABALLO MAYA", in favor of GGM SHIPPING S.A. de C.V.,** and therefore, a change in status is requested for the accredited party and the guarantors, to ratify the March 18th, 2011 sale mentioned in the previous section 1 and the credit payments made to the bank institutions mentioned in the previous section 2.

4.  Proof of Panama's Maritime Registration, where it is stated that the contract mentioned in section 1 was filed in the case file kept for the "Caballo Maya" vessel.



4

5. Contract dated March 21st, 2011, entered into by Oceanografia S.A. de C.V., and my client, through which the first receives the use and enjoyment of the vessel to provide services to PEMEX, under the terms established in the second clause of said contract, which says:

> *"... As such, "OSA" will have the right to use and enjoy the Caballo Maya vessel to fulfill its contracts with PEMEX, during the term of this contract..."*

In light of the foregoing, I request you, Mr. Public Ministry Agent, to please:

**First.** Set on record that I appeared, under the terms of this document, with the capacity I possess, and that I agreed to provide the documentation mentioned here when appearing on the day and time assigned to ratify my writing.

**Second.** To rule favorably regarding the **LIFT OF THE PRECAUTIONARY SEIZURE** of the vessel called **"CABALLO MAYA", Panamanian, with the OMI 9453341**, decreed on March sixth, two thousand and fourteen, by this corporate representative.

**Third.** As a **CONSEQUENCE OF THE ABOVE, THE RETURN** of the vessel called **"CABALLO MAYA", with which I request you to issue a notification to the Military Government of Puerto de Isla del Carmen, municipality of Ciudad del Carmen, Campeche**, informing them of this situation and ordering the vessel is only released to the legal representative and/or the staff and/or the crew of SHIPPING GROUP MEXICO SGM S.A. de C.V.

**Fourth.** Inform SAE of the **LIFT OF THE PRECAUTIONARY SEIZURE** of the **"CABALLO MAYA"** vessel.

Respectfully,

Mexico, D.F., May 29th, 2015.

**OSCAR ISRAEL GARCIA CORDOVA**

5

**A.P.** UEIORPIFAM/AP/065/2014.

**C. TITULAR DE LA UNIDAD ESPECIALIZADA EN INVESTIGACIÓN DE OPERACIONES CON RECURSOS DE PROCEDENCIA ILÍCITA Y DE FALSIFICACIÓN O ALTERACIÓN DE MONEDA DE LA SUBPROCURADURÍA ESPECIALIZADA EN INVESTIGACIÓN DE LA DELINCUENCIA ORGANIZADA, DE LA PROCURADURIA GENERAL DE LA REPÚBLICA.**
Presente

**OSCAR ISRAEL GARCIA CORDOVA**, en mi caracter de apoderado legal de la persona juridica **"SHIPPING GROUP MEXICO SGM S.A DE C.V."** antes **"GGM SHIPPING S.A. DE C.V."**, personalidad que se acredita con el instrumento notarial número 108,946, de veintitrés de mayo de dos mil catorce, pasado ante la fe del Licenciado Raúl Name Neme, Titular de la Notaría Pública número 79 en el Estado de México, señalando como domicilio para oír notificaciones y recibir todo tipo de documentos el ubicado en la calle de Avenida de la Palmas No. 425, piso 8, Lomas de Chapultepec, Delegación. Miguel Hidalgo, México Distrito Federal, autorizando para los mismo efectos al Licenciado en Derecho Raúl Rodríguez Reséndiz, respetuosamente comparezco para:

### EXPONER

Por medio del presente ocurso, con fundamento en los artículos 40, del Código Penal Federal; 182-N, fracción I, y 182-Ñ, del Código Federal de Procedimientos Penales, se solicita **EL LEVANTAMIENTO DEL ASEGURAMIENTO PRECAUTORIO,** de la embarcación denominada **"CABALLO MAYA" con nacionalidad de la República de Panamá, con OMI 9453341,** decretado el seis de marzo de dos mil catorce, por esta representación social, y en **CONSECUENCIA SU DEVOLUCIÓN**, ya que, son propiedad de un tercero ajeno a los hechos que se investigan y no se encuentran en ninguno de los supuestos previstos en los artículos 400 y 400 Bis, del Código Penal Federal,

Misma embarcación que se encuentra bajo la jurisdicción de la **Capitanía de Puerto de Isla del Carmen, Municipio de Ciudad del Carmen, Campeche**, a quien se le ordene restringir el despacho a la navegación en virtud de aseguramiento antes citado.

1

En efecto, en términos de los artículos precitados es procedente levantar el aseguramiento precautorio de la embarcación en cita, y en consecuencia devolver el bien mueble afecto a la indagatoria, ya que, de una interpretación a contrario sensu del articulo 40 de la Código Penal Federal, se advierte que solamente se podrán decomisar y en su caso asegurar en la etapa de investigación objetos, instrumentos o productos de uso lícito cuando pertenezcan a un tercero que los haya obtenido bajo algunos de los supuestos previstos en el articulo 400 Bis del Código Penal Federal.

En otras palabras, la interpretación a contrario sensu del articulo en estudio del Código Sustantivo del Materia, consistente que los objetos, instrumentos o productos del delito no se podrán asegurar cuando éstos sean de uso lícitos, y que pertenezcan a un tercero que no los haya obtenido bajo alguno uno de los supuesto del articulo 400 Bis del Código en cita.

Por consiguiente, si la medida cautelar de aseguramiento no reúne los requisitos previstos, es evidente que procedente el levamiento del aseguramiento y consecuentemente la devolución de los objetos asegurados en términos de los artículos 182-N y 182-Ñ del Código Federal de Procedimientos Penales.

Circunstancia que en la especie acontece, en virtud de que la embarcación denominada **"CABALLO MAYA"** de nacionalidad panameña, es un bien de uso licito, el cual pertenece a la persona jurídica **"SHIPPING GROUP MEXICO SGM S.A DE C.V."** antes **"GGM SHIPPING S.A. DE C.V.",** persona que adquirio la embarcación a traves de un contrato de compraventa, el cual se celebró entre MARFIEL LTD INC Y GGM SHIPPING S.A. DE C.V., a través de sus representante legales, el veinte de octubre de dos mil once.

Dicha embarcación, se utlizó para prestar servicios maritimos a la paraestatal Petroleos Mexicanos (PEMEX), a traves de la empresa OCEANOGRAFÍA S.A DE C.V., quien tenia contratos celebrados con ésta última, de ahí, que Oceanografia contaba con el uso y goce de la embarcación CABALLO MAYA. Sin embargo eso no significa que la empresa Oceanografía, fuera la propietaria de la multicitada embargación asegurada.

2

Por lo anterior, resulta procedente el levamiento de aseguramiento de la embarcación en cita, y por consecuencia su devolución a mi representada, por la propietaria de la embaración; A efecto de acreditar lo anterior, se ofrecen las pruebas siguientes:

**1.-** Contrato de Compraventa de fecha 18 de Marzo de 2011, celebrado entre la empresa Marfield Ltd Inc. como vendedor y mi representada como comprador, respecto de la embarcación denominada "Caballo Maya", realizado bajo la denominación de "Memorándum del Acuerdo" bajo el formato de venta 1993 adoptado por el Consejo Báltico Marítimo Internacional ( BIMCO ) en 1956, el cual se tiene en Ingles con su debida traducción al español, del que se desprende lo siguiente:

Del proemio de dicho contrato se transcribe literalmente lo siguiente:

*"Marfield Ltd Inc., en lo sucesivo…….., acordaron a vender, y GGM Shipping S.A de C.V. denominado en lo sucesivo los Compradores, acordaron comprar……."*

*"..1.- Precio de compra us$ 130,000.00 ( CIENTO TREINTA MILLONES DE DOLARES ESTADOUNIDENSES) ……."*

*"..2.- Deposito*
*Como depósito para el cumplimiento correcto de este Acuerdo, los compradores deberán realizar un pago de US 5,000,000.00 ( CINCO MILLONES DE DOLARES ESTADOUNIDENSES UNICAMENTE) …..los pagos posteriores deberán hacerse como se detalla en la clausula 21.*

> *Todos los pagos deberán realizarse a:*
> *JP Morgan Chase Bank New York*
> *Para la cuenta del Oversea-Chinese Banking Corporation*
> *No. De cuenta 0011746047*
> *Codigo Siwft OCBCSGSG*
> *A nombre de Coastline Maritime Pte Ltd.*
> *No. De cuenta 501-216758-201…."*

De lo anterior, se desprende que el contrato citado, conforme a su naturaleza es un contrato mercantil de compraventa, siendo aplicable

3

de manera supletoria, los artículos 1858, 2248 y 2249 del Código Civil Federal, que a la letra dicen:

*Artículo 1858. Los contratos que no estén especialmente reglamentados en este Código, se regirán por las reglas generales de los contratos; por las estipulaciones de las partes, y en lo que fueren omisas, por las disposiciones del contrato con el que tengan más analogía, de los reglamentados en este ordenamiento.*

*Artículo 2248. Habrá compra-venta cuando uno de los contratantes se obliga a transferir la propiedad de una cosa o de un derecho, y el otro a su vez se obliga a pagar por ellos un precio cierto y en dinero.*

*Artículo 2249. Por regla general, la venta es perfecta y obligatoria para las partes cuando se han convenido sobre la cosa y su precio, aunque la primera no haya sido entregada, ni el segundo satisfecho.*

**2.-** Constancias de Transferencias Bancarias del pago del precio yo crédito del financiamiento de "Caballo Maya", a que se refiere el Contrato de Compraventa descrito en el numeral anterior, realizadas mediante Actinver S.A. a *Coastline Maritime Pte Ltd., Caterpillar Financial Services y Eksportfinans ASA. (Estas dos últimas conforme a la documental que se menciona en el numeral 3.- siguiente).*

**3.-** Carta de fecha 21 de Octubre de 2011, con el membrete de MARFIELD LTD INC, dirigida por el Sr. Terry Highlands en representación de la empresa Marfield Ltd Inc a Caterpillar Financial Services Asia Pte Ltd y Eksportfinans ASA, la cual consta en Ingles y su traducción al Español, mediante la cual el señor Terry Highlands en representación de Marfield Ltd Inc., notifica a dichas Instituciones financieras que en relación con el contrato de crédito entre Caterpillar, Eksportfinance y Marfield Ltd Inc., existe un cambio de propietario del barco **"CABALLO MAYA" a favor de GGM SHIPPING S.A de C.V.** por lo que solicita cambiar a el acreditado y los garantes, con lo cual se ratifica la compraventa de fecha 18 de Marzo de 2011 referida en el numeral 1.- anterior y los pagos del crédito a dichas instituciones bancarias referidas en el numeral 2.- anterior.

**4.-** Constancia del Registro Marítimo de Panamá donde se hace constar que el contrato referido en el numeral 1.- fue archivado en el expediente relativo a la nave " Caballo Maya",

4

**5.-** Contrato de fecha 21 de Marzo de 2011, celebrado entre Oceanografía S.A de C.V. y mi representada mediante el cual se transfiere a la primera el uso y goce de la embarcación para la prestación de servicios a PEMEX, en términos de la cláusula segunda del mismo que dice:

*".... En tal virtud "OSA" tendrá el uso y Goce de la embarcación Caballo Maya para el cumplimiento de los contratos con PEMEX, durante el término del presente contrato..."*

En mérito de lo expuesto y fundado, a usted C. Agente del Ministerio Público de la Federación, atentamente solicito se sirva:

**Primero.-** Tenerme por presentado en los términos del presente escrito, con la personalidad que ostento, comprometiéndome a exhibir la documentación referida en el cuerpo de este ocurso al momento de comparecer el día y hora señalados para ratificar mi escrito.

**Segundo.-** Acordar favorablemente mi petición sobre **EL LEVANTAMIENTO DEL ASEGURAMIENTO PRECAUTORIO,** de la embarcación denominada **"CABALLO MAYA" con nacionalidad de la República de Panamá, con OMI 9453341,** decretado el seis de marzo de dos mil catorce, por esta representación social.

**Tercero.-** En **CONSECUENCIA DE LO ANTERIOR LA DEVOLUCIÓN** de la embarcación denominada **"CABALLO MAYA", dentro de lo cual solicito se gire atento oficio a la Capitanía de Puerto de Isla del Carmen,  Municipio de Ciudad del Carmen, Campeche,** informándole dicha situación y ordenándole libere el despacho a la navegación únicamente al representante legal y/o personal y/o tripulación de SHIPPING GROUP MEXICO SGM S.A de C.V.

**Cuarto.-** Comunicar al SAE el **LEVANTAMIENTO DEL ASEGURAMIENTO PRECAUTORIO,** de la embarcación denominada **"CABALLO MAYA"**

Protesto a usted mí respeto.

México. D.F. a 29 de Mayo de 2015.

**OSCAR ISRAEL GARCIA CORDOVA.**

5